**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JOSEPH HAUSER, Derivatively On Behalf Of NEW YORK COMMUNITY BANCORP, INC.,

Plaintiff,

v.

THOMAS R. CANGEMI, JOHN J. PINTO, ALESSANDRO P. DINELLO, JAMES J. CARPENTER, HANIF DAHYA, LESLIE D. DUNN, MARSHALL LUX, LAWRENCE ROSANO, JR., RONALD A. ROSENFELD, LAWRENCE J. SAVARESE, PETER SCHOELS, DAVID L. TREADWELL, ROBERT WANN and JENNIFER R. WHIP,

Defendants,

and,

NEW YORK COMMUNITY BANCORP, INC.,

Nominal Defendant.

Case No: 1:24-cv-01207-NRM-JRC

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Joe Hauser ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of New York Community Bancorp, Inc. ("NYCB" or the "Company"), submits this Amended Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein

after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from March 1, 2023 through January 31, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

2. Through the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, particularly with respect to the Purchase and Assumption Agreement to acquire certain assets and assume certain liabilities of Signature Bridge Bank, N.A. ("Signature") that the Company entered into on March 20, 2023.

3. Specifically, the Individual Defendants failed to disclose to investors: (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4. On January 30, 2024, the truth emerged when NYCB announced its fiscal fourth quarter 2023 financial results. The Company reported a fourth quarter net loss of $252 million due to "a $552 million provision for loan losses," which was "primarily attributable to higher net

charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio. Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements.

5. On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume, causing damage to the Company.

## JURISDICTION

6. This Court has jurisdiction over the subject matter of this action pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act. This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

7. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the

defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

9. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

10. ***Plaintiff Joseph Hauser*** ("Plaintiff") is, and was at relevant times, a shareholder of the Company. Plaintiff has continuously held shares of NYCB common stock since he purchased them on April 4, 2022. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

11. ***Nominal Defendant New York Community Bancorp*** ("NYCB") is incorporated under the laws of Delaware with its principal executive offices located in Hicksville, New York. NYCB's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NYCB."

**Director Defendants**

12. ***Defendant Alessandro DiNello*** ("DiNello") has served as a Company director and Executive Chairman of the Board of Directors (the "Board") since 2022. Defenant DiNello is also a member of the Executive, Board Credit, and Technology Committees. On February 25, 2024, the Board and the Bank Board appointed Defendant DiNello the Executive Chairman of the Board and the Bank Board, to the offices of President and Chief Executive Officer of the Company and the Bank, which appointment became effective on February 29, 2024.

13. ***Defendant James J. Carpenter*** ("Carpenter") served as a Company director from 2022 through to his resignation in March 2024. Defendant Carpenter was also the Chair of the Board Credit Committee and a member of the Risk Assessment Committee. On March 11, 2024, the resignation of Defendant Carpenter became effective.

14. ***Defendant Hanif "Wally" Dahya*** ("Dahya") served as a Company director from 2007 through to his resignation in February 2024. Defendant Dahya was the Chair of the Nominating and Corporate Governance Committee ("N&G Committee") and a member of the Audit, Compensation, Executive, Board Credit, and Technology Committees. Defendant Dahya was also the independent presiding Director of the Board. On February 25, 2024, Defendant Dahya notified the Company of his resignation as (a) Presiding Director of the Board and (b) a member of the Board and the Bank Board, effective immediately. In connection with his resignation, Defendant Dahya noted that ***he did not support*** the proposed appointment of Defendant DiNello as President and Chief Executive Officer of the Company.

15. ***Defendant Leslie D. Dunn*** ("Dunn") served as a Company director from 2015 through her resignation in March 2024. Defendant Dunn was the Chair of the Compensation

Committee and a member of the Audit Committee and N&G Committee. Defendant Dunn previously served as Chair of the N&G Committee and as a member of the Risk Assessment Committee. On March 11, 2024, the resignation of Defendant Dunn became effective.

16. ***Defendant Marshall Lux*** ("Lux") has served as a Company director since 2022. Defendant Lux is also the Chair of the Technology Committee and is a member of the Audit Committee and Risk Assessment Committee.

17. ***Defendant Lawrence Rosano, Jr.*** ("Rosano") served as a Company director from 2014 through his resignation in March 2024. Defendant Rosano was also a member of the Compensation Committee, Board Credit Committee and Risk Assessment Committee. On March 11, 2024, the resignation of Defendant Rosano became effective.

18. ***Defendant Ronald A. Rosenfeld*** ("Rosenfeld") served as a Company director from 2012 through his resignation in March 2024. Defendant Rosenfeld was also a member of the N&G Committee, Risk Assessment Committee and Board Credit Committee. On March 11, 2024, the resignation of Defendant Rosenfeld became effective.

19. ***Defendant Lawrence J. Savarese*** ("Savarese") served as a Company director from 2013 through his resignation in March 2024. Defendant Savarese was also the Chair of the Audit Committee and a member of the Compensation Committee and N&G Committee. On March 14, 2024, the resignation of Savarese from the Board became effective.

20. ***Defendant Peter Schoels*** ("Schoels") has served as a Company director since 2013. Defendant Schoels is also a member of the N&G Committee and Technology Committee.

21. ***Defendant David L. Treadwell*** ("Treadwell") served as a Company director from 2009 through his resignation in March 2024. Defendant Treadwell is also the Chair of the Risk

Assessment Committee and a member of the Audit Committee and the N&G Committee. On March 19, 2024, the resignation of David Treadwell from the Board became effective.

22. ***Defendant Robert Wann*** ("Wann") served as a Company director from 2008 through his resignation in March 2024. Defendant Wann was also a member of the Risk Assessment Committee and Technology Committee. On March 11, 2024, the resignation of Defendant Wann became effective.

23. ***Defendant Jennifer R. Whip*** ("Whip") has served as a Company director since 2017. Defendant Whip is also a member of the Audit Committee, Compensation Committee, Risk Assessment Committee and Board Credit Committee.

24. The above-named defendants at ¶¶ 12–23 are collectively referred to herein as the "Director Defendants."

**<u>Officer Defendants</u>**

25. ***Defendant Thomas R. Cangemi*** ("Cangemi") served as the President, Chief Executive Officer ("CEO"), and director of the Company since 2020, having previously held other senior roles within the Company since 2001. Because of the wrongdoing as alleged herein, Defendant Cangemi is also named as a defendant in the Securities Class Action.[1] On February 23, 2024, Defendant Cangemi notified NYCB of his resignation as (a) the President and Chief Executive Officer and (b) an employee of the Company and Flagstar Bank, N.A., a wholly owned subsidiary of the Company, effective immediately. However, Defendant Cangemi remained a member of the Board of Directors of both NYCB and Flagstar. Then, on March 20,

[1] As noted *infra*, with respect to demand futility only, the term "Director Defendants" shall also refer to Defendant Cangemi.

2024, it was announced that Defendant Cangemi had also resigned from the NYCB Board of Directors, effective March 11, 2024.

26. ***Defendant John J. Pinto*** ("Pinto") has served as the Company's Chief Financial Officer ("CFO") since 2020 and was also appointed Senior Executive Vice President in 2021, having previously held other senior roles within the Company since 2001. Because of the wrongdoing as alleged herein, Defendant Cangemi is also named as a defendant in the Securities Class Action.

27. The above-named defendants at ¶¶ 25–26 are collectively referred to herein as the "Officer Defendants."

28. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29. NYCB is a large commercial-real estate lender in the New York City market area, where it specializes in rent-regulated, non-luxury apartment buildings. NYCB is engaged in several national businesses, including multi-family lending, mortgage originations and servicing, and warehouse lending. The Company's specialty finance loans and leases are generally made to large corporate obligors that participate in stable industries nationwide, and its warehouse loans are made to mortgage lenders across the country.

30. On December 1, 2022, the Company completed the acquisition of Flagstar Bancorp, Inc., which became a wholly owned subsidiary called Flagstar Bank, N.A. ("Flagstar"). The acquisition of Flagstar led to the Company becoming one of the top 25 banks in the country in total assets.

31. Following this, and as detailed *infra*, the Company, through Flagstar, went onto acquire Signature Bridge Bank ("Signature") in a Federal Deposit Insurance Corp-sponsored rescue in March 2023. This acquisition catapulted the Company into a Category VI bank, with between $100 billion and $250 billion in assets, resulting in the Company being subject to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards, as well as requirements for overall risk management and stress testing.

**FALSE AND MISLEADING STATEMENTS**

32. On March 1, 2023, the Company submitted its Annual Report for the fiscal year ended December 31, 2022 on a Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by each of the Individual Defendants. The 2022 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Cangemi and Pinto.

33. The 2022 10-K stated, in relevant part:

> **Asset Quality**
>
> Asset quality remained strong during 2022 as increases in NPAs were substantially due to changes in asset mix related to the Flagstar acquisition and centered on non-performing one-to-four family residential and home equity loans. Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by NPLs and assets acquired in the Flagstar acquisition. At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.
>
> ***
>
> At December 31, 2022, total assets were $90.1 billion, up $30.6 billion or 51 percent compared to December 31, 2021. The growth compared the prior period was primarily due to the Flagstar acquisition which added $25.8 billion of assets, net of PAA, while the remaining growth was driven by growth in our lending portfolios.
>
> ***
>
> **Provision for Credit Losses**

> For the twelve months ended December 31, 2022, the provision for credit losses totaled $133 million compared to $3 million for the twelve months ended December 31, 2021. The fourth-quarter and full-year provision for credit losses was impacted by the provision for credit losses related to the initial ACL measurement of non-PCD Flagstar acquired loans totaling $117 million.

34. The 2022 10-K further stated that the Company's "allowance for credit losses might not be sufficient to cover our actual losses." Specifically, the Company stated, in relevant part:

> ***Our allowance for credit losses might not be sufficient to cover our actual losses, which would adversely impact our financial condition and results of operations.***
>
> In addition to mitigating credit risk through our underwriting processes, we attempt to mitigate such risk through the establishment of an allowance for credit losses. The process of determining whether or not the allowance is sufficient to cover potential credit losses is based on the current expected credit loss model or CECL. This methodology is described in detail under "Critical Accounting Estimates" in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report. CECL may result in greater volatility in the level of the ACL, depending on various assumptions and factors used in this model. If the judgments and assumptions we make with regard to the allowance are incorrect, our allowance for losses on such loans might not be sufficient, and an additional provision for credit losses might need to be made. Depending on the amount of such loan loss provisions, the adverse impact on our earnings could be material. In addition, growth in our loan portfolio may require us to increase the allowance for credit losses on such loans by making additional provisions, which would reduce our net income. Furthermore, bank regulators have the authority to require us to make provisions for credit losses or otherwise recognize loan charge-offs following their periodic review of our loan portfolio, our underwriting procedures, and our allowance for losses on such loans. Any increase in the loan loss allowance or in loan charge-offs as required by such regulatory authorities could have a material adverse effect on our financial condition and results of operations.
>
> ***
>
> Partially reflecting the net recoveries noted above, and the provision of $133 million for the allowance for loan losses, the allowance for credit losses increased $194 million, equaling $393 million at December 31, 2022 from $199 million at December 31, 2021. The majority of the increase is related to the initial provision for credit losses of $117 million and the adjustment for PCD loans acquired in the

> Flagstar acquisition. The allowance for credit losses on loans and leases represented 278.87 percent of non-performing loans at December 31, 2022, as compared to 611.79 percent at the prior year-end.
>
> Based upon all relevant and available information at the end of this December, management believes that the allowance for losses on loans was appropriate at that date.

35. On March 20, 2023, the Company announced that its subsidiary, Flagstar Bank, N.A., acquired certain assets and assumed certain liabilities of Signature Bridge Bank in a press release that stated, in relevant part:

> The Bank acquired only certain financially and strategically complementary parts of Signature that are intended to enhance our future growth. Under terms of the Purchase and Assumption Agreement (the "Agreement") with the FDIC, the Bank:
>
> • Purchased assets of approximately $38 billion, including cash totaling approximately $25 billion and approximately $13 billion in loans. Included in the $25 billion of cash is $2.7 billion arising from a discounted bid to net asset value.
>
> • Assumed liabilities approximating $36 billion, including deposits of approximately $34 billion and other liabilities of approximately $2 billion.
>
> • The Company is working on an agreement to sub-service the legacy Signature multi-family, commercial real estate ("CRE"), and other loans it did not acquire.
>
> • Also included in the transaction is Signature's wealth-management and broker-dealer business.
>
> ***
>
> Mr. Cangemi continued, "This transaction continues our transformation from a predominantly multi-family lender to a diversified full-service commercial bank. It builds upon and accelerates the transformation set in motion by the merger of New York Community and Flagstar, and we believe the financial metrics are extremely attractive. The deal is expected to significantly strengthen our deposit base, lower the loan-to-deposit ratio, provide the opportunity to pay down a substantial amount of our wholesale funding, and further diversify our loan portfolio away from CRE loans and more toward commercial loans. Financially, the deal is expected to be significantly accretive to both earnings per share and to tangible book value per share. The net interest margin expands due to lower

> funding costs, the additional deposits reduce the loan-to-deposit ratio to less than 90%, improves our profitability ratios, adds liquidity, and we maintain strong pro-forma capital ratios."
>
> Further, he added, "Both the Company and the Bank were well positioned prior to the recent market turmoil, with strong capital, a stable retail deposit franchise, and ample liquidity. Moreover, our asset quality metrics remain solid, as they have over multiple business cycles. After this transaction, we will be even better positioned to deal with any residual market issues, including by now operating with a significantly lower loan-to-deposit ratio. Overall, we are happy that our conservative business model and balance sheet put us in a position to quickly consummate this important transaction."

36. On April 21, 2023, the Company filed its 2023 Proxy Statement on Schedule 14A with the SEC, solicited by Defendant Cangemi and the Director Defendants. The 2023 Proxy Statement solicited shareholder votes to approve *inter alia*: (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years; (ii) executive compensation; and (iii) the amendment to the Company's 2020 Omnibus Incentive Plan.

37. The 2023 Proxy Statement contained the following information, in relevant part:

> The Signature transaction adds a substantial amount of low-cost deposits and is expected to be significantly accretive to both earnings per share and tangible book value per share.
>
> ***
>
> Our Board, as stewards of shareholder interests, is committed to maximizing long-term shareholder value creation and to maintaining sound corporate governance principles consistent with current rules and practices. Under the leadership of the Nominating and Corporate Governance Committee, we have concentrated significant efforts and resources on ensuring that our overall corporate governance practices serve the best interests of the Company and its various constituencies, focusing on the changing needs for financial institutions in the current regulatory environment and have taken into consideration the governance policies and practices of our peers.
>
> The Board of Directors maintains a Risk Assessment Committee comprised of independent directors to assist the Board, together with the other Committees of the Board, in overseeing and reviewing information regarding our enterprise risk management programs, risk exposure, and risk governance policies and practices.

***

**Board's Role in Risk Oversight**

**Risk Governance** – Management of risk is important to the success of our operations and business strategies and our Board devotes significant attention to the oversight of risks inherent in our banking business, including, but not limited to, credit, interest rate, liquidity, price, operational, strategic, compliance and reputational risks.

The Board reviews the key risks associated with the Company's strategic plan annually and regularly throughout the year as part of its consideration of the strategic direction of the Company as well as regularly reviewing various Company's risk management processes reporting and reviewing risks associated with specific business units and corporate functions.

While the Board of Directors as a whole is responsible for risk management oversight, management is responsible for the day-to-day management of the risks faced by the Company. As part of our risk oversight processes, our Chief Risk Officer reports to the Risk Assessment Committee; the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks; and senior members of management attend Board meetings and are available to address questions or concerns raised by the Board on risk management and other matters.

In carrying out its responsibilities in this area, the Board has delegated important duties to its committees. The Risk Assessment Committee has responsibility to oversee the functioning of the Company's enterprise risk management program and to ensure that risk is appropriately identified, measured, mitigated, monitored, and reported within approved governance structures. Among its duties, the Risk Assessment Committee reviews with management Company policies regarding risk assessment and management of risks that may be material to the Company, the Company's system of disclosure controls and system of internal controls over financial reporting, the Company's governance structure and processes, related person transactions, certain compliance issues and Board and committee structures, and the Company's compliance with legal and regulatory requirements. The Chairman of the Risk Assessment Committee is independent and the Nominating and Corporate Governance Committee of the Board has determined that he has the requisite risk experience for such position.

***

**Other Governance Practices**

**Code of Business Conduct and Ethics** – The Company maintains a Code of Professional Conduct, applicable to all Company and Bank employees, which sets forth requirements relating to ethical conduct, conflicts of interest, and compliance with the law. The Code of Professional Conduct requires that the

Bank's employees avoid conflicts of interest, comply with all laws and other legal requirements, conduct business in an honest and ethical manner, and otherwise act with integrity and in the Company's and the Bank's best interests. The CEO, Chief Financial Officer and Chief Accounting Officer are bound by the Code of Professional Conduct as well as our Code of Business Conduct and Ethics for the CEO, Chief Financial Officer and other senior financial officers. Copies of both Codes, which also apply to the directors of the Company, are available, free of charge, on the corporate governance pages of the Investor Relations portion of our website, www.ir.mynycb.com, and are available in print to any shareholder who requests a copy.

***

In addition to the above described committees of the Company Board, the Credit Committee of the Bank Board serves important governance functions in the lending businesses of the Company. The multi-family, commercial real estate, commercial and industrial, residential, consumer, warehouse, home-builder and other asset-based loans that the Bank originates all are made in accordance with loan underwriting policies and procedures approved by the Committee, which maintain active oversight of management's loan origination, servicing, and collections processes. Committee members, who have significant experience in real estate and other lending businesses, apply their knowledge and expertise in key policy and risk-management decisions relating to these core business areas.

The authority of the Bank Board Credit Committee includes, among other things, oversight regarding the administration and implementation of loan policies, credit management policies and procedures, lending activities of the Bank's specialty finance company subsidiary, oversight regarding the administration and implementation of commercial and industrial loan policies, review of the risks associated with loans approved by management, and the delegation of credit authority. Each member has expertise in relevant areas of commercial and residential real estate lending, commercial and industrial lending, lending risk, and the business of financial institutions.

***

**Proposal 7: Approval of Amendment to the [NYCB] 2020 Omnibus Incentive Plan**

[…]

The 2020 Plan is critical to the successful execution of our pay-for-performance compensation strategy and our stated intention to provide compensation in a form that aligns the long-term interests of our key employees and directors with the interests of our shareholders. After considering the number of shares currently available under the 2020 Plan and assessing the Company's

> anticipated equity compensation needs under several scenarios, we believe that approval of the amendment will provide the Company with the flexibility necessary to meet the objectives of our incentive compensation program.

38. However, the 2023 Proxy Statement was false and misleading when it discussed the above, because: (i) the Board did not effectively manage risk, which ultimately resulted in, among other things, the fourth quarter 2023 net loss of $252 million; (ii) the Board were not in fact "committed to maximizing long-term shareholder value"; (iii) the Board's corporate governance was insufficient; (iv) despite the existence of the Code of Conduct and related corporate governance, the Individual Defendants continuously engaged in wrongful and unlawful conduct; and (v) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to the Company.

39. Furthermore, the 2021 Proxy Statement was false and misleading when it failed to disclose that (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

40. Had Company shareholders known of these facts prior to the Annual Meeting of Shareholders held on June 1, 2023, they would not have approved the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years, nor would they

have approved the executive compensation and the amendment to the Company's 2020 Omnibus Incentive Plan.

41. On April 21, 2023, the Company filed its Annual Report to Security Holders for 2022 on From ARS with the SEC ("2022 Annual Report"). The 2022 Annual Report was signed by Defendants Cangemi, DiNello, Carpenter, Rosano, Saverese, Treadwell, Whip, Pinto, Dahya, Dunn, Lux, Rosenfeld, Schoels, and Wann. The 2022 Annual Report also contained SOX certifications signed by Defendants Cangemi and Pinto.

42. From the outset of the 2022 Annual Report, Defendant Cangemi stated, in a letter to shareholders, that "[a]t December 31, 2022, the Company had $90.1 billion of assets, $69.0 billion of loans, deposits of $58.7 billion, and total stockholders' equity of $8.8 billion," and provided the following infographic:

| | | |
|---|---|---|
| **NYCB**<br>NYSE Symbol | **$90.1B**<br>Total Assets | **$69.0B**<br>Total Loans |
| **395**<br>Branches | **$58.7B**<br>Deposits | **$8.8B**<br>Stockholder's Equity |

43. Defendant Cangemi's letter to shareholders in the 2022 Annual Report also stated the following with respect to the "crisis" resulting from increased interest rates, and NYCB's subsequent acquisition of Signature, in relevant part:

> … unlike the last financial crisis, I don't expect a large number of banks to fail this time. […]. Recent failures appear to be more idiosyncratic in nature. They stemmed from each of these banks' specific business models along with substantially high levels of uninsured deposits and the lack of an appropriate risk management framework.
>
> ***
>
> While no financial institution is 100% immune, [NYCB] fared relatively well due to our diversified business model, focusing on our core competencies: multi-

family/commercial real estate lending, retail banking, commercial lending, and residential mortgage originations and servicing.

***

Amidst the recent crisis, an opportunity arose for our organization. This opportunity arrived on March 20th, when we announced that our bank subsidiary, Flagstar [], acquired certain assets and assumed certain liabilities, of Signature [] from the Federal Deposit Insurance Corporation. We did not acquire the entire ban, only certain strategically and financially complimentary parts of Signature that will enhance our growth. This transaction is a game changer for us. It builds upon the merger between [NYCB] and Flagstar and accelerates our evolution into a diversified, high-performing commercial bank, while jumpstarting our middle market lending and "boots on the ground" relationship banking strategy.

***

Not only is the transaction expected to immediately and significantly boost our earnings per share and tangible book value per share, but to execute such a transaction during the depths of a crisis, speaks volumes of faith and confidence our regulators have in our management team and business model.

44. Defendant Cangemi's letter to shareholders continued:

Despite our growth over the past several months, there is one thing we will not outgrow – our conservative underwriting criteria. We have an enviable track record of historically low levels of non-performing loans and an even lower level of losses on our loan portfolio.

***

With all of these things ahead of us, 2023 will be a transition year for us as we work to integrate and convert two acquisitions, focus on reducing expenses, growing our deposit base and building out each of our businesses in connection with the rollout of the New Flagstar.

45. On April 28, 2023, the Company announced its first quarter 2023 financial results in a press release with stated in relevant part:

At March 31, 2023 total assets were $123.8 billion compared to $90.1 billion at December 31, 2022 and $61.0 billion at March 31, 2022.

***

Asset Quality:

– Our asset quality metrics and trends remain strong.

– Non-performing assets ("NPAs") were $161 million at March 31, 2023 or 0.13% of total assets.

– Non-performing loans ("NPLs") were $148 million at March 31, 2023 or 0.18% of total loans.

– The allowance for credit losses totaled $550 million at March 31, 2023 or 370.38% of non-performing loans and 0.67% of total loans.

– Net charge-offs were zero during first quarter 2023 compared to $2 million during first quarter 2022 and $1 million during fourth quarter 2022.

***

In addition to the bargain purchase gain, first quarter 2023 GAAP results were impacted by the following items:

• Merger-related and restructuring expenses of $67 million, comprised of $40 million for the Flagstar acquisition and $27 million for the Signature transaction;

• An initial provision for credit losses totaling $132 million for the loans acquired from Signature; and

• A 48% increase in average diluted common shares outstanding compared to the year-ago first quarter.

***

"While we have closed two acquisitions over the past four months, we have remained focused on our fundamentals including asset quality. Our asset quality metrics remain strong with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. We continue to be laser focused on credit quality across all lending verticals […]."

46. On May 10, 2023, the Company submitted its quarterly report for the period ended March 31, 2023 on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("1Q23 10-Q"). The 1Q23 10-Q affirmed the previously reported financial results and stated:

> Historically, our level of net charge-offs has been relatively low in downward credit cycles, even when the volume of non-performing loans has increased. For the three months ended March 31, 2023, our net charge-offs were zero as compared to net charge-offs of $2 million over the same period in 2022.
>
> The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022. The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume. The allowance for credit losses on loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.
>
> Based upon all relevant and available information at March 31, 2023, management believes that the allowance for losses on loans was appropriate at that date.

47. Then, on May 18, 2023, the Company filed on Form 424B7 with the SEC, its Prospectus, to "sell up to 39,032,006 shares [] of [NYCB's] common stock." The Prospectus misrepresented as a potential future risk, "the ability to successfully integrate branches and operations and to implement appropriate internal controls and regulatory functions," rather than a present ongoing risk.

48. On July 27, 2023, the Company announced its second quarter 2023 financial results in a press release which stated in relevant part:

> At June 30, 2023 total assets were $118.8 billion compared to $123.7 billion at March 31, 2023 and $90.1 billion at December 31, 2022.
>
> ***
>
> Asset Quality:
>
> – Non-performing assets ("NPAs") were $246 million at June 30, 2023 or 0.21% of total assets.
>
> – Non-performing loans ("NPLs") were $233 million at June 30, 2023 or 0.28% of total loans.
>
> – The allowance for credit losses totaled $594 million at June 30, 2023 or 255.40% of non-performing loans and 0.71% of total loans.

> – Net recoveries were $1 million during second quarter 2023 compared to $7 million of net recoveries during second quarter 2022 and zero in the previous quarter.
>
> ***
>
> Our asset quality trends remain among the best in the industry, despite the slightly higher NPLs. At June 30, 2023, NPAs to total assets equaled 21 basis points compared to 14 basis points at March 31, 2023, while NPLs to total loans equaled 28 basis points compared to 20 basis points at March 31, 2023.
>
> Allowance for Credit Losses
>
> At June 30, 2023, the allowance for credit losses was $594 million compared to $550 million at March 31, 2023, up $44 million. The allowance for credit losses to total loans held for investment increased to 71 basis points at June 30, 2023 compared to 67 basis points at March 31, 2023.

49. On August 9, 2023, the Company submitted its quarterly report for the period ended June 30, 2023, on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("2Q23 10-Q"). The 2Q23 10-Q affirmed the previously reported financial results and stated:

> At June 30, 2023, total assets were $118.8 billion, up $28.7 billion compared to December 31, 2022. Total deposits were $88.5 billion at June 30, 2023, up $29.8 billion from December 31, 2022. These year-to-date increases were primarily due to our March 20, 2023, assumption of a substantial amount of the deposits and certain identified liabilities and the acquisition of certain assets and lines of business of Signature Bridge Bank, from the FDIC, as receiver for Signature Bridge Bank (the "Signature Transaction").
>
> ***
>
> The allowance for credit losses on loans and leases increased $201 million, equaling $594 million at June 30, 2023 from $393 million at December 31, 2022. The increase was primarily related to the initial allowance for credit losses of $132 million for the acquired loans in the Signature Transaction, an increase of $13 million in specific reserves primarily related to two loans that have moved to non-accrual and an increase of $56 million primarily related to our worsening forecast of macroeconomic conditions and origination volume since year-end. The allowance for credit losses on loans and leases represented 255 percent of

> nonperforming loans at June 30, 2023, as compared to 279 percent at the prior yearend.
>
> Based upon all relevant and available information at June 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as that date.

50. On October 26, 2023, the Company announced its third quarter 2023 financial results in a press release which stated in relevant part:

> Balance Sheet:
>
> – Total assets of $111.2 billion at September 30, 2023 declined $7.6 billion compared to June 30, 2023, primarily due to a decline in cash balances, a portion of which was used to pay-down wholesale borrowings and brokered deposits. This was partially offset by growth in the loan portfolio.
>
> ***
>
> Asset Quality:
>
> – Non-performing assets ("NPAs") were $404 million at September 30, 2023 or 0.36% of total assets.
>
> – Non-performing loans ("NPLs") were $392 million at September 30, 2023 or 0.47% of total loans.
>
> – The allowance for credit losses totaled $619 million at September 30, 2023 or 158% of non-performing loans and 0.74% of total loans.
>
> – Net charge offs were $24 million during third quarter 2023 compared to zero during third quarter 2022 and net recoveries of $1 million in the previous quarter.
>
> ***
>
> "On the asset quality front, while we experienced a significant decline in early-stage delinquencies compared to the previous quarter, non-performing loans increased on a linked-quarter basis, owing primarily to two commercial real estate loans in the office sector. Despite this, our asset quality metrics continue to be among the best in the industry with non-performing loans at 47 basis points of total loans and net charge-offs of only three basis points. This reflects our conservative underwriting practices.

> ***
>
> Allowance for Credit Losses
>
> At September 30, 2023, the allowance for credit losses was $619 million compared to $594 million at June 30, 2023, up $25 million. The allowance for credit losses to total loans held for investment increased to 74 basis points at September 30, 2023 compared to 71 basis points at June 30, 2023.
>
> ***
>
> Provision for Credit Losses
>
> For the three months ended September 30, 2023, the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023.
>
> For the nine months ended September 30, 2023, the provision for credit losses totaled $281 million compared to $9 million for the nine months ended September 30, 2022. The year-to-date amount includes a $132 million initial provision for credit losses for the acquired portion of the Signature loan portfolio.

51. Also, on October 26, 2023, the Company filed a Current Report on Form 8-K with the SEC. Attached as Exhibit 99.1 to this Current Report was a written presentation to be distributed and made available to investors, and posted on the Company's website, beginning October 26, 2023. The presentation contained the following information, in relevant part:


Financial and strategic highlights
Flagstar Bank, N.A.
Solid balance sheet
• Total assets of $111.2 billion declined $7.6 billion compared to June 30, 2023, primarily due to lower cash balances resulting from a decrease in FDIC custodial deposits
• Total loans of $84.0 billion increased $0.7 billion, or 0.9%, driven by growth in the commercial loan portfolios.
• Total deposits of $82.7 billion includes $2 billion of deposits related to custodial deposits from the Signature transaction.
◦ Non-interest bearing deposits at 30% of total deposits compared to 34% at June 30th
Strong operating performance
• As adjusted, Q3 2023 net income available to common stockholders totaled $266 million, compared to $345 million in Q2 2023
• As adjusted, Q3 2023 diluted EPS of $0.36 compared to $0.47 for Q2 2023
• Q3 2023 NIM of 3.27%, up 6 basis points compared to Q2 2023
Strong capital and disciplined credit
• CET1 ratio 9.60% at September 30, 2023; remain well capitalized and well above the minimum thresholds for all applicable capital ratios
• NPAs/Total Assets was 0.36%; NPLs/Total Loans was 0.47%
• ALL/NPLs was 158%
• Net charge-offs of $24 million

## Credit quality

Flagstar Bank, N.A.

**Our current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses.**

### Net Charge-Offs/Average Loans



# Regulatory capital

Flagstar Bank, N.A.

| Ratio | NYCB<br>*At September 30, 2023* | Peers<br>*At June 30, 2023* |
|---|---|---|
| Total Risk-Based Capital | 11.98% | 13.23% |
| Tier 1 Risk-Based Capital | 10.17% | 11.26% |
| Common Equity Tier 1 | 9.60% | 10.28% |
| Tier 1 Leverage | 7.92% | 8.98% |

→

- We remain well capitalized and well above the minimum thresholds for all applicable ratios
- Our ratios increased as compared to the prior quarter primarily due to the impact of our earnings

**Highlights**

- Sponsor led approach
- Continue to perform enhanced monitoring on the portfolio
- Two nonperforming loans totaling $124 million and net chargeoffs of $14 million
- 26% rated special mention or substandard

NYCB **Guidance**(1) Flagstar Bank, N.A.

| 2023 Guidance | |
|---|---|
| **Net interest margin** | • Q4-23 NIM estimated to be between 3.00% to 3.10% |
| **Provision for Credit Losses** | • Provision for credit losses will be impacted by loan growth, charge-offs and the impact from changing macroeconomic conditions |
| **Non-interest income** | • Q4-23 Gain on Sale revenue of $16 million to $20 million<br>• Net return on MSR is 8% - 10%<br>• Loan administration income estimated at $15 million |
| **Non-interest expense** | • Full-year 2023 range of $2.0 billion to $2.1 billion, excluding merger-related expenses and intangible amortization. |
| **Tax Rate** | • Approximately 23% |

52. On November 9, 2023, the Company submitted its quarterly report for the period ended September 30, 2023, on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("3Q23 10-Q"). The 3Q23 10-Q affirmed the previously reported financial results and stated:

> **Provision for Credit Losses**
>
> *Comparison to Prior Quarter*
>
> The three months ended September 30, 2023 the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023. During the third quarter 2023, we incorporated the commercial loans and unfunded commitments acquired in the Signature Transaction in the Company's allowance for credit loss models which resulted in a net provision benefit of $13 million. The $75 million provision on the remainder of the portfolio was driven by increases to our estimated loan loss and unfunded commitment reserves as a result of changes in the macroeconomic environment,

> specifically the inflationary pressures leading to sharp increases in interest rates and a slow-down of prepayment activity leading to longer weighted average lives on the balance sheet. In addition, the increase reflects unfavorable market conditions in the CRE portfolio (primarily office). During the quarter we had net charge-offs totaling $24 million.
>
> The second quarter 2023 provision of $49 million included increases of $13 million related to specific reserves for new non-accrual loans and the remainder was driven by changes in the macroeconomic forecast.
>
> ***
>
> We continue to monitor our loans held for investment portfolio and the related allowance for credit losses, particularly given the economic pressures facing the commercial real estate and multi-family markets. While our multi-family lending niche has not been immune to downturns in the credit cycle, the limited number of losses we have recorded, even in adverse credit cycles, suggests that the multi-family loans we produce involve less credit risk than certain other types of loans. In general, buildings that are subject to rent regulation have historically tended to be stable, with occupancy levels remaining more or less constant over time. Because the rents are typically below market and the buildings securing our loans are generally maintained in good condition, they have been more likely to retain their tenants in adverse economic times. In addition, we generally exclude any short-term property tax exemptions and abatement benefits the property owners receive when we underwrite our multi-family loans.
>
> ***
>
> The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022. The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume. The allowance for credit losses on loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.

53. The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors: (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of

the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **THE TRUTH EMERGES**

54. On January 31, 2024, before the market opened, NYCB announced its fiscal fourth quarter 2023 financial results. The Company reported a fourth quarter net loss of $252 million due to "a $552 million provision for loan losses," which was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio.

55. Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements. Specifically, in its press release, the Company stated the following, in relevant part:

> For the three months ended December 31, 2023, the Company reported a net loss of $252 million compared to net income of $207 million for the three months ended September 30, 2023. For the three months ended December 31, 2023, the Company reported a net loss available to common stockholders of $260 million compared to net income available to common stockholders of $199 million for the three months ended September 30, 2023. Diluted EPS totaled $(0.36) for the three months ended December 31, 2023 compared to diluted EPS of $0.27 for the three months ended September 30, 2023.

Fourth quarter 2023 net income and diluted EPS were impacted by merger-related items and a FDIC special assessment. As adjusted, the net loss for the three months ended December 31, 2023 totaled $185 million, compared to net income of $274 million for the three months ended September 30, 2023. The net loss includes the impact from higher provision for credit losses that primarily reflects a significant increase in the ACL which strengthened the credit profile of the Company.

***

"Shortly after closing the acquisition of Flagstar Bank, we were presented with the unique opportunity to accelerate this transformation when we were selected by the FDIC to purchase certain strategically and financially attractive assets and liabilities of Signature Bank. The benefits of this transaction were abundantly clear, as it strengthened our balance sheet by adding a significant amount of low-cost deposits and a middle-market business supported by over 130 private banking teams. The transaction also put us over $100 billion in total assets, placing us firmly in the Category IV large bank class of banks between $100 billion and $250 billion in assets and subjecting us to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards, requirements for overall risk management and stress testing. While we began preparing to be a $100 billion bank almost immediately after closing the Flagstar acquisition, we crossed this important threshold sooner than anticipated as a result of the Signature transaction. Alongside the integration of our three banks and in anticipation of our initial capital plan submission in April of this year, we have pivoted quickly and accelerated some necessary enhancements that come with being a $100 billion-plus Category IV bank.

"With this in mind, during the fourth quarter, we took decisive actions to build capital, reinforce our balance sheet, strengthen our risk management processes, and better align ourselves with the relevant bank peers. We significantly built our reserve levels by recording a $552 million provision for loan losses, bringing our ACL coverage more in line with these peer banks. In addition, we added on-balance sheet liquidity as we prepare for the enhanced prudential standards that apply to banks with $100 billion or more in total assets.

"To this end, we are also building capital by reducing our quarterly common dividend to $0.05 per common share. We recognize the importance and impact of the dividend reduction on all of our stockholders and it was not made lightly. We believe this is the prudent decision as it will allow us to accelerate the building of capital to support our balance sheet as a Category IV bank.

56. The Company disclosed further details concerning its allowance for credit losses, stating in relevant part:

> At December 31, 2023, the allowance for credit losses was $992 million compared to $619 million at September 30, 2023, up $373 million reflecting our actions to build reserves during the quarter to address weakness in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets, which better aligns the Company with its relevant bank peers, including Category IV banks.

57. The Company also disclosed details concerning the Company's provision for credit losses, stating in relevant part:

> For the three months ended December 31, 2023, the provision for credit losses totaled $552 million compared to a $62 million provision for the three months ended September 30, 2023. The increase is primarily attributable to higher net charge-offs, as well as, to address weakness in the office sector, potential repricing risk in the multi-family portfolio, and an increase in classified assets.
>
> ***
>
> Fourth quarter net charge-offs were primarily related to two loans. First, we had one co-op loan with a unique feature that pre-funded capital expenditures. Although the borrower was not in default, the loan was transferred to held for sale during the fourth quarter. We expect the loan to be sold during the first quarter of 2024. We also performed a review of other co-op loans and did not find any other loans with similar characteristics.
>
> Second, we had an additional charge-off on an office loan that went non-accrual during the third quarter, based on an updated valuation. Given the impact of recent credit deterioration within the office portfolio, we determined it prudent to increase the ACL coverage ratio.
>
> Together, these two loans accounted for the bulk of the $185 million of net charge-offs we took during the fourth quarter.

58. On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume.

59. Following this, *Bloomberg* published an article entitled "NYCB's Talks With Watchdog Led to Moves that Rocked Market." In the article, *Bloomberg* reported that:[2]

---

[2] Hannah Levitt, et al., *NYCB's Talks With Watchdog Led to Moves That Rocked Market*, Bloomberg (Feb. 5, 2024), https://www.bloomberg.com/news/articles/2024-02-05/nycb-s-tense-

Mounting pressure from a top US watchdog led to New York Community Bancorp's surprise decision to slash its dividend and stockpile cash in case commercial real estate loans go bad, according to people with direct knowledge of the matter.

The drastic financial moves — which triggered a record plunge in the company's stock and dragged down shares across the industry last week — followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency, the people said, asking not to be identified describing the confidential discussions.

Two senior executives left their posts in the months before the bank unveiled its measures, one of the people said. As of late last year, the company's website no longer showed chief risk officer Nicholas Munson and chief audit executive Meagan Belfinger on its leadership page. The changes weren't publicly reported by the firm at the time.

A spokesperson for the OCC declined to comment, as did Munson and Belfinger. The bank confirmed Munson's departure to the Financial Times and Bloomberg News on Monday, but declined to otherwise comment.

New York Community Bancorp has said building reserves is part of its widely expected transition to more stringent capital rules after the lender swelled beyond $100 billion in assets while acquiring parts of Signature Bank last year. But investors were rattled when it set aside $552 million for potential loan losses — more than 10 times what analysts anticipated — and slashed quarterly dividends by 70%.

The OCC wielded unusually tight control over those payouts after the firm's acquisition of Flagstar Bank in late 2022. The deal gives the watchdog a right to object to any dividends set by the parent company through late 2024, regulatory filings show.

Then, last year, US watchdogs drew a painful lesson from the failure of another firm that had grown rapidly — Silicon Valley Bank. SVB collapsed after using deposits from tech companies to load up its balance sheet with long-term assets. When clients later tapped their cash to weather a slump in fundraising, SVB began selling holdings at losses to keep up with withdrawals, setting off panic and a run.

A Federal Reserve review ultimately found that examiners didn't act swiftly enough to shore up the lender's controls and balance sheet after it surpassed $100

---

talks-with-watchdog-led-to-moves-that-rocked-market?embedded-checkout=true (last accessed Apr. 9, 2024).

billion in assets. In a letter outlining lapses, the Fed's vice chair for supervision, Michael Barr, suggested authorities must sometimes be more aggressive — even forcing banks to hold extra capital awhile to "focus management's attention."

New York Community Bancorp almost doubled in size over the past 15 months thanks to its acquisition of Flagstar and opportunistic takeover of deposits and some loans from Signature Bank, which failed last year. The deals gave the 165-year-old lender new heft and drove up its share price.

The takeovers also catapulted its assets past $100 billion, placing the lender in a more rigorous category of regulation, in which the firm lagged behind its new peers in terms of capital and loan-loss reserves.

In recent months, global regulators and investors have grown more concerned about the declining value of US commercial properties and the inability of some borrowers to refinance — and whether regional lenders may get burned.

It's unclear why or precisely when Munson and Belfinger exited their posts. Archived copies of the company's website show they were listed among its leadership in early October but not by the end of the year.

On Wednesday, the bank said it would reduce shareholder payouts and beef up reserves, noting that debts 30 to 89 days past due had jumped 48% last quarter compared to the quarter before. Net charge-offs in the period were primarily related to a pair of debts tied to a co-op complex and offices.

"We are taking decisive actions to build capital, strengthen our balance sheet and risk management processes which better aligns us with the relevant peers for a bank of our larger size and complexity," Chief Executive Officer Thomas Cangemi said on an earnings conference call Wednesday. He declined to comment on talks with regulators when an analyst asked if something had changed there.

The stock dropped 45% over the two days after its announcement, leading the broader KBW Regional Banking Index of 50 companies down 8.2%, its worst two-day performance since SVB imploded. An additional decline on Monday left the bank's stock 48% lower than before its disclosure.

**Tiered Regulation**

US rules introduced under former President Donald Trump eased the regulatory burden on many small banks and introduced several tiers of scrutiny above them, based on a lender's size and risk profile. Those range from Category I for the giant Wall Street firms down to Category IV for banks with between $100 billion and $250 billion assets — where New York Community Bancorp now sits. Firms below that level are deemed uncategorized.

> Each level imposes new combinations of capital requirements, liquidity rules, stress testing and other must-dos. That can make it challenging for banks to jump from one bucket up to the next.

60. That same day, *Reuters* also published an article entitled "New York Community Bancorp shares decline after Fitch downgrade, Citi PT cut." The *Reuters* article stated the following:[3]

> Feb 5 (Reuters) - Shares of New York Community Bancorp (NYCB.N), dropped nearly 10.6% on Monday, resuming their descent after a one-day reprieve following a downgrade by ratings agency Fitch and a price target cut by brokerage Citigroup.
>
> The bank's shares had plunged nearly 45% in two days after reporting a surprise fourth-quarter loss due to higher provisions tied to its commercial real estate (CRE) portfolio.
>
> They pared losses on Friday before Fitch downgraded the bank's credit rating. Citi later lowered the target price on its shares to $7 from $11.
>
> The trading in NYCB's stock reflects increased levels of uncertainty, Citi analysts wrote in a note. "We don't see a lot in near-term to change perception and see better risk-reward elsewhere."
>
> New York Community Bank on Monday confirmed its chief risk officer Nick Munson had left the company after the Financial Times had earlier reported Munson's departure weeks ahead of the company's fourth-quarter result.
>
> "We can confirm that Nick Munson left the company in early 2024," the bank said in an email.
>
> NYCB's results shone a spotlight on the banking industry's exposure to the troubled CRE sector, where borrowers are under pressure due to higher interest rates and lower occupancies due to remote work.
>
> ***
>
> But analysts have said the issues at NYCB were specific to its balance sheet and were not reflective of other banks.

---

3 *New York Community Bancorp shares decline after Fitch downgrade, Citi PT cut*, Reuters (Feb. 5, 2024), https://www.reuters.com/markets/us/new-york-community-bancorp-pay-dividend-1594-certain-preferred-stock-2024-02-05/ (last accessed Apr. 9, 2024).

> Investors should be "playing offense" with other U.S. banking stocks as the recent turmoil has created "attractive entry points," Citi said.
>
> Separately, NYCB kept the quarterly dividend for its preferred stock unchanged on Monday, days after it slashed the payout for its common shares by 70%. The bank said it would pay a dividend of $15.94 per preferred share. Preferred shareholders are typically entitled to more favorable terms of dividend compared to common shareholders.
>
> NYCB has said it is building capital to deal with stricter regulatory requirements after the purchase of Signature Bank last year pushed its assets above a $100 billion threshold.

61. Following the publication of the *Bloomberg* and *Reuters* articles, the Company's share price fell once again from $5.40 on February 5, 2024, a $4.20 per share on February 6, 2024, amounting to a further decline of 22% in the Company's share price.

62. On February 23, 2024, Defendant Cangemi informed the Company that he would be resigning as President and CEO, effective immediately. Then, on February 25, 2024, the Company appointed Defendant DiNello "to the offices of President and Chief Execuitve Officer of the Company and the Bank, which appointment became effective on February 29, 2024." The Company announced these changes via Form 8-K filed with the SEC on February 29, 2024.

63. In that same Form 8-K filed with the SEC, the Company announced that Defendant Dahya was resigning from the Board, effective February 25, 2024, and attached Defendant Dahya's resignation letter as Exhibit 99.1. Defendant Dahya's resignation letter stated: "At the time of my resignation I did not support the proposed appointment of Mr. DiNello as President and CEO of the Company."

64. Then, in a February 29, 2024 Form 12b-25 filing with the SEC, signed by Defendant Pinto, the Company announced that it would be unable to timely file its Annual

Report because it discovered adjustments that must be made to its financial reports prior to completing the Annual Report. The Company further stated:

> Separately, as part of management's assessment of the Company's internal controls, management identified material weaknesses in the Company's internal controls related to internal loan review, resulting from ineffective oversight, risk assessment and monitoring activities. Although assessment of the Company's internal controls is not yet complete, the Company expects to disclose in the 2023 Form 10-K that its disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2023. The Company's remediation plan with respect to such material weaknesses is expected to be described in the 2023 Form 10-K.

65. Then, on March 1, 2024, Fitch Ratings downgraded the Company, stating that "The Rating Outlook is Negative."[4]

66. Following these series of events, the Company's share price took a further hit and fell from $4.79 per share on February 29, 2024 to a close of $2.73 per share on March 4, 2024 – the lowest that the Company's share price had been since 1996.[5]

67. Then, on March 7, 2024, the Company filed a Current Report on Form 8-K with the SEC. The Current Report announced that NYCB entered into "investment agreements with affiliates of funds managed by Liberty 77 Capital, L.P. and certain other investors […] for an aggregate investment amount of $1.05 billion." Attached to the Current Report as Exhibit 99.2 was a press release announcing that "Mr. [Joseph] Otting will become Chief Executive Officer and Mr. DiNello will be named as a Non-Executive Chairman." The press release further stated that "As part of the reconstitution, the Board will be reduced to nine members and will include

---

[4] *Fitch Downgrades New York Community Bancorp; Outlook Negative*, Fitch Ratings (Mar. 1, 2024), https://www.fitchratings.com/research/banks/fitch-downgrades-new-york-community-bancorp-outlook-negative-01-03-2024 (last accessed Apr. 9, 2024).

[5] *See* Elisabeth Buchwald, *NYCB stock tumbles to lowest level since 1996*, CNN Business (Mar. 4, 2024), https://edition.cnn.com/2024/03/04/business/nycb-stock-price/index.html (last accessed Apr. 9, 2024).

Secretary Mnuchin, Mr. Otting, Mr. Puwalski, Mr. Berlinski, Mr. DiNello, Marshall Lux, Peter Schoels, Jennifer Whip and David Treadwell."

68. On March 14, 2024, the Company filed another Current Report on Form 8-K with the SEC. In the Current Report, the Company announced that "In connection with the completion of the Investment, Thomas Cangemi, James Carpenter, Leslie Dunn, Lawrence Rosano Jr, Ronald Rosenfeld and Robert Wann (the "Resigning Directors") resigned as members of the NYCB Board, effective as of March 11, 2024."

69. Then, on March 20, 2024, the Company filed another Current Report on Form 8-K with the SEC which announced, *inter alia*, the resignations of Defendant Savarese and Treadwell from the Board.

70. On March 28, 2024, *Reuters* published an article entitled "US banks face loss risk from multi-family property loan exposure, says Fitch."[6] In the article, it was noted that "Fitch Ratings analysts highlighted the risks facing banks which have underwritten loans behind apartment complexes and other multifamily properties." The article went onto state:

> But supply has begun to outstrip demand, creating downward pressure on the rents landlords can charge, Fitch noted during Wednesday's call. These landlords also face rising interest rates and insurance premiums, coupled with decreasing apartment values.
>
> These factors have weighed on several regional banks with high exposure to the asset class, and in particular those most exposed to rent-controlled multifamily loans, where landlords face a ceiling on rent increases to offset rising costs.
>
> "Especially in the more stringent rent-controlled areas, there is a limited ability to make up that difference," said Brian Thies, senior director at Fitch, on Wednesday's call.

---

[6] Matt Tracy, *US banks face loss risk from multi-family property loan exposure, says Fitch*, Reuters (Mar. 28, 2024), https://www.reuters.com/business/finance/us-banks-face-loss-risk-multi-family-property-loan-exposure-says-fitch-2024-03-27/ (last accessed Apr. 9, 2024).

> "So I would say it can be a concern for loan performance at this point."
>
> This was seen in late February, when regional bank New York Community Bancorp [] posted $2.7 billion in losses and a $552 million provision for credit losses in its fourth quarter, including on a New York-based rent-controlled multifamily loan.
>
> Fitch highlighted 10 banks with the greatest multifamily loan exposure as of year-end 2023. Flagstar Bank [], which merged with New York Community Bancorp in 2022, topped the list with 43.6% of its loan portfolio in multifamily.

## DAMAGES TO THE COMPANY

### Securities Class Action

71. On February 6, 2024, a securities class action complaint was filed in the United States District Court for the Eastern District of New York against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Lemm v. New York Community Bancorp, Inc., et al.*, Case 1:24-cv-00903 (E.D.N.Y.) ("Securities Class Action").

72. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Unjust Compensation

73. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

74. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and

administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

75. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

76. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

77. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

78. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

**The Company's Share Repurchase Damages**

79. Throughout the Relevant Period, the Individual Defendants caused the Company to repurchase substantial amounts of its own common stock at artificially inflated prices, causing significant harm to the Company.

80. The Individual Defendants, in the knowledge that the Company's share price was artificially inflated, caused the Company to repurchase approximately 427,559 shares of its own stock for a total amount in excess of $4 million. As detailed herein, because the Company's share price was in fact worth considerably less than the Company paid, the Individual Defendants caused the Company to overspend by ***over $2.89 million***, as follows:

| Repurchase Period[7] | Number of Shares | Average Price per Share ($) | Total Paid ($) | Amount Overpaid By ($)[8] |
|---|---|---|---|---|
| March 2023 | 146,448 | 7.57 | 1,108,611.36 | 708,808.32 |
| April 2023 | 26,330 | 8.93 | 235,126.90 | 163,246 |
| May 2023 | 111,992 | 10.49 | 1,174,796.08 | 869,057.92 |
| June 2023 | 51,885 | 10.81 | 560,876.85 | 419,230.80 |
| July 2023 | 10,323 | 12.11 | 125,011.53 | 96,829.74 |
| August 2023 | 12,555 | 13.53 | 169,869.15 | 135,594 |
| September 2023 | 11,078 | 11.69 | 129,501.82 | 99,258.88 |
| October 2023 | 1,525 | 10.29 | 15,692.25 | 11,529.00 |
| November 2023 | 4,897 | 9.34 | 45,737.98 | 32,369.17 |
| December 2023 | 50,526 | 9.92 | 501,217.92 | 363,281.94 |
| **TOTAL** | **427,559** | **-** | **4,066,441.84** | **2,899,205.77** |

## CORPORATE GOVERNANCE

81. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties

[7] The Repurchase Period covers each and every day within the stated month. *E.g.*, "March 2023" covers from March 1 through March 31.

[8] As the Company's common stock was actually worth $2.73, the price on March 4, 2024 when the truth was revealed, the Individual Defendants caused the Company to overpay for its own common stock by this amount.

on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

82. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

83. At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") "which specifically applies to Directors, and the CEO, the CFO, together with all other senior financial officers of the Company designated by the CEO."

84. In a section entitled "Director and Senior Financial Officer Responsibilities," the Code of Conduct states, in relevant part:

> Directors and Senior Financial Officers shall:
>
> [] engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> [] produce full, fair, accurate, timely, and understandable disclosures in the reports that the Company periodically files with, or submits to, the United States Securities and Exchange Commission and in other public communications made by the Company;
>
> [] comply with all applicable governmental laws, rules, and regulations, as well as the rules adopted by any exchange upon which Company-issued securities are listed;
>
> [] promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, or any fraud,

> whether or not material, that involves management or other employees who have a significant role in financial reporting, disclosures, or internal controls; and
>
> [] promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and to the operation of its business, or a material violation of this Code, by the Company or any agent thereof.

85. In a section entitled "Enforcement," the Code of Conduct provides that:

> Violations of this Code by Directors or Senior Financial Officers are matters of the utmost concern. A Senior Financial Officer who compromises or violates the law or policies and procedures contained in this Code may be subject to disciplinary actions, up to and including termination of employment for cause. A Director who compromises or violates the law or policies and procedures contained in this Code may be subject to disciplinary action upon the review and determination of the Board, up to and including removal from the Board. Directors and Senior Financial Officers may also be subject to civil and/or criminal prosecution.

**<u>Code of Professional Conduct</u>**

86. Further, the Company also had in place its "Code of Professional Conduct to establish and promote the highest standards of integrity, accountability, and ethics in the conduct of business among Company personnel and with the Company's customers, its vendors, and the banking industry."

87. The Code of Professional Conduct provides, in relevant part, that "each member of the Board of Directors2 (each, a "Director") and each Employee of the Company (together with the Directors, collectively, "Company Personnel") shall abide by this Code and the following principles of professional conduct – to wit, each shall:

> [] Faithfully advance the legitimate business interests of the Company while fully complying with all applicable laws, regulations, and Company policies […];
>
> [] Avoid apparent and actual conflicts of interest, as well as breaches of fiduciary duties […];

> [] Cooperate with the Company's auditors, examiners, regulators, other authorized governmental agencies (e.g., IRS, GSEs) and attorneys, and be completely candid with them.

88. In a section entitled "Obligation to Report to Company Officials," the Code of Professional Conduct states:

> Company Personnel that witness any act(s) and/or omission(s) by other Company Personnel that such witnessing Company Personnel reasonably believes to be in violation of this Code (each such act or omission ultimately determined to be in violation of this Code, a "Code violation") shall be responsible for reporting such act(s) and/or omission(s) to the GC, Human Resources, a departmental manager, or the Flagstar Ethics Hotline (for information about how to submit a confidential report via the Flagstar Ethics Hotline, please see section III.B, below)

89. In a section entitled "Compliance with Laws, Rules, and Regulations," the Code of Professional Conduct provides, in relevant part:

> Obeying the law, both in letter and in spirit, is one of the foundations on which the Company's policies, including this Code, are built. All Company Personnel must respect and obey all applicable laws, rules, and regulations (including, without limitation, insider trading laws). Although not all Company Personnel are expected to know the details of such laws, rules, and regulations, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate personal, such as an officer within Human Resources or Legal.

**<u>Audit Committee Charter</u>**

90. At all relevant times, the Company had in place its Audit Committee Charter which sets forth the specific duties and responsibilities of the Audit Committee – comprised of Defendants Dahya, Dunn, Lux, Savarese, and Whip. The Audit Committee Charter provides that the purpose of the Audit Committee is to "assist the Boards in fulfilling their respective oversight responsibilities, including with respect to review and, as applicable, approval of (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; (3) the qualifications, performance and independence of the Company's Independent Registered Public Accounting Firm (the "Independent Auditor"); (4) the

performance of the Company's internal audit function (the "Internal Audit Function"); (5) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time; and (6) to provide the annual report of the Committee to be included in the Company's annual proxy statement."

91. The Audit Committee Charter further sets forth these additional duties and responsibilities:

> [] Oversee the preparation of an annual report by the Audit Committee which must be included in the Holding Company's annual proxy statement.
>
> [] Meet with management of the Company and the Independent Auditor to review and discuss the Holding Company's annual audited financial statements and quarterly financial statements and such other related financial statements of the Bank or any of the Company's affiliates as the Committees in its discretion shall deem necessary or appropriate;
>
> [] With regard to the Company's financial statements and disclosures, review: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;
>
> [] Discuss the Company's policies with respect to risk assessment and risk management to ensure that the CEO and senior management of the Company assess and manage the Company's exposure to risk;
>
> [] Discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;
>
> [] Perform, or engage others to undertake such discussion, meetings, actions, monitoring, investigations, or other procedures as the Committees deem necessary or appropriate.

**Risk Committee Charter**

92. At all relevant times, the Company had in place its Risk Assessment Committee Charter which sets forth the specific duties and responsibilities of the Risk Assessment Committee – comprised of Defendants Carpenter, Lux, Rosano, Rosenfeld, Treadwell, Wann, and Whip. The Risk Assessment Committee Charter states that its purpose "is to assist the Board in fulfilling its responsibilities with respect to oversight of the Corporation's risk management and compliance frameworks, including as it relates to (1) the risk appetite of the Corporation; (2) the enterprise compliance program; (3) regulatory compliance and supervisory expectations; and (4) the policies and procedures used to identify, measure, monitor and manage various risks, including the Corporation's strategic, credit and investment, market, operational, compliance, liquidity and reputational risks."

93. The Risk Assessment Committee Charter sets forth these additional duties and responsibilities, in relevant part:

> [] Review and approve the Corporation's risk framework, risk appetite and policies, including:
>
> > [] Reviewing the Corporation's actual risk profile against the Board approved risk appetite which includes information on the categories of risk the Corporation faces (e.g., credit, liquidity, interest rate, price, strategic, compliance, operational, and reputation risk); review exceptions, if any, to risk limits and key risk indicators ("KRIs") that can serve as signals of changing risk; and review management proposed updates and/or revisions to Board-level KRIs and recommend appropriate action to the Board for its consideration and approval.
> >
> > [] Reviewing and evaluating proposed updates to the Corporation's Risk Appetite Policy and supporting documentation in order to make recommendations to the Board that considers how much risk the Corporation or applicable NYCB Entity is prepared to take in order to pursue its Strategic Plan objectives, what kinds of risks are most relevant on an enterprise-wide basis, and how it should define its risk appetite tolerances.
> >
> > [] Review and evaluate supporting information, documentation and rationale for any Risk Profiles that are not aligned with their

corresponding Risk Appetites, along with monitoring timelines for bringing them into alignment. The Committee shall be promptly notified if any Risk Profiles exceed their corresponding Risk Appetite.

[] Oversee risk concentrations across the Corporation including, without limitation, commercial real estate and liquidity, and review of reports that indicate whether concentrations are within the accepted tolerances as described within the Risk Appetite Policy.

[] Oversee senior management's responsibilities related to oversight of the Corporation's credit portfolio, including management's responses to trends in credit risk, credit concentration and asset quality, and review and assess on a quarterly basis management's process for establishing the Corporation's allowance for credit losses.

[] Consult with other committees of the Board on risk-related matters, in such manner as the Committee or its chair deems appropriate. The chairperson of the Committee shall discuss with the chairperson of the Audit Committee the Committee's review of the Corporation's allowance for credit losses on a quarterly basis.

[] Oversee the Corporation's Enterprise Risk Management ("ERM") Framework and Enterprise Compliance Risk Management Framework, including overseeing the CRO and ECCO's design and implementation of the ERM framework.

[] Carry out other duties or responsibilities expressly delegated to the Committee by the Board from time to time.

## DUTIES OF THE DIRECTOR DEFENDANTS

94. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

95. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

96. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

97. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

98. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

99. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director

Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

100. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101. Plaintiffs brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

102. Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

103. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

104. Because of the facts set forth herein, Plaintiffs has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

105. "In general, the relevant Board of Directors for the purposes of demand futility is the one in place at the time of the filing of the operative complaint. […] But, Plaintiff may plead demand futility as to an earlier iteration of the […] Board of Directors (*i.e.*, the one in place when the Original Complaint was filed) if the derivative claims in the Amended Complaint already were "validly in litigation" before the Amended Complaint was filed." *Barenbaum v. Palleschi*, 1:1-cv-05913 (MKV), 2020 U.S. Dist. LEXIS 180624, at *23-24 (S.D.N.Y. Sep. 30, 2020) (citing *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006)). Plaintiff contends that the three-part test set out in *Barenbaum* (*Id.* at *24) is satisfied and that the claims herein are validly in litigation, thus demand futility need only be pled as to the Board on February 15, 2024, the date Plaintiff filed the original complaint.

106. At the time this suit was initially filed, the Board was comprised of thirteen (13) members – the Director Defendants, as defined at ¶ 24, *supra*, along with Defendant Cangemi (collectively in this section, the "Director Defendants"). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, seven (7), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

107. According to the Company's 2023 Proxy Statement, "[t]he Board has determined that 10 of our 14 directors are "independent" within the meaning of the rules of the New York Stock Exchange." The Board determined that Defendants Cangemi, DiNello, Carpenter, and Wann are not independent and, thus, demand is futile as to each of them.

108. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of

material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

109. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

110. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

111. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

112. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

113. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**THE DIRECTOR DEFENDANTS**
**ARE NOT INDEPENDENT OR DISINTERESTED**

**<u>Defendant Cangemi</u>**

114. Defendant Cangemi neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its President and CEO) is an employee of the Company who derives substantially all of his income from his employment with NYCB, making him not independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Cangemi cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

115. As CEO, Defendant Cangemi also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Cangemi could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Cangemi is therefore futile.

116. In addition, Defendant Cangemi receives lucrative compensation in connection with his employment with the Company. Defendant Cangemi is not independent from Defendants Dahya, Dunn, Rosano, Savarese, and Whip as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Cangemi. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Cangemi could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

117. Defendant Cangemi has served as a Company director throughout the Relevant Period. As a director, Defendant Cangemi was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Cangemi failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

118. Defendant Cangemi, during the Relevant Period, as a trusted senior officer of the Company, conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

119. Because of Defendant Cangemi's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Cangemi is unable to comply with his fiduciary duties and prosecute this action. Defendant Cangemi is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

120. In addition, Defendant Cangemi signed and thus personally made the false and misleading statements in the 2022 10-K, 1Q23 10-Q, 2Q23 10-Q, and 3Q23 10-Q and faces a substantial likelihood of liability therefor.

121. Defendant Cangemi also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Cangemi secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, and (iii) executive compensation which Defendant Cangemi would materially benefit from. Accordingly, Defendant Cangemi faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

122. Defendant Cangemi further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Cangemi not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Cangemi cannot, therefore, independently and objectively consider a demand to prosecute this action.

123. Defendant Cangemi is neither independent nor disinterested. Any demand upon Defendant Cangemi is futile and, thus, excused.

**Defendant DiNello**

124. According to the Company's 2023 Proxy Statement, Defendant DiNello is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

125. Defendant DiNello has served as a Company director at all relevant times hereto. As a director, Defendant DiNello was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant DiNello failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

126. As a trusted Company director, and Chairman of the Board, Defendant DiNello conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

127. Additionally, in connection with his role as a Company director, Defendant DiNello receives substantial income. Accordingly, Defendant DiNello cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

128. In addition, Defendant DiNello signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

129. Moreover, Defendant DiNello previously served as President, CEO, and a director of Flagstar, and held other senior roles within Flagstar prior to that. Meanwhile, Defendant Whip also served as a director of Flagstar. Thus, Defendants DiNello and Whip each have a

longstanding business relationship with one another and cannot reasonably consider a demand to sue each other.

130. Further, Defendant DiNello, as former President and CEO of Flagstar, also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant DiNello could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant DiNello is therefore futile.

131. Defendant DiNello also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant DiNello secured (i) the re-election of himself along with Defendants Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan which Defendant DiNello would materially benefit from. Accordingly, Defendant DiNello faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

132. Defendant DiNello further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant DiNello not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant DiNello cannot, therefore, independently and objectively consider a demand to prosecute this action.

133. Defendant DiNello is neither independent nor disinterested. Any demand upon Defendant DiNello is futile and, thus, excused.

**Defendant Carpenter**

134. According to the Company's 2023 Proxy Statement, Defendant Carpenter is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

135. Defendant Carpenter has served as a Company director at all relevant times hereto. As a director, Defendant Carpenter was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Carpenter failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

136. As a trusted Company director, Defendant Carpenter conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

137. Additionally, in connection with his role as a Company director, Defendant Carpenter receives substantial income. Accordingly, Defendant Carpenter cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

138. In addition, Defendant Carpenter signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

139. Defendant Carpenter also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Carpenter secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan which Defendant Carpenter would materially benefit from. Accordingly, Defendant Carpenter faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

140. Defendant Carpenter further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Carpenter not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Carpenter cannot, therefore, independently and objectively consider a demand to prosecute this action.

141. Defendant Carpenter is neither independent nor disinterested. Any demand upon Defendant Carpenter is futile and, thus, excused.

**<u>Defendant Dahya</u>**

142. Defendant Dahya has served as a Company director at all relevant times hereto. As a director, Defendant Dahya was required to, among other things: (i) ensure that the

Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Dahya failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

143. As a trusted Company director, Defendant Dahya conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

144. Defendant Dahya also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dahya is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Dahya failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Dahya faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

145. Additionally, in connection with his role as a Company director, Defendant Dahya receives substantial income. Accordingly, Defendant Dahya cannot reasonably and

objectively consider a demand to sue the Board who control his continued compensation, including himself.

146. In addition, Defendant Dahya signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

147. Defendant Dahya also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Dahya secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Dahya would materially benefit from. Accordingly, Defendant Dahya faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

148. Defendant Dahya further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Dahya not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Dahya cannot, therefore, independently and objectively consider a demand to prosecute this action.

149. Defendant Dahya is neither independent nor disinterested. Any demand upon Defendant Dahya is futile and, thus, excused.

**Defendant Dunn**

150. Defendant Dunn has served as a Company director at all relevant times hereto. As a director, Defendant Dunn was required to, among other things: (i) ensure that the Company

complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Dunn failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

151. As a trusted Company director, Defendant Dunn conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

152. Defendant Dunn also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dunn is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Dunn failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Dunn faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

153. Additionally, in connection with her role as a Company director, Defendant Dunn receives substantial income. Accordingly, Defendant Dunn cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

154. In addition, Defendant Dunn signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

155. Defendant Dunn also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Dunn secured (i) the re-election of herself along with Defendants DiNello, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Dunn would materially benefit from. Accordingly, Defendant Dunn faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

156. Defendant Dunn further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Dunn not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Dunn cannot, therefore, independently and objectively consider a demand to prosecute this action.

157. Defendant Dunn is neither independent nor disinterested. Any demand upon Defendant Dunn is futile and, thus, excused.

**Defendant Lux**

158. Defendant Lux has served as a Company director at all relevant times hereto. As a director, Defendant Lux was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately

guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Lux failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

159. As a trusted Company director, Defendant Lux conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

160. Defendant Lux also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Lux is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Lux failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Lux faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

161. Additionally, in connection with his role as a Company director, Defendant Lux receives substantial income. Accordingly, Defendant Lux cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

162. In addition, Defendant Lux signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

163. Defendant Lux also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Lux secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan which Defendant Lux would materially benefit from. Accordingly, Defendant Lux faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

164. Defendant Lux is neither independent nor disinterested. Any demand upon Defendant Lux is futile and, thus, excused.

**Defendant Rosano**

165. Defendant Rosano has served as a Company director at all relevant times hereto. As a director, Defendant Rosano was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Rosano failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

166. As a trusted Company director, Defendant Rosano conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

167. Additionally, in connection with his role as a Company director, Defendant Rosano receives substantial income. Accordingly, Defendant Rosano cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

168. In addition, Defendant Rosano signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

169. Defendant Rosano also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Rosano secured (i) the re-election of himself along with Defendants DiNello, Dunn, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Rosano would materially benefit from. Accordingly, Defendant Rosano faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

170. Defendant Rosano further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Rosano not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Rosano cannot, therefore, independently and objectively consider a demand to prosecute this action.

171. Defendant Rosano is neither independent nor disinterested. Any demand upon Defendant Rosano is futile and, thus, excused.

**Defendant Rosenfeld**

172. Defendant Rosenfeld has served as a Company director at all relevant times hereto. As a director, Defendant Rosenfeld was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Rosenfeld failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

173. As a trusted Company director, Defendant Rosenfeld conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

174. Additionally, in connection with his role as a Company director, Defendant Rosenfeld receives substantial income. Accordingly, Defendant Rosenfeld cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

175. In addition, Defendant Rosenfeld signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

176. Defendant Rosenfeld also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Rosenfeld secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Rosenfeld would materially benefit from. Accordingly, Defendant Rosenfeld faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

177. Defendant Rosenfeld further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Rosenfeld not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Rosenfeld cannot, therefore, independently and objectively consider a demand to prosecute this action.

178. Defendant Rosenfeld is neither independent nor disinterested. Any demand upon Defendant Rosenfeld is futile and, thus, excused.

**<u>Defendant Savarese</u>**

179. Defendant Savarese has served as a Company director at all relevant times hereto. As a director, Defendant Savarese was required to, among other things: (i) ensure that the

Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Savarese failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

180. As a trusted Company director, Defendant Savarese conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

181. Defendant Savarese also serves as Chair of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Savarese is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Savarese failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Savarese faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

182. Additionally, in connection with his role as a Company director, Defendant Savarese receives substantial income. Accordingly, Defendant Savarese cannot reasonably and

objectively consider a demand to sue the Board who control his continued compensation, including himself.

183. In addition, Defendant Savarese signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

184. Defendant Savarese also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Savarese secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Savarese would materially benefit from. Accordingly, Defendant Savarese faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

185. Defendant Savarese further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Savarese not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Savarese cannot, therefore, independently and objectively consider a demand to prosecute this action.

186. Defendant Savarese, while serving as Chair of the Audit Committee, reappointed KPMG LLP as the Company's public accounting firm, according to the Company's 2023 Proxy Statement. Notably, Defendant Savarese spent many years of his career at KPMG LLP. Indeed,

for 19 years, Defendant Savarese was an Audit Partner in KPMG's Financial Services Practice, serving as partner in charge of audits of both Banks (including the Company and the Bank) and international banks with branches and agencies in the United States. During this time, Defendant Savarese served as KPMG's representative to the New York Bankers Association and The Institute of International Bankers. From 2008 to 2012, Defendant Savarese served as Audit Partner, Risk Management, for KPMG's Advisory Practice, where he managed risk at KPMG and developed and applied complex risk management objectives; risk management policies for model development; advisory service protocols in connection with certain requirements of the Public Company Accounting Oversight Board; policies for internal controls over financial reporting services provided to non-audit clients; and reviewed engagement letters and management risk performance. Defendant Savarese's selection of KPMG was clearly not the product of informed and independent judgment, thus demonstrating Defendant Savarese's inability to exercise such independent and objective decision-making. Thus, demand is excused as to Defendant Savarese.

187. Defendant Savarese is neither independent nor disinterested. Any demand upon Defendant Savarese is futile and, thus, excused.

**Defendant Schoels**

188. Defendant Schoels has served as a Company director at all relevant times hereto. As a director, Defendant Schoels was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv)

ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Schoels failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

189. As a trusted Company director, Defendant Schoels conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

190. Additionally, in connection with his role as a Company director, Defendant Schoels receives substantial income. Accordingly, Defendant Schoels cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

191. In addition, Defendant Schoels signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

192. Defendant Schoels also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Schoels secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Schoels would materially benefit from. Accordingly, Defendant Schoels faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

193. Defendant Schoels further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess

of $2.89 million. As such, Defendant Schoels not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Schoels cannot, therefore, independently and objectively consider a demand to prosecute this action

194. Defendant Schoels is neither independent nor disinterested. Any demand upon Defendant Schoels is futile and, thus, excused.

**Defendant Treadwell**

195. Defendant Treadwell has served as a Company director at all relevant times hereto. As a director, Defendant Treadwell was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Treadwell failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

196. As a trusted Company director, Defendant Treadwell conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

197. Defendant Treadwell also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Treadwell is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's

compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Treadwell failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Treadwell faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

198. Additionally, in connection with his role as a Company director, Defendant Treadwell receives substantial income. Accordingly, Defendant Treadwell cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

199. In addition, Defendant Treadwell signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

200. Defendant Treadwell also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Treadwell secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Treadwell would materially benefit from. Accordingly, Defendant Treadwell faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

201. Defendant Treadwell further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in

excess of $2.89 million. As such, Defendant Treadwell not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Treadwell cannot, therefore, independently and objectively consider a demand to prosecute this action.

202. Defendant Treadwell is neither independent nor disinterested. Any demand upon Defendant Treadwell is futile and, thus, excused.

**Defendant Wann**

203. According to the Company's 2023 Proxy Statement, Defendant Wann is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

204. Defendant Wann has served as a Company director at all relevant times hereto. As a director, Defendant Wann was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Wann failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

205. As a trusted Company director, Defendant Wann conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

206. Additionally, in connection with his role as a Company director, Defendant Wann receives substantial income. Accordingly, Defendant Wann cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

207. In addition, Defendant Wann signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

208. Defendant Wann also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Wann secured (i) the re-election of himself along with Defendants DiNello, Dunn, and Rosano to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Wann would materially benefit from. Accordingly, Defendant Wann faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

209. Defendant Wann further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Wann not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Wann cannot, therefore, independently and objectively consider a demand to prosecute this action.

210. Defendant Wann is neither independent nor disinterested. Any demand upon Defendant Wann is futile and, thus, excused.

**Defendant Whip**

211. Defendant Whip has served as a Company director at all relevant times hereto. As a director, Defendant Whip was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Whip failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

212. As a trusted Company director, Defendant Whip conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

213. Defendant Whip also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Whip is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Whip failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them.

Therefore, Defendant Whip faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

214. Additionally, in connection with her role as a Company director, Defendant Whip receives substantial income. Accordingly, Defendant Whip cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

215. In addition, Defendant Whip signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

216. Defendant Whip also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Whip secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Whip would materially benefit from. Accordingly, Defendant Whip faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

217. Defendant Whip further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Whip not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Whip cannot, therefore, independently and objectively consider a demand to prosecute this action.

218. Moreover, Defendant Whip previously served as a director of Flagstar. Meanwhile, Defendant DiNello served as President, CEO, and a director of Flagstar. Thus,

Defendant Whip has a longstanding professional relationship with Defendant DiNello and cannot reasonably and independently consider a demand to sue him.

219. Defendant Whip is neither independent nor disinterested. Any demand upon Defendant Whip is futile and, thus, excused.

**Additional Reasons Demand is Futile**

220. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

221. The Company, at all material times, had its Code of Conduct, Business Code, and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

222. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of

company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

223. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

224. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

225. Publicly traded companies, such as NYCB, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause

the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

226. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

**(Against the Individual Defendants for Breach of Fiduciary Duties)**

227. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

228. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

229. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

230. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by making or permitted false and misleading statements and/or failing to disclose that: (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve

capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

231. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

232. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**COUNT II**

**(Against the Individual Defendants for Gross Mismanagement)**

233. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

234. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

235. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

236. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**COUNT III**

**(Against the Individual Defendants for Waste of Corporate Assets)**

237. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

238. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

239. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

240. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**COUNT IV**

**(Against the Individual Defendants for Unjust Enrichment)**

241. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

243. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

244. Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**COUNT V**

**(Against the Director Defendants for Aiding and Abetting)**

245. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

247. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC

filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

248. As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

249. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

250. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**COUNT VI**

**(Against the Officer Defendants for Contribution Under Sections 10(b) and 21D of the Securities Exchange Act of 1934)**

251. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252. NYCB, along with the Officer Defendants, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

253. The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing NYCB securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased

such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

254. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

255. The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

256. Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

257. As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## COUNT VII

**(Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934)**

258. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

259. During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and

misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

260. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NYCB, their control over, and/or receipt and/or modification of NYCB's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning NYCB, participated in the fraudulent scheme alleged herein.

261. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

262. The Individual Defendants were each members of NYCB's Board of Directors and senior management team during the aforesaid time period. Based on their roles at NYCB,

each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

263. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at NYCB, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

264. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

265. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

266. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

**COUNT IX**

**(Against Defendant Cangemi and the Director Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934)**

267. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

269. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

270. Under the watch and direction of Defendant Cangemi and the Director Defendants (together, the "Proxy Defendants"), the 2023 Proxy Statement failed to disclose that (i) the Board did not effectively manage risk, which ultimately resulted in, among other things, the fourth quarter 2023 net loss of $252 million; (ii) the Board were not in fact "committed to

maximizing long-term shareholder value"; (iii) the Board's corporate governance was insufficient; (iv) despite the existence of the Code of Conduct and related corporate governance, the Individual Defendants continuously engaged in wrongful and unlawful conduct; and (v) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to the Company.

271. Furthermore, the 2023 Proxy Statement also failed to disclose that (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

272. The Proxy Defendants also caused the 2023 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

273. Moreover, the 2023 Proxy Statement was false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including

the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

274. In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors.

275. The misrepresentations and omissions set forth herein were material to shareholders in voting on the proposals in the 2023 Proxy Statement who would not have approved, *inter alia*: (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years; (ii) executive compensation; and (iii) the amendment to the Company's 2020 Omnibus Incentive Plan.

276. As a result of the respective Proxy Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, and approved, *inter alia*: (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years; (ii) executive compensation; and (iii) the amendment to the Company's 2020 Omnibus Incentive Plan.

277. The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C. Awarding, against the Director Defendants and in favor of the Company, damages sustained by the Company as a result of the Director Defendants' aiding and abetting of the Individual Defendants' breaches of fiduciary duty;

D. Awarding, against the Officer Defendants and in favor of the Company, all contribution and indemnification under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

E. Awarding, against the Individual Defendants and in favor of the Company, for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 as the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company;

F. Awarding, against Defendant Cangemi and the Director Defendants and in favor of the Company, Defendant Cangemi and the Director Defendants violations of Section 14(a) of the Securities Exchange Act of 1934;

G. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

H. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 11, 2024

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
Gregory M. Egleston
Thomas J. McKenna
260 Madison Avenue, 22nd Fl.
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

***Attorneys for Plaintiff***

# VERIFICATION

I, JOSEPH HAUSER, declare that I have reviewed the AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT ("Amended Complaint") prepared on behalf of New York Community Bancorp, Inc. and authorize its filing. I have reviewed the allegations made in the Amended Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of New York Community Bancorp, Inc. common stock at all relevant times. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

JOSEPH HAUSER