# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELAINE WANG, Derivatively on Behalf of Nominal Defendant NEW YORK COMMUNITY BANCORP, INC., <br><br>Plaintiff, <br><br>v. <br><br>THOMAS R. CANGEMI, ALESSANDRO P. DINELLO, JAMES J. CARPENTER, HANIF DAHYA, LESLIE D. DUNN, MARSHALL LUX, LAWRENCE ROSANO, JR., RONALD A. ROSENFELD, LAWRENCE J. SAVARESE, PETER SCHOELS, DAVID L. TREADWELL, ROBERT WANN, JENNIFER R. WHIP, and JOHN J. PINTO, <br><br>Defendants, <br><br>and, <br><br>NEW YORK COMMUNITY BANCORP, INC., <br><br>Nominal Defendant. | Case No. 1:24-cv-1422-NRM-JRC <br><br>**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Elaine Wang ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of New York Community Bancorp, Inc. ("NYCB" or the "Company"), submits this Verified Amended Shareholder Derivative Complaint (the "Amended Complaint" or "AC"). Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of confidential Company documents produced to Plaintiff and publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, publications from the government and regulators,

including the Federal Deposit Insurance Corporation ("FDIC") and the Office of the Comptroller of the Currency ("OCC") (together, the "Federal Banking Agencies"), the Company's books and records, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law and have caused substantial harm to the Company.

2.      NYCB is one of the largest regional banks in the nation, with positions in businesses including multi-family lending, mortgage originations and servicing, and warehouse lending. Prior to December 2022, NYCB operated as the bank holding company for New York Community Bank (the "Bank"), formerly known as Queens County Savings Bank.

3.      On December 1, 2022, NYCB acquired Flagstar Bancorp, Inc., which operated Flagstar Bank N.A  (the "Flagstar Merger"). Flagstar operates 395 branches across nine states, particularly in the Northeast and Midwest. Following the acquisition, New York Community Bank was merged with and into Flagstar Bank N.A., with Flagstar Bank N.A. continuing as the surviving entity. In October 2024, NYCB announced that the Company was to be renamed as Flagstar Financial, Inc (together with Flagstar Bank N.A., "Flagstar").[1]

4.      On March 20, 2023, NYCB announced that, through Flagstar, it had acquired a substantial amount of the assets of Signature Bridge Bank, N.A. ("Signature Bank"). The Flagstar and Signature Bank acquisitions nearly doubled the Company's total assets from $63 billion to

---

[1]      To avoid confusion, the Amended Complaint refers to post-merger company as "NYCB" or the "Company."

$123.8 billion over the short span of approximately four months. As a result of this growth in total assets to over $100 billion, NYCB became subjected to, among other things, stricter risk-based and leverage capital requirements and liquidity standards as set forth by the Federal Reserve Board ("FRB") as a now "Category IV" bank.

5.      At all relevant times, the Individual Defendants (defined below) made materially false and misleading statements about NYCB's business and financial condition, the impact of the Flagstar Merger and Signature transaction, and the credit quality of the Company's commercial real estate loan ("CRE") portfolio. Specifically, the Individual Defendants failed to disclose to investors the true nature of: (i) regulatory opposition to the Flagstar Merger, and the Company's motivations for amending the Flagstar Merger agreement to eliminate the need for FDIC approval; (ii) NYCB's risk management practices and controls; (iii) NYCB's loan review processes and asset quality; and (iv) NYCB's internal controls over financial reporting. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      Additionally, NYCB's filings with the SEC in connection with the Flagstar Merger contained materially false statements of fact and omitted to state material facts necessary to make the statements therein not misleading. Specifically, offering documents filed in connection with the Flagstar Merger materially misrepresented: (i) the FDIC's decision to reject NYCB's application for approval of the Flagstar Merger; (ii) NYCB's risk management framework and practices; and (iii) the asset quality of NYCB's highly concentrated CRE loan portfolio and the Company's unreliable estimation of its allowance for credit losses on loans and leases and provision for credit losses.

7.      On January 31, 2024, the truth began to emerge when NYCB announced its fiscal fourth quarter 2023 financial results. The Company reported a fourth quarter net loss of $252 million due to "a $552 million provision for loan losses," which was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio. Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements.

8.      On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume, causing damage to the Company.

9.      On February 5, 2024, *Bloomberg* reported that NYCB's chief risk officer and chief audit executive left the Company in the fourth quarter of 2023. The *Bloomberg* report cited "people with direct knowledge of the matter" that the Company's "drastic financial moves…followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency…" On this news, the price of NYCB common stock dropped 22%, or $1.20 per share, to close at $4.20 per share on February 6, 2024.

10.     On February 29, 2024, NYCB delayed the filing of its annual report on Form 10-K. The Company also announced that it had completed its goodwill impairment assessment and determined the Company required a goodwill impairment charge resulting in a $2.4 billion decrease to the fourth quarter and annual net (loss) income. In the announcements that day, the Company admitted to "material weaknesses in the Company's internal controls related to internal

loan review, resulting from ineffective oversight, [ineffective] risk assessment and [ineffective] monitoring activities."

11.     On this news, NYCB's stock price dropped 26% on March 1, 2024 and then another 23% on March 4, 2024, closing at $8.19 per share. On March 6, 2024, trading of NYCB shares was halted on the New York Stock Exchange ("NYSE") as the price of the Company's stock continued to decline.

12.     Also on March 6, 2024, the Company received a $1 billion capital infusion from an investor group led by former Treasury Secretary Steven Mnuchin. The "lifeline" investment also came with sweeping changes to the Company's management, including four new seats to the Board comprised of individuals from the investor group, and an announcement that Joseph Otting ("Otting"), a former comptroller of the currency, would replace Alessandro DiNello as Chief Executive Officer ("CEO"). The newly composed Board denied former CEO Thomas R. Cangemi ("Cangemi"), former Chief Financial Officer ("CFO") John J. Pinto ("Pinto"), and former President of Commercial Real Estate Finance John T. Adams ("Adams") of any incentive bonuses for 2023, attributing this decision to NYCB's "significant risk management failures" under their watch.

13.     When the Company filed its annual report on form 10-K on March 14, 2024, NYCB shockingly admitted that the "Board of Directors did not exercise sufficient oversight responsibilities, which led to us lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities." NYCB further explained that its "internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged[,]" which impacted the Company's "ability to accurately disclose loan rating classifications, identify problem loans, and ultimately

the recognition of the allowance for credit losses on loans and leases." The Company further admitted that it "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates[.]"

14.    Following an exodus of Company management and directors in the wake of the troubling revelations, on June 5, 2024, Defendant Otting admitted that the departures of "most of the executive management" and the "majority of the board" were part of an effort "of holding people accountable" "for material weaknesses and other items associated with the company."

15.    In light of the Individual Defendant's misconduct—which has subjected the Company and certain of its officers and directors to liability from a securities fraud class action (defined below), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

**JURISDICTION**

16.    This Court has jurisdiction over the subject matter of this action pursuant to Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9 and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.§240.10b-5, promulgated thereunder by the SEC.

17.    This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the Individual Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

20. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

21. ***Plaintiff Elaine Wang*** is, and was at relevant times, a shareholder of the Company. Plaintiff Wang has continuously held shares of NYCB common stock. Plaintiff Wang will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

22.     ***Nominal Defendant New York Community Bancorp*** ("NYCB"), now known as Flagstar Financial, is incorporated under the laws of Delaware with its principal executive offices located in Hicksville, New York. NYCB's common stock trades on the NYSE under the ticker symbol "FLG."

**Director Defendants**

23.     ***Defendant Alessandro DiNello*** ("DiNello") has served as a Company director and Executive Chairman of the Board of Directors (the "Board") since 2022. Defenant DiNello is also a member of the Executive, Board Credit, and Technology Committees. On February 25, 2024, the Board and the board of directors of the Bank (the "Bank Board") appointed Defendant DiNello the Executive Chairman of the Board and the Bank Board, to the offices of President and Chief Executive Officer of the Company and the Bank, which appointment became effective on February 29, 2024.

24.     ***Defendant James J. Carpenter*** ("Carpenter") served as a Company director from 2022 through to his resignation in March 2024. Defendant Carpenter was also the Chair of the Board Credit Committee and a member of the Board's Risk Assessment Committee. On March 11, 2024, the resignation of Defendant Carpenter became effective.

25.     ***Defendant Hanif "Wally" Dahya*** ("Dahya") served as a Company director from 2007 through to his resignation in February 2024. Defendant Dahya was the Chair of the Nominating and Corporate Governance Committee ("N&G Committee") and a member of the Audit, Compensation, Executive, Board Credit, and Technology Committees. Defendant Dahya was also the independent presiding Director of the Board. On February 25, 2024, Defendant Dahya notified the Company of his resignation as (a) Presiding Director of the Board and (b) a member of the Board and the Bank Board, effective immediately. In connection with his resignation,

Defendant Dahya noted that **he did not support** the proposed appointment of Defendant DiNello as President and Chief Executive Officer of the Company.

26.     **Defendant Leslie D. Dunn** ("Dunn") served as a Company director from 2015 through her resignation in March 2024. Defendant Dunn was the Chair of the Compensation Committee and a member of the Audit Committee and N&G Committee. Defendant Dunn previously served as Chair of the N&G Committee and as a member of the Risk Assessment Committee. On March 11, 2024, the resignation of Defendant Dunn became effective.

27.     **Defendant Marshall Lux** ("Lux") has served as a Company director since 2022. Defendant Lux is also the Chair of the Technology Committee and is a member of the Audit Committee and Risk Assessment Committee.

28.     **Defendant Lawrence Rosano, Jr.** ("Rosano") served as a Company director from 2014 through his resignation in March 2024. Defendant Rosano was also a member of the Compensation Committee, Board Credit Committee and Risk Assessment Committee. On March 11, 2024, the resignation of Defendant Rosano became effective.

29.     **Defendant Ronald A. Rosenfeld** ("Rosenfeld") served as a Company director from 2012 through his resignation in March 2024. Defendant Rosenfeld was also a member of the N&G Committee, Risk Assessment Committee and Board Credit Committee. On March 11, 2024, the resignation of Defendant Rosenfeld became effective.

30.     **Defendant Lawrence J. Savarese** ("Savarese") served as a Company director from 2013 through his resignation in March 2024. Defendant Savarese was also the Chair of the Audit Committee and a member of the Compensation Committee and N&G Committee. On March 14, 2024, the resignation of Savarese from the Board became effective.

31.     ***Defendant Peter Schoels*** ("Schoels") has served as a Company director since 2013. Defendant Schoels is also a member of the N&G Committee and Technology Committee.

32.     ***Defendant David L. Treadwell*** ("Treadwell") served as a Company director from 2009 through his resignation in March 2024. Defendant Treadwell is also the Chair of the Risk Assessment Committee and a member of the Audit Committee and the N&G Committee.  On March 19, 2024, the resignation of David Treadwell from the Board became effective.

33.     ***Defendant Robert Wann*** ("Wann") served as a Company director from 2008 through his resignation in March 2024. Defendant Wann was also a member of the Risk Assessment Committee and Technology Committee. On March 11, 2024, the resignation of Defendant Wann became effective.

34.     ***Defendant Jennifer R. Whip*** ("Whip") has served as a Company director since 2017. Defendant Whip is also a member of the Audit Committee, Compensation Committee, Risk Assessment Committee and Board Credit Committee.

35.     The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

36.     ***Defendant Thomas R. Cangemi*** ("Cangemi") served as the President, Chief Executive Officer ("CEO"), and Director of the Company since 2020, having previously held other senior roles within the Company since 2001. Because of the wrongdoing as alleged herein, Defendant Cangemi is also named as a defendant in the securities class action captioned *Lemm v. New York Community Bancorp, Inc., et al.*, Case 1:24-cv-00903 (E.D.N.Y.) ("Securities Class

Action").[2] On February 23, 2024, Defendant Cangemi notified NYCB of his resignation as (a) the President and CEO and (b) an employee of the Company and Flagstar Bank, N.A., a wholly owned subsidiary of the Company, effective immediately. However, Defendant Cangemi remained a member of the Board of both NYCB and Flagstar. Then, on March 20, 2024, it was announced that Defendant Cangemi had also resigned from the NYCB Board, effective March 11, 2024.

37.     ***Defendant John J. Pinto*** ("Pinto") has served as the Company's Chief Financial Officer ("CFO") since 2020 and was also appointed Senior Executive Vice President in 2021, having previously held other senior roles within the Company since 2001. Because of the wrongdoing as alleged herein, Defendant Cangemi is also named as a defendant in the Securities Class Action.

38.     Defendants Cangemi and Pinto are collectively referred to herein as the "Officer Defendants."

39.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**<u>Background of the Company</u>**

40.     NYCB is a large commercial-real estate lender in the New York City market area, where it specializes in rent-regulated, non-luxury apartment buildings. NYCB is engaged in several national businesses, including multi-family lending, mortgage originations and servicing, and warehouse lending. The Company's specialty finance loans and leases are generally made to

---

[2]     As noted *infra*, with respect to demand futility, the term "Director Defendants" shall also refer to Defendant Cangemi.

large corporate obligors that participate in stable industries nationwide, and its warehouse loans are made to mortgage lenders across the country.

41. NYCB is a leading producer of CRE loans collateralized by multi-family apartment buildings and other non-residential commercial office and retail spaces. Banks with large concentrations of CRE loans face pronounced risks given the cyclical nature of real estate markets. As noted by the OCC, while "many banks rely on revenue from [CRE lending] to grow and prosper. . . . [i]mprudent risk-taking and inadequate risk management, particularly during periods of rapid economic growth, can lead to significant levels of problem assets and loan losses and can contribute to bank failures."[3]

42. Beginning in the 1990s, the Company executed a growth strategy lasting nearly two decades by which NYCB acquired rival banks and then deployed those banks' deposits to issue billions of dollars of multi-family and other CRE loans to borrowers based largely in metro New York. By 2010, NYCB's total asset size measured nearly $50 billion.

43. In 2006, the Federal Banking Agencies issued guidance addressing risk management concerns inherent in highly concentrated CRE loan portfolios (the "CRE Guidance")[4] noting, among other things, that a high concentration "could create safety and soundness concerns in the event of a significant economic downturn."

44. As early as 2022, NYCB acknowledged that, pursuant to CRE Guidance, the Company's management "must employ heightened risk management practices that address key elements, including board and management oversight and strategic planning, portfolio

---

[3] Comptroller's Handbook on Safety and Soundness, Commercial Real Estate Lending, Off. of Comptroller of the Currency (Version 2.0, Mar. 2022), at 1 ("OCC 2022 CRE Lending Handbook").

[4] *Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580 (Dec. 12, 2006).

management, development of underwriting standards, risk assessment and monitoring through market analysis and stress testing, and maintenance of increased capital levels as needed to support the level of CRE lending."

45.     In its annual report filed with the SEC on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"), NYCB represented that its loan review process assigned a "credit quality indicator" risk rating to its CRE loans to further help identify problem loans. NYCB identified four categories of risk in its CRE portfolio:

> pass loans are of satisfactory quality; special mention loans have potential weaknesses that deserve management's close attention; substandard loans are inadequately protected by the current net worth and paying capacity of the borrower or of the collateral pledged (these loans have a well-defined weakness and there is a possibility that the Company will sustain some loss); and doubtful loans, based on existing circumstances, have weaknesses that make collection or liquidation in full highly questionable and improbable.

46.     Prior to the Flagstar Merger, CRE loans comprised approximately 90% of the Company's total loans held for investment. The 2022 10-K acknowledged this heavy concentration, noting that its "leadership position in these markets has been instrumental to [the Company's] production of solid earnings and [] consistent record of exceptional asset quality."

**The Relevant Banking Regulatory Framework**

47.     Previously, the banking industry, and the regulatory framework within which it operated, underwent considerable changes. By 2008, for instance, the newly passed Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") imposed a slate of mandatory and preferred risk management and compliance obligations on historically mid-sized banks with more than $50 billion in assets. Dodd-Frank required such banks to implement strict compliance and risk management processes, perform annual publicly reported stress tests, and undergo a qualitative assessment of capital adequacy by the Federal Reserve.

48.     The passage of Dodd-Frank lead to new challenges for NYCB, as the Company faced greater regulatory scrutiny. In October 2015, NYCB announced $2 billion cash and stock deal with rival bank Astoria Financial that would have elevated NYCB to above the $50 billion Dodd-Frank asset threshold. Regulators with the Federal Reserve, however, seemed poised to reject the merger and NYCB thereafter pulled the application and ended the deal.

49.     In 2018, however, the banking industry succeeded in advocating for the Economic Growth, Regulatory Relief, and Consumer Protection Act (the "EGRRCPA"), which, among other things, increased the threshold for Dodd-Frank's enhanced standards from $50 billion to $250 billion in assets. Of the four large bank "categories" created under EGRRCPA, the "Category IV" designation represents, reserved for the smallest banks of the group, is comprised of banks with between $100 billion to $250 billion in assets. Following the passage of EGRRCPA, the Federal Banking Agencies rolled back some of Dodd-Frank's more restrictive provisions for these Category IV banks, including annual public stress tests and certain capital planning requirements.

50.     In December 2020, NYCB announced that Defendant Cangemi would become the Company's CEO and Defendant Pinto would be elevated from his role as Chief Accounting Officer to fill the vacancy at CFO left by Cangemi's promotion. During his first earnings call as CEO, Defendant Cangemi indicated NYCB's priority for growth, stating: "we are very much looking at deposit opportunities as well as whole bank M&A. I mean, there's no question that we're in an environment that mergers and acquisitions makes a lot of sense."

51.     NYCB repeatedly touted the Company's "strong," "superb," and "stellar" loan portfolio asset quality, even as the market faced significant headwinds through increased rent regulation, raised interest rates, and post-pandemic office vacancies. NYCB attributed its "superior asset quality," in part, to its "[l]ow risk credit culture."

52.     The Company further represented that NYCB had effective internal controls over its processes, with a "strong risk culture" and "sound risk management practices."

**NYCB Acquires Flagstar**

53.     In April 2021, NYCB and Flagstar jointly announced that the companies had entered into a definitive merger agreement under which the two companies would combine in an all-stock merger.

54.     Because NYCB was the acquiring entity, and would be the surviving entity, approval was required from NYCB's regulators: the Federal Reserve, the FDIC, and the New York Department of Financial Services ("NYDFS"). NYCB submitted applications for approval of the Flagstar Merger with these agencies on May 19, 2021.

55.     By April 2022, after nearly a year having passed since NYCB submitted applications, the Company still did not have approval from either the FDIC or the Federal Reserve. During this timeframe, NYCB had to extend the Flagstar Merger closing deadline several times.

56.     On June 11, 2021, NYCB filed with the SEC a preliminary registration statement on Form S-4. On June 24, 2021, NYCB filed an amendment to the registration statement on Form S-4/A with the SEC. The SEC declared the registration statement effective on June 25, 2021.

57.     On June 25, 2021, NYCB filed a joint proxy statement and prospectus on Form 424B3. On August 4, 2021, the shareholders of NYCB and Flagstar voted to approve the Flagstar Merger. Subsequently, NYCB filed several prospectus supplements, including on November 3, 2021, November 4, 2021, February 2, 2022, and March 4, 2022.

58.     On or about April 25, 2022, after still not having received approval for the Flagstar Merger from the FDIC, NYCB and Flagstar amended the initial merger agreement to provide that Flagstar's banking subsidiary change its charter, converting to a national bank, after which

NYCB's banking subsidiary would merge into Flagstar. As a result of this change, the Flagstar Merger no longer involved any approvals by the FDIC or the NYDFS and, instead, the OCC along with the Federal Reserve, would need to approve the Flagstar Merger and continue supervision of the combined company.

59. On April 27, 2022, NYCB filed a current report on Form 8-K announcing an April 26, 2022 amendment to the April 24, 2021 merger agreement between NYCB and Flagstar. Pursuant to this amendment, NYCB and Flagstar agreed to amend the definition of "Requisite Regulatory Approvals" such that approvals of the FDIC and NYDFS were no longer required, replacing such approvals with the approval of the OCC. During an earnings call held that day, Defendant Cangemi stated that "we truly believe that with the National Banking platform and where we're heading in the bank in the future that the OCC charter is the way to go."

60. On May 10, 2022, NYCB and Flagstar submitted their application for the necessary approvals to the OCC.

61. On August 3, 2022, NYCB filed a post-effective amendment to the registration statement on Form S-4 as originally declared effective by the SEC on June 25, 2021.

62. On September 28, 2022, NYCB filed another post-effective amendment to the registration statement (the "September 28, 2022 Registration Statement") on Form S-4 as originally declared effective by the SEC on June 25, 2021, to also update certain information in the Registration Statement and include certain information required to be included in a registration statement on Form S-4 in response to SEC comments that NYCB include all disclosures required by Form S-4.

63. On October 11, 2022, the SEC declared the September 2022 Registration Statement effective.

64.     On October 12, 2022, NYCB filed an amended prospectus (the "October 12, 2022 Prospectus" and, together with the September 28, 2022 Registration Statement and documents incorporated therein, the "Flagstar Offering Documents") for the NYCB shares issued and exchanged in the Flagstar Merger.

65.     On October 27, 2022, the OCC conditionally approved the Flagstar Merger but required NYCB to relinquish to the OCC the authority to veto the issuance of any dividend to investors for the period of two years. The OCC imposed this condition "[t]o ensure [NYCB bank subsidiary] has sufficiently allocated resources to address any supervisory issues that arise post-merger."

66.     On December 1, 2022, NYCB and Flagstar announced the closing of the transaction for approximately $2.6 billion, representing NYCB's largest acquisition to date. Defendant Cangemi stated at the time that the merger "creates a company with significant scale and capabilities with a more diversified loan portfolio, an improved funding mix, and a much better interest-rate risk profile. Our employees will benefit from greater opportunities and resources that a bank with almost $90 billion in assets possesses." In connection with the transaction, NYCB's Board appointed six new directors, five of whom were former directors of Flagstar. The acquisition of Flagstar led to the Company becoming one of the top 25 banks in the country in total assets.

67.     NYCB would continue to insist that the Flagstar Merger "[did] not raise significant regulatory concerns," while omitting that its's decision to amend the Flagstar Merger agreement, which eliminated the need for FDIC approval and pivoted to the OCC's approval, was due to avoid the need for the FDIC's approval.

**NYCB Acquires Signature Bank's Assets**

68.     In early March 2023, the New York State Department of Financial Services took possession of Signature Bank "in order to protect depositors" and named the FDIC as receiver. The FDIC in turn transferred all the deposits and nearly all of the assets to Signature Bridge Bank, a full-service bank operated by the FDIC, while it looked for potential bidders for Signature Bank.

69.     On March 19, 2023, NYCB acquired $38.4 billion in assets from Signature Bank, including approximately $13 billion in loans and 40 branches (the "Signature Transaction"). In a press release issued that day, NYCB highlighted that the transaction "SIGNIFICANTLY ACCELERATES NEW FLAGSTAR BANK'S TRANSFORMATION TO A HIGH-PERFORMING COMMERCIAL BANK." In connection with the Signature Transaction, the FDIC received equity appreciation rights to approximately 39 million shares of NYCB common stock.

70.     As a result of the Flagstar and Signature Bank acquisitions, NYCB's total assets exceeded $100 billion, making it a "Category IV" bank by FRB prudential standards. Banks designated as a Category IV are subjected to stricter prudential standards, including risk-based and leverage capital requirements, and liquidity standards. NYCB's Category IV status also meant that it was now part of the Federal Reserve Board's Large and Foreign Banking Organization ("LFBO") supervisory program as opposed to the smaller Regional Banking Organization ("RBO") supervisory portfolio of firms. LFBO supervision allows examiners to compare risk management practices at different firms, identify gaps in practices at specific firms, and promote sound practices across the industry. Additionally, NYCB was assigned a designated "Bank Examiner," and the OCC "maintain[ed] a continuous on-site presence" at NYCB headquarters.

## FALSE AND MISLEADING STATEMENTS

**Statements and Omissions Concerning**
**Regulatory Opposition to the Flagstar Merger**

71.     On July 27, 2022, NYCB hosted an earnings call with analysts and investors to discuss results from the second quarter 2022 (the "2Q22 Earnings Call"). During the call, one analyst raised questions about the status of the Flagstar Merger, and specifically, the Company's decision to switch regulators, asking for "a temperature check on obtaining regulatory approval for the [Flagstar] deal," and whether "any critical milestones at this point have been reached and approved and if you can speak to any of them, including that national bank charter switch?" Defendant Cangemi responded: "we feel very confident where we are."

72.     Defendant DiNello denied that the regulatory switch had anything to do with the FDIC's underlying concerns about the deal: "don't read anything into the National Bank piece of it. It's just an easy way to get there. . . . So again stop, don't read anything into that. There's no complication associated with the application because of the National Bank piece of it." Defendant DiNello further stated that "the National Bank target just makes a lot more sense for our organization and for the combined organization as well."

73.     On October 12, 2022, NYCB filed the October 12, 2022 Prospectus with the SEC on Form 424(b)(3). The October 12, 2022 Prospectus was signed by Defendants Cangemi and DiNello. The prospectus discussed the need for "Regulatory Approvals" in order to effectuate the Flagstar Merger, stating, in relevant part:

> Subject to the terms of the merger agreement, NYCB and Flagstar have agreed to cooperate with each other and use reasonable best efforts to . . . obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties and governmental entities which are necessary or advisable to consummate the transactions contemplated by the merger agreement, and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such governmental entities. Pursuant to the original merger agreement, these approvals included, among others, the approval of . . . the Federal Deposit Insurance Corporation (the "FDIC") . . . . The initial submission of regulatory applications to the Federal Reserve Board, FDIC and NYDFS occurred on May 19, 2021. . . .
>
> Pursuant to the amendments to the merger agreement effected by the merger agreement amendment, *the approvals of the FDIC and the NYDFS are no longer*

*required to consummate the transactions contemplated by the merger agreement. The requirement to obtain these approvals has been replaced, pursuant to the merger agreement amendment, with the approval of the Office of the Comptroller of the Currency (the "OCC"), which is required to consummate the transactions contemplated by the merger agreement.* The merger agreement amendment made no other changes to the approvals required to consummate the transactions contemplated by the merger agreement, including those described in the previous paragraph. The initial submission of regulatory applications to the OCC occurred on May 10, 2022.

Although *neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required to consummate the transactions contemplated by the merger agreement in a timely manner*, NYCB and Flagstar cannot be certain when or if they will be obtained, or that the granting of these regulatory approvals will not involve the imposition of conditions on the completion of the merger, the holdco merger, the conversion or the bank merger.

74.    NYCB provided further details of the regulator switch in a section of the October 12, 2022 Prospectus titled "Background of the Merger," stating:

On April 25, 2022, NYCB and Flagstar agreed to amend the merger agreement pursuant to the merger agreement amendment . . . [that], among other things . . . amend[ed] the regulatory approvals necessary to consummate the transactions contemplated by the merger agreement such that the approvals of the FDIC and NYDFS are no longer required, replacing such approvals with the approval of the OCC.

\*\*\*

*NYCB and Flagstar each believe that a national bank charter is an appropriate charter for the combined company's banking operations*, especially taking into account Flagstar's national mortgage banking business, which Flagstar has operated successfully for many years under the supervision of the OCC.

75.    NYCB further dispelled any regulatory concerns with respect to the Flagstar Merger, stating: "*NYCB and Flagstar believe that the merger does not raise significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals*."

76.    On October 26, 2022, NYCB hosted an earnings call with analysts and investors to discuss third quarter financial results (the "3Q22 Earnings Call"). In response to an analyst's question during the call concerning "expect to close the deal" and whether "anything [had] changed

. . . that would make you think differently about the strategic merits of the deal today or November 1 versus when the deal was announced[,]" Defendant Cangemi stated: "we're very comfortable that the business combination is [a] powerful opportunity for two companies to come together and build a NewCo that has good diversity, a tremendous unique opportunity on deposit side and funding and give us an opportunity to transition a thrift commercial to a commercial banking enterprise."

77.     During the same 3Q22 Earnings Call, in response to an analyst's question of whether regulators were "slow-playing the approvals," Defendant DiNello stated that "[t]he regulatory process is what it is" and "I don't think you should read anything into any of our comments today, other than we're still hopeful because we see that the -- as we always have, we've seen that the opportunity and power of the combined organization is really something special."

78.     The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As would later be revealed on February 22, 2024, NYCB's decision to amend the Flagstar Merger agreement, which eliminated the need for FDIC approval and pivoted to the OCC's approval, was due to the FDIC's opposition to the Flagstar Merger over concerns based in part on "NYCB's exposure to multi-family loans" and the banks' lending practices. Despite its unfamiliarity with NYCB, the OCC was therefore a less challenging avenue for approval. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Statements and Omissions Concerning**
**NYCB's Risk Management Practices and Controls**

79.     On March 1, 2023, the Company filed the 2022 10-K with the SEC. The 2022 10-K was signed by each of the Individual Defendants. The 2022 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Cangemi and Pinto.

80.     The 2022 10-K stated, in relevant part:

**Asset Quality**

Asset quality remained strong during 2022 as increases in NPAs were substantially due to changes in asset mix related to the Flagstar acquisition and centered on non-performing one-to-four family residential and home equity loans. Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by NPLs and assets acquired in the Flagstar acquisition. At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.

\*\*\*

At December 31, 2022, total assets were $90.1 billion, up $30.6 billion or 51 percent compared to December 31, 2021. The growth compared the prior period was primarily due to the Flagstar acquisition which added $25.8 billion of assets, net of PAA, while the remaining growth was driven by growth in our lending portfolios.

\*\*\*

**Provision for Credit Losses**

For the twelve months ended December 31, 2022, the provision for credit losses totaled $133 million compared to $3 million for the twelve months ended December 31, 2021. The fourth-quarter and full-year provision for credit losses was impacted by the provision for credit losses related to the initial ACL measurement of non-PCD Flagstar acquired loans totaling $117 million.

81.     With respect to the Company's "risk culture" and "sound risk management practices," the 2022 10-K further stated:

**Enterprise Risk Management**

The Company's and the Bank's Boards of Directors are actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, measure, monitor, mitigate, and report risk. The Company has established an ERM program that reinforces a strong risk culture to support

sound risk management practices. The Board is responsible for the approval and oversight of the ERM program and framework.

ERM is responsible for setting and aligning the Company's Risk Appetite Policy with the goals and objectives set forth in the budget, and the strategic and capital plans. Internal controls and ongoing monitoring processes capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives, including the recognition of safety and soundness concerns and consumer protection. Additionally, ERM monitors key risk indicators against the established risk warning levels and limits, as well as elevated risks identified by the Chief Risk Officer.

82.     On March 20, 2023, the Company announced that its subsidiary, Flagstar Bank, N.A., acquired certain assets and assumed certain liabilities of Signature Bridge Bank. During a conference call held that day to discuss the deal, one analyst inquired "what are the things that . . . you think enables you to execute on this transaction?" In response, Defendant Cangemi stated, in relevant part:

I would just say . . . there's no question that['s] my priority as CEO, I'm very confident that we've built a very strong risk management team and we strengthened it every day, and we're up for the challenge and we're open to the regulatory landscape changing. That's our job[,] to be risk managers.

*** 

So, we're pleased and proud about the investment made on the risk management [and] regulatory oversight. But that's my priority. This is important. We're now a $100 billion bank. We're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank. We've made sizable investments. . . . We know what our obligations are as a large institution, and we convey it with confidence and professionalism with our regulatory constituents.

83.     Defendant Cangemi responded to whether the "outside noise" and "almost panic on deposit trends" brought on by recent well-publicized bank failures, including Signature Bank, was "overblown" for NYCB, stating:

So look, I can't address the stock market though I want to address the stock market. And I think we've done a really good job on managing client calls, dealing with the liquidity funding position and putting out the risk management tools to ensure that if a—we'll call it the lack of content continues that our risk managers are in place to have excess liquidity. But at the end of the day, we have a very stable source of

funding being a legacy thrift model of a lot of retail stability in the system. . . . so
in the event if we had to pull a liquidity situation, we would literally take down the
securities without any real consequence of the capital and be in a very unique
position with significant lines available because our portfolio is pledgeable [*sic*] on
the multifamily side. So we have a very good risk management plan in place.

84.     On April 21, 2023, the Company filed its 2023 Proxy Statement on Schedule 14A

with the SEC (the "2023 Proxy"), solicited by Defendant Cangemi and the Director Defendants.

The 2023 Proxy Statement solicited shareholder votes to approve *inter alia*: (i) the re-election of

Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years; (ii)

executive compensation; and (iii) the amendment to the Company's 2020 Omnibus Incentive Plan.

85.     The 2023 Proxy Statement contained the following information:

The Signature transaction adds a substantial amount of low-cost deposits and is
expected to be significantly accretive to both earnings per share and tangible book
value per share.

\*\*\*

Our Board, as stewards of shareholder interests, is committed to maximizing long-
term shareholder value creation and to maintaining sound corporate governance
principles consistent with current rules and practices. Under the leadership of the
Nominating and Corporate Governance Committee, we have concentrated
significant efforts and resources on ensuring that our overall corporate governance
practices serve the best interests of the Company and its various constituencies,
focusing on the changing needs for financial institutions in the current regulatory
environment and have taken into consideration the governance policies and
practices of our peers.

The Board of Directors maintains a Risk Assessment Committee comprised of
independent directors to assist the Board, together with the other Committees of the
Board, in overseeing and reviewing information regarding our enterprise risk
management programs, risk exposure, and risk governance policies and practices.

\*\*\*

**Board's Role in Risk Oversight**

**Risk Governance** – Management of risk is important to the success of our
operations and business strategies and our Board devotes significant attention to the
oversight of risks inherent in our banking business, including, but not limited to,
credit, interest rate, liquidity, price, operational, strategic, compliance and
reputational risks.

The Board reviews the key risks associated with the Company's strategic plan annually and regularly throughout the year as part of its consideration of the strategic direction of the Company as well as regularly reviewing various Company's risk management processes reporting and reviewing risks associated with specific business units and corporate functions.

While the Board of Directors as a whole is responsible for risk management oversight, management is responsible for the day-to-day management of the risks faced by the Company. As part of our risk oversight processes, our Chief Risk Officer reports to the Risk Assessment Committee; the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks; and senior members of management attend Board meetings and are available to address questions or concerns raised by the Board on risk management and other matters.

In carrying out its responsibilities in this area, the Board has delegated important duties to its committees. The Risk Assessment Committee has responsibility to oversee the functioning of the Company's enterprise risk management program and to ensure that risk is appropriately identified, measured, mitigated, monitored, and reported within approved governance structures. Among its duties, the Risk Assessment Committee reviews with management Company policies regarding risk assessment and management of risks that may be material to the Company, the Company's system of disclosure controls and system of internal controls over financial reporting, the Company's governance structure and processes, related person transactions, certain compliance issues and Board and committee structures, and the Company's compliance with legal and regulatory requirements. The Chairman of the Risk Assessment Committee is independent and the Nominating and Corporate Governance Committee of the Board has determined that he has the requisite risk experience for such position.

***

## Other Governance Practices

**Code of Business Conduct and Ethics** – The Company maintains a Code of Professional Conduct, applicable to all Company and Bank employees, which sets forth requirements relating to ethical conduct, conflicts of interest, and compliance with the law. The Code of Professional Conduct requires that the Bank's employees avoid conflicts of interest, comply with all laws and other legal requirements, conduct business in an honest and ethical manner, and otherwise act with integrity and in the Company's and the Bank's best interests. The CEO, Chief Financial Officer and Chief Accounting Officer are bound by the Code of Professional Conduct as well as our Code of Business Conduct and Ethics for the CEO, Chief Financial Officer and other senior financial officers. Copies of both Codes, which also apply to the directors of the Company, are available, free of charge, on the corporate governance pages of the Investor Relations portion of our website,

www.ir.mynycb.com, and are available in print to any shareholder who requests a copy.

***

In addition to the above described committees of the Company Board, the Credit Committee of the Bank Board serves important governance functions in the lending businesses of the Company. The multi-family, commercial real estate, commercial and industrial, residential, consumer, warehouse, home-builder and other asset-based loans that the Bank originates all are made in accordance with loan underwriting policies and procedures approved by the Committee, which maintain active oversight of management's loan origination, servicing, and collections processes. Committee members, who have significant experience in real estate and other lending businesses, apply their knowledge and expertise in key policy and risk-management decisions relating to these core business areas.

The authority of the Bank Board Credit Committee includes, among other things, oversight regarding the administration and implementation of loan policies, credit management policies and procedures, lending activities of the Bank's specialty finance company subsidiary, oversight regarding the administration and implementation of commercial and industrial loan policies, review of the risks associated with loans approved by management, and the delegation of credit authority. Each member has expertise in relevant areas of commercial and residential real estate lending, commercial and industrial lending, lending risk, and the business of financial institutions.

***

**Proposal 7: Approval of Amendment to the [NYCB] 2020 Omnibus Incentive Plan**

[…]

The 2020 Plan is critical to the successful execution of our pay-for-performance compensation strategy and our stated intention to provide compensation in a form that aligns the long-term interests of our key employees and directors with the interests of our shareholders. After considering the number of shares currently available under the 2020 Plan and assessing the Company's anticipated equity compensation needs under several scenarios, we believe that approval of the amendment will provide the Company with the flexibility necessary to meet the objectives of our incentive compensation program.

86.    However, the 2023 Proxy Statement was false and misleading when it discussed

the above, because: (i) the Board did not effectively manage risk, which ultimately resulted in,

among other things, the fourth quarter 2023 net loss of $252 million; (ii) the Board was not in fact "committed to maximizing long-term shareholder value"; (iii) the Board's corporate governance was insufficient; (iv) despite the existence of the Code of Conduct and related corporate governance, the Individual Defendants continuously engaged in wrongful and unlawful conduct; and (v) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to the Company.

87.     Furthermore, the 2023 Proxy Statement was false and misleading when it failed to disclose that (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; and (v) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

88.     Had Company shareholders known of these facts prior to the Annual Meeting of Shareholders held on June 1, 2023, they would not have approved the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years, nor would they have approved the executive compensation and the amendment to the Company's 2020 Omnibus Incentive Plan.

89.     Also on April 21, 2023, the Company filed its Annual Report to Security Holders for 2022 on From ARS with the SEC ("2022 Annual Report"). The 2022 Annual Report was signed by Defendants Cangemi, DiNello, Carpenter, Rosano, Saverese, Treadwell, Whip, Pinto, Dahya,

Dunn, Lux, Rosenfeld, Schoels, and Wann. The 2022 Annual Report also contained SOX certifications signed by Defendants Cangemi and Pinto.

90.     From the outset of the 2022 Annual Report, Defendant Cangemi stated, in a letter to shareholders, that "[a]t December 31, 2022, the Company had $90.1 billion of assets, $69.0 billion of loans, deposits of $58.7 billion, and total stockholders' equity of $8.8 billion," and provided the following infographic:



| NYCB NYSE Symbol | $90.1B Total Assets | $69.0B Total Loans |
|---|---|---|
| 395 Branches | $58.7B Deposits | $8.8B Stockholder's Equity |

91.     Defendant Cangemi's letter to shareholders in the 2022 Annual Report also stated the following with respect to the "crisis" resulting from increased interest rates, and NYCB's subsequent acquisition of Signature Bank, in relevant part:

> … unlike the last financial crisis, I don't expect a large number of banks to fail this time. […]. Recent failures appear to be more idiosyncratic in nature. They stemmed from each of these banks' specific business models along with substantially high levels of uninsured deposits and the lack of an appropriate risk management framework.
>
> ***
>
> While no financial institution is 100% immune, [NYCB] fared relatively well due to our diversified business model, focusing on our core competencies: multi-family/commercial real estate lending, retail banking, commercial lending, and residential mortgage originations and servicing.
>
> ***
>
> Amidst the recent crisis, an opportunity arose for our organization. This opportunity arrived on March 20th, when we announced that our bank subsidiary, Flagstar [], acquired certain assets and assumed certain liabilities, of Signature [] from the Federal Deposit Insurance Corporation. We did not acquire the entire ban, only certain strategically and financially complimentary parts of Signature that will

enhance our growth. This transaction is a game changer for us. It builds upon the merger between [NYCB] and Flagstar and accelerates our evolution into a diversified, high-performing commercial bank, while jumpstarting our middle market lending and "boots on the ground" relationship banking strategy.

\*\*\*

Not only is the transaction expected to immediately and significantly boost our earnings per share and tangible book value per share, but to execute such a transaction during the depths of a crisis, speaks volumes of faith and confidence our regulators have in our management team and business model.

92.     Defendant Cangemi's letter to shareholders continued:

Despite our growth over the past several months, there is one thing we will not outgrow – our conservative underwriting criteria. We have an enviable track record of historically low levels of non-performing loans and an even lower level of losses on our loan portfolio.

\*\*\*

With all of these things ahead of us, 2023 will be a transition year for us as we work to integrate and convert two acquisitions, focus on reducing expenses, growing our deposit base and building out each of our businesses in connection with the rollout of the New Flagstar.

93.     On April 28, 2023, the Company hosted an earnings call with analysts and investors to discuss NYCB's earnings release for the first quarter of 2023 (the "1Q23 Earnings Call"). During the call, in response to an analyst's question about NYCB's "risk management infrastructure" and how much the Company would have to invest in such infrastructure, Defendant Cangemi stated:

We went to a journey at 49.9. If I recall, when I was CFO, it was about five years at the time, holding the line at 49.9 and not crossing over an average. So that until we really built a position to understand what was expected as our regulatory framework was uniquely different than some others, which gave us a lot of oversight at the time to be with. And obviously those rules and pronouncements have changed but we've held through that our position that we were going to have a bank that could be ready to be $100 billion. That goes back to when we started that journey back in 2012 or 2011, and it's been a constant reinvestment over time.

So we're really excited about where we are. There's always going to be updates, it's always going to be evolving, especially given the regulatory landscape that

we're in currently, because who knows what's going to come out of this, I will call a mini crisis of confidence. But I don't think it's going to get easier but, you know, we're prepared to do what we have to do to manage a safe and sound organization. And risk management is our number one focus, right?

So we have a tremendous team and I'm proud of my risk team and I do a great job. And we're going to add a lot of new people from all three organizations together, as well as from the outside, and be ready for what's required for us as a highly regulated institution. But this is nothing new to us. It's just something we've been working on for quite some time, and we're prepared to make sure we have the highest standard.

94.    Defendant Pinto also reassured investors that NYCB was ready to operate as a Category IV bank, stating "there will always be some incremental add, but we don't think it will be a material add given the structure and backbone that we already have in place." Defendant Cangemi further added that: "we were ready to be at that $100 [b]illion mark and getting ready, but we were there, as far as operationally, moving from that direction. And at the same time, we get the offering leverage, we're making very substantial investments going back to early days, and we just continue to evolve from that. So, obviously, it's the most important aspect of this company going forward, is handling risk, given the nature of the bank and our new products."

95.    Just days later, however, during an April 25, 2023 ███████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████ █ █████████████████████████████████████████████████████████████

---

[5]    This was also discussed on April 19, 2023 ███████████████████████████████
████████████████████████████████████████████████████████████



96.     The April 25, 2023



97.     Additionally, ██████████████████ the April 25, 2023 ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

(emphasis in original).

98.     On June 13, 2023, ████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████

███████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████

99.     The same was also discussed on June 21, 2023 ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████

███████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████

███████████████



32

100.    A presentation given ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

101.    On October 26, 2023, NYCB hosted an earnings call with analysts and investors to discuss NYCB's third quarter 2023 financial results (the "3Q23 Earnings Call"). In response to an analyst's question concerning the Company's expenses as a result of becoming a Category IV bank, Defendant Pinto explained that the Company had an already-existing "significant stress testing group" and that they added two new people to that group in order to "be ready for the plan to be ready to be over $100 billion." Defendant Pinto further added:

> I mean, we'll continue to do what we have been doing. And since we started building to get ready for the old $50 billion threshold back in 2012 with preparing a capital plan, submitting a capital plan, going through the process, we have a significant stress testing group that we've put in place a long time ago and have added 2 to be ready for the plan to be ready to be over $100 billion.

102.    Defendant Cangemi assured investors that NYCB was making sure that the Company had "all of the requisite infrastructure" to operate as a Category IV bank, stating:

> We haven't given our 2024 guidance. And clearly, we are investing, as you indicated into the infrastructure, the build out past the $100 billion now. We understand our obligations there. So we clearly are focusing on making this company at the point of a $100 billion process, making sure that we have all of the requisite infrastructure, and we spent a lot of money over the years to get there. So we would understand the path there. . . . The reality is that we have a very strong focus here to make sure that we have a history, and this is just a history of managing a very strong efficiency ratio, but we're also being cognizant of our obligations as a $100 billion plus institution.

103.    On September 19, 2023, however, just over a month before the 3Q23 Earnings Call,

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

*Id.*

104. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

105.     The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As the Company would later admit, NYCB's "Board of Directors did not exercise sufficient oversight responsibilities, which led to [NYCB] lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities." Instead, NYCB "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates." Additionally, NYCB's "recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively." Further, the Company "did not sufficiently maintain effective control activities related to internal loan review" such that the Bank's "internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately

challenged," and which "impact[ed] the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases."

106.    Additionally, NYCB's new CEO Otting admitted, on May 1, 2024, that NYCB lacked "good risk management infrastructure" and that he and new management needed to "clean up our house and get it in order" as "we build infrastructure here." Otting further admitted that NYCB "was not ready to be regulated by the OCC."

107.    Former employees cited as confidential witnesses in the Securities Class Action confirmed that the Company's risk management practices were ineffective, at best. One former employee cited in the Securities Class Action as "CW-1," a member of NYCB's Regulatory Lending & Compliance Team, was quoted as stating that the Company had "nothing in place" in terms of controls.  CW-2, a former employee who worked directly with Chief Risk Officer Munson, stated that Munson was "in over his head" and was set up for failure.

108.    As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Statements and Omissions Concerning**
**NYCB's Loan Review Process and Asset Quality**

109.    On July 27, 2022, NYCB issued a press release announcing second quarter results for 2022 (the ("2Q22 Earnings Release"). The 2Q22 Earnings Release reported the following "asset quality" metrics:

- ***Nonperforming assets of $56 million***, equal to nine basis points (0.09%) of total assets ($63.1 billion);
- ***Non-performing loans of $50 million***, equal to ten basis points (0.10%) of total loans ($48.5 million);

- ***Total loans past due 30 to 89 days of $30 million***;
- ***ACL of $216 million***, representing 434% of total non-performing loans and 0.45% of total loans ($48.5 billion);
- ***Provision for credit losses of $9 million***;
- ***Net charge-offs (recoveries) of ($7 million)***.

110. The 2Q22 Earnings Release also reported non-GAAP net income for the three months ended June 30, 2022, of $166 million, up 6% from the previous quarter, and diluted non-GAAP earnings per share of $0.35, also up 6% from the previous quarter.

111. The 2Q22 Earnings Release further stated that NYCB's "***asset quality remained strong during the second quarter . . .***" Defendant Cangemi was quoted as stating, in relevant part:

> We are extremely pleased with the Company's operating performance during the current second quarter. ***By almost any measure, results exceeded expectations, despite market volatility and higher interest rates. We reported record net income available to common stockholders***, another quarter of record deposit growth, near-record loan growth, record originations, a higher net interest margin, and stable operating expenses, ***while asset quality remained stellar***. This resulted in strong year-over-year diluted earnings per share growth.

112. Also on July 27, 2022, NYCB hosted an earnings call with analysts and investors to discuss NYCB's second quarter results for 2022 ("2Q22 Earnings Call"), which was accompanied by an Investor Presentation, also filed on Form 8-K ("2Q22 Investor Presentation").

113. The 2Q22 Investor Presentation assured investors that NYCB's $36.8 billion multi-family loan portfolio was "[w]ell [i]nsulated" against recent changes in rent regulation laws. The presentation further declared that the Company's "***asset quality in _any_ credit cycle has consistently been better than our industry peers . . .***" NYCB also emphasized that it "rank[s] among the largest U.S. bank holding companies . . . ***but without the risk other large banks have***," explaining: "***Our asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers***." The 2Q22 Investor Presentation included the below chart demonstrating that NYCB's percentage of nonperforming loans to total loans was nearly ten times

lower than banks in the S&P U.S. BMI Banks Index, and twelve times lower than NYCB's peer banks:

| RATIO | NYCB<br>At 6/30/2022 | S&P U.S. BMI BANKS<br>INDEX (b)<br>At 3/31/2022 | PEERS (b)<br>At 3/31/2022 |
|---|---|---|---|
| NCOs/Average Loans | (0.01)% | 0.13% | 0.08% |
| Cumulative losses (a) | 107 bp | 2,425 bp | 1,360 bp |
| NPAs/Total Assets | 0.09% | 0.41% | 0.49% |
| NPLs/Total Loans | 0.10% | 0.95% | 1.20% |
| ALLL/NPLs | 434.11% | 124.34% | 123.64% |

114.     On August 8, 2022, NYCB filed its quarterly report for second quarter of 2022 on Form 10-Q with the SEC (the "2Q22 10-Q") which was signed by and contained SOX certifications by the Officer Defendants. The 2Q22 10-Q repeated the same asset quality metrics as detailed in the 2Q22 Earnings Release described above. With respect to allowance for credit losses, the 2Q22 10-Q stated: "Based upon all relevant and available information as of the end of the current second quarter, ***management believes that the allowance for losses on loans was appropriate at that date***."

115.     On October 26, 2022, the Company announced its third quarter 2023 financial results in a press release ("3Q22 Press Release") which stated in relevant part:

Balance Sheet:

–     Total assets of $111.2 billion at September 30, 2023 declined $7.6 billion compared to June 30, 2023, primarily due to a decline in cash balances, a portion of which was used to pay-down wholesale borrowings and brokered deposits.  This was partially offset by growth in the loan portfolio.

\*\*\*

Asset Quality:

–     Non-performing assets ("NPAs") were $404 million at September 30, 2023 or 0.36% of total assets.

–     Non-performing loans ("NPLs") were $392 million at September 30, 2023 or 0.47% of total loans.

–     The allowance for credit losses totaled $619 million at September 30, 2023 or 158% of non-performing loans and 0.74% of total loans.

–     Net charge offs were $24 million during third quarter 2023 compared to zero during third quarter 2022 and net recoveries of $1 million in the previous quarter.

***

"On the asset quality front, while we experienced a significant decline in early-stage delinquencies compared to the previous quarter, non-performing loans increased on a linked-quarter basis, owing primarily to two commercial real estate loans in the office sector. ***Despite this, our asset quality metrics continue to be among the best in the industry with non-performing loans at 47 basis points of total loans and net charge-offs of only three basis points***. This reflects our conservative underwriting practices.

116.     Also on October 26, 2022, NYCB hosted an earnings call to discuss NYCB's third quarter results for 2022 ("3Q22 Earnings Call"), which was accompanied by an Investor Presentation, also filed on Form 8-K ("3Q22 Investor Presentation").

117.     The 3Q22 Investor Presentation assured investors that changes in New York City rent regulation laws posed no threat to NYCB's $37.2 billion multi-family loan portfolio, stating: "Our Multi-Family Portfolio is Well Insulated Against Recent Changes in the Rent Regulation Laws."

118.     The 3Q22 Investor Presentation also declared that the Company's "***asset quality in any credit cycle has consistently been better than our industry peers*** . . ." The 3Q22 Investor Presentation further stated: "We rank among the largest U.S. bank holding companies . . . ***but without the risk other large banks have***," explaining that "Our asset quality metrics compare very

favorably to both the S&P U.S. BMI Banks Index and our regional bank peers," and including the following chart showing NYCB's percentage of nonperforming loans compared to the bank's peers:

| RATIO | NYCB At 9/30/2022 | S&P U.S. BMI BANKS INDEX (b) At 6/30/2022 | PEERS (b) At 6/30/2022 |
|---|---|---|---|
| NCOs/Average Loans | 0.00% | 0.06% | 0.10% |
| Cumulative losses (a) | 107 bp | 2,431 bp | 1,362 bp |
| NPAs/Total Assets | 0.08% | 0.37% | 0.43% |
| NPLs/Total Loans | 0.09% | 0.57% | 0.87% |
| ALLL/NPLs | 480.22% | 302.11% | 204.96% |

119.    In the 3Q22 Investor Presentation, NYCB claimed that "[w]e are a conservative lender across all of our loan portfolios[;]" and the Company's "[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles."

120.    During the 3Q22 Earnings Call, Defendant Cangemi praised NYCB's "hallmark" strong asset quality, stating in relevant part: "*we produced solid loan and deposit growth, lower operating expenses and continued strong levels of asset quality, which remains our hallmark*." Defendant Cangemi explained:

> Moving on to *one of the company's hallmarks: credit. Our asset quality and credit trends remain superb and continue to rank the company as among the best in the industry*. Nonperforming assets totaled $50 million, down $6 million compared to $56 million in the prior quarter and were 8 basis points of total assets. Additionally, we recorded 0 net charge-offs during the current third quarter compared to $7 million of net recoveries last quarter. *The strong asset quality metrics reflect our conservative underwriting practices and historically low level of losses in our core portfolios*.

121.    On November 4, 2022, NYCB filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2022 (the "3Q22 10-Q"), which was signed by and contained

SOX certifications by the Officer Defendants. The 3Q22 10-Q repeated the same asset quality metrics described above in the 3Q22 Press Release. With respect to allowance for credit losses, the 3Q22 Form 10-Q stated: "***Based upon all relevant and available information as of the end of the current second quarter, management believes that the allowance for losses on loans was appropriate at that date***."

122.    On January 31, 2023, NYCB issued a press release announcing fourth quarter 2022 financial results (the "4Q22 Press Release"). The 4Q22 Press Release discussed the Flagstar Merger, which had closed on December 1, 2022, stating that "the transition to commercial bank model" was "underway."

123.    The 4Q22 Press Release reported the following "asset quality" results for the quarter:

- Nonperforming assets of $153 million, or 0.17% of total assets ($90 billion);
- Nonperforming loans of $141 million, or 0.20% of total loans ($69 billion)60;
- Total loans past due 30 to 89 days of $64 million;
- ACL of $393 million, representing 279% of total non-performing loans ($141 million) and 0.57% of total loans ($69 billion);
- PCL of $124 million, as "impacted by the initial provision for credit losses totaling $117 million due to the Flagstar acquisition." Excluding this item, the fourth-quarter and full-year 2022 provision for credit losses was $7 million; and
- Net charge-offs (recoveries) of $1 million.

124.    The 4Q22 Press Release reported that the Company's "[a]sset quality remained strong during the fourth quarter of 2022." The 4Q22 Press Release included a "CEO Commentary" portion, quoting Defendant Cangemi as stating that the Company's "sensitivity to interest rate changes has improved materially to a more balanced position."

125.    Also on January 31, 2023, NYCB hosted an earnings call with analysts and investors to discuss fourth quarter results for 2022 (the "4Q22 Earnings Call"), accompanied by an Investor Presentation, also filed on Form 8-K ("4Q22 Investor Presentation"). The 4Q22 Investor Presentation touted NYCB's underwriting and asset quality, stating: "[o]ur *asset quality over various credit cycles has consistently been better than our industry peers*[,]" and "[l]ow risk credit culture and business strategy has resulted in *superior asset quality through past cycles*[.]" The 4Q22 Investor Presentation also included the following slide boasting that NYCB's "quality asset metrics compare favorably to both S&P U.S. BMI Banks Index and our regional bank peers[,]":



→ Our asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers.

| Ratio | NYCB <br> At 12/31/2022 | S&P U.S. BMI Banks Index [b] <br> At 9/30/2022 | Peers [b] <br> At 9/30/2022 |
|---|---|---|---|
| NCOs/Average Loans | 0.00% | 0.08% | 0.11% |
| Cumulative losses [a] | 107 bp | 2,433 bp | 1,363 bp |
| NPAs/Total Assets | 0.17% | 0.37% | 0.46% |
| NPLs/Total Loans | 0.20% | 0.57% | 1.03% |
| ALLL/NPLs | 279% | 321% | 143% |

126.    During the 4Q22 Earnings Call, Defendant Cangemi described NYCB's "solid" credit quality, "conservative" underwriting, and "high quality" balance sheet, stating:

> *Our credit quality remains -- metric remain solid, and reflect the strong credit culture of both legacy organizations*. NPAs to total assets equaled 17 basis points, while NPLs to total loans were 20 basis points, continuing to rank us among the best in the industry. *These metrics are proof positive that our conservative underwriting standards have served us well over various business cycles. This one is a high quality balance sheet should serve us well in the event of a downturn in the economy*.

127. With respect to NYCB's multi-family loan portfolio, Defendant Cangemi stated that "our bread and butter nonluxury rent regulation niche remains very strong."

128. In response to an analyst's question concerning the Company's credit perspective on office-related CRE loans, Defendant Pinto stated that NYCB's "office and really throughout the CRE and portfolio has been unbelievably strong from a credit perspective." Defendant Pinto further stated that "the performance in th[e CRE] portfolio has been better than we originally expected coming out of the pandemic." Defendant Cangemi added that "we're not seeing any negative trends and the LTV is relatively low. And in the event that we have to sit down and deal with a situation that has maybe some of [*sic*] credit deterioration, we think we're well protected as a sponsorship as well as overall value. I haven't seen any negative trends . . . . It's been very, very solid."

129. On March 1, 2023, the Company filed the 2022 10-K with the SEC. The 2022 10-K claimed that the Company's asset quality was "strong," and attributed the increase in NPAs, NPLs, ACL and PCL[6] to recently acquired Flagstar assets:

**Asset Quality**

***Asset quality remained strong during 2022*** as increases in [nonperforming assets ("NPAs")] were substantially due to changes in asset mix related to the Flagstar [Merger] and centered on non-performing one-to-four family residential and home equity loans. Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by [Nonperforming loans ("NPLs")] and assets acquired in the Flagstar [Merger]. At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.

---

[6]     "NPAs" refers to nonperforming assets; "NPLs" refers to nonperforming loans; "ACL" refers to allowance for credit losses on loans and leases; and "PCL" refers to provision for credit losses.

130.    The 2022 10-K further stated that, with respect to NYCB's ACL and PCL: "[b]ased upon all relevant and available information at the end of this December, management believes that the [following] allowance for losses on loans was appropriate at that date:"

> Partially reflecting the net recoveries noted above, and ***the provision of $133 million for the allowance for loan losses, the allowance for credit losses increased $194 million, equaling $393 million at December 31, 2022 from $199 million at December 31, 2021***. The majority of the increase is related to the initial provision for credit losses of $117 million and the adjustment for PCD loans acquired in the Flagstar [Merger]. ***The allowance for credit losses on loans and leases represented 278.87 percent of non-performing loans at December 31, 2022, as compared to 611.79 percent at the prior year-end***.

131.    The 2022 10-K assured investors that "***[b]ased upon all relevant and available information at the end of this December, management believes that the allowance for losses on loans was appropriate at that date***."

132.    On March 20, 2023, NYCB filed a current report on Form 8-K with the SEC, attaching a press release, announcing that on the previous day, the Company's banking subsidiary had entered into a definitive agreement to acquire Signature Bank's assets from the FDIC. Under the terms of the purchase agreement, the FDIC would receive NYCB stock in consideration for the Signature Transaction. In the press release, NYCB emphasized that the transaction was expected to be "significantly accretive to both earnings per share and tangible book value." The press release also quoted Defendant Cangemi as stating:

> Both the Company and the Bank were well positioned prior to the recent market turmoil, with strong capital, a stable retail deposit franchise, and ample liquidity. ***Moreover, our asset quality metrics remain solid, as they have over multiple business cycles***. After this transaction, we will be even better positioned to deal with any residual market issues, including by now operating with a significantly lower loan-to-deposit ratio. Overall, we are happy that our conservative business model and balance sheet put us in a position to quickly consummate this important transaction.

133.    On April 21, 2023, NYCB filed the 2022 Annual Report, which stated that as of December 31, 2022, NYCB had "$90.1 billion of assets, $69 billion of loans, deposits of $58.7

billion, and total stockholders' equity of $8.8 billion." In a letter to stockholders included in the

2022 Annual Report, Defendant Cangemi stated:

> Despite our growth over the past several months, there is one thing we will not outgrow – our conservative underwriting criteria. ***We have an enviable track record of historically low levels of non-performing loans and an even lower level of losses on our loan portfolio. At the end of last year, our asset quality metrics remained among the strongest in the industry***.

134.    The 2023 Proxy, also issued on April 21, 2023, how the Signature Transaction

would "enhance and quicken [NYCB's] growth."

> ***Management maintained the Company's superior loan growth and credit quality, maintaining our hallmark asset quality*** and a solid capital position.
>
> ***By successfully closing the Flagstar merger, management was able to take advantage of the strategically important opportunity to improve loan portfolio diversity*** (at December 31, 2022, multi-family, CRE and constructions loans represented 70% of total loans held for investment, compared with 91% at December 31, 2021), ***while continuing to maintain strong credit quality, with lowest net charge offs to average loans among peers*** (1st among 18 in peer group) and ratio of average non-performing loans to total loans of 0.45%, compared to S&P U.S. BMI Banks Index of 1.57%.

135.    On April 28, 2023, NYCB issued press release attached to a Form 8-K announcing

financial and "asset quality" results for the first quarter 2023 (the "1Q23 Press Release"),

including:

- Nonperforming assets of $161 million, equal to 0.13% of total assets ($123.8 billion);
- Nonperforming loans of $148 million, equal to 0.18% of total loans ($82.5 billion);
- Total loans past due 30 to 89 days of $175 million;
- ACL of $550 million, representing 370.38% of total non-performing loans and 0.45% of total loans ($82.5 billion)61;
- PCL of $170 million, which included a $132 million initial provision for credit losses for the acquired portion of the Signature loan portfolio;
- Net charge-offs (recoveries) of ($1 million).

136.    The 1Q23 Press Release further reiterated the strength of NYCB's asset quality, stating: "***Our asset quality metrics remained strong during the first quarter of 2023***."

137.    Defendant Cangemi was quoted in the 1Q23 Press Release as stating, with respect to the Company's asset and credit quality:

> While we have closed two acquisitions over the past four months, ***we have remained focused on our fundamentals including asset quality. Our asset quality metrics remain strong*** with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. ***We continue to be laser focused on credit quality across all lending verticals***.

138.    During the 1Q Earnings Call held that day, Defendant Cangemi stated that "[a]s for the quality of our loan portfolio, both our asset quality metrics and trends remain strong." Cangemi also stated that:

> Importantly, ***we reported another quarter of low or no loan losses as net charge-offs was zero during the current [sic] first quarter compared to $1 million during the previous quarter. Our office exposure remains very manageable, and we remain comfortable with the credit trends in this sector***. Our office exposure at quarter end was $3.4 billion or approximately 4% of total loans. We provided some details in our investor presentation, but to summarize, the average loan size is $11 million with a weighted average coupon of 4.62%. The weighted average LTV is 56% and the weighted average debt service coverage ratio was 1.73x.
>
> Furthermore, we have no delinquencies and no charge-offs in this portfolio. As you can see, ***these metrics are proof positive that our conservative underwriting standards have served us well over numerous credit cycles, this along with a high-quality balance sheet should serve us well in the event of an economic downturn. Regardless, we will continue to be laser-focused on credit quality across all the new verticals, especially those that we have recently entered***.

139.    In response to an analyst's question about NYCB's customers with office related loans, Defendant Cangemi stated that "***I think the messaging is that we know our customers very well. We're very comfortable with the LTV, the debt service coverage ratio*** . . . ." With respect to NYCB's asset and credit quality, Defendant Cangemi stated, in relevant part:

> Again, ***we feel really confident in it. But right now, we're seeing very strong performance, no delinquencies, no late pay***, and we're working with our customers in the event there is some issues on just changes in square foot rent rolls.

However, ***the LTVs are very low and the relationships are very strong and we know the customer very well***.

140.    In response to a separate question how NYCB's debt service coverage ratios for its regulated multi-family portfolio were holding up as a result of higher interest rates, Defendant Cangemi stated: "Given that we're a low leverage lender, LTVs are traditionally lower, are [sic] we underwrite very differently than some of our competitors . . . rates are elevated, but we're still seeing 100% consistency on no delinquencies, no late pays."

141.    Just days before the 1Q23 Earnings call, however, ██████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

142.    An Investor Presentation, filed on Form 8-K the same day ("1Q23 Investor Presentation") and accompanying the 1Q23 Earnings Call, stated that NYCB's "asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers[,]" and "asset quality over various credit cycles has consistently been better than our industry peers." The 1Q23 Investor Presentation added that "current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses[,]" and "[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles[.]"

143.    On May 10, 2023, the Company submitted its quarterly report for the period ended March 31, 2023 on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("1Q23 10-Q").

144.    With respect to asset quality, the 1Q23 10-Q claimed that the Company's "***asset quality metrics remained strong during the first quarter of 2023 with increases in NPLs and***

***NPAs attributable to the Signature Transaction.***" The 1Q23 10-Q further claimed that, with respect to the Company's allowance for credit losses: "***Based upon all relevant and available information at March 31, 2023, management believes that the allowance for losses on loans was appropriate at that date.***"

145. On March 24, 2023, ███████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████

███████████████████

████████████████████████████████████████
████████████████████████████

███████████████

146. Thereafter, on April 25, 2023, ████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████

███████████████

████████████████████████████████████████
████████████████████████████

███

███████████████

████████████████████████████████████████
██████████████████████████



147.    On May 9, 2023, ████████████████████████████████████████

████████████████████████████████████████████

██

████████████████████████████████████████████

██

████████████████████████████████████████████

███████

148.    On July 25, 2023, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

████

████████████████████████████████████████████

██

████████████████████████████████████████████

149.    On July 27, 2023, NYCB announced its second quarter 2023 financial results in a
press release (the "2Q23 Press Release") which stated:

> At June 30, 2023 total assets were $118.8 billion compared to $123.7 billion at
> March 31, 2023 and $90.1 billion at December 31, 2022.
>
> ***
>
> Asset Quality:
>
>> – Non-performing assets ("NPAs") were $246 million at June 30, 2023 or
>> 0.21% of total assets.
>>
>> – Non-performing loans ("NPLs") were $233 million at June 30, 2023 or
>> 0.28% of total loans.
>>
>> – The allowance for credit losses totaled $594 million at June 30, 2023 or
>> 255.40% of non-performing loans and 0.71% of total loans.
>>
>> – Net recoveries were $1 million during second quarter 2023 compared to
>> $7 million of net recoveries during second quarter 2022 and zero in the
>> previous quarter.
>
> ***
>
> ***Our asset quality trends remain among the best in the industry***, despite the slightly
> higher NPLs. At June 30, 2023, NPAs to total assets equaled 21 basis points
> compared to 14 basis points at March 31, 2023, while NPLs to total loans equaled
> 28 basis points compared to 20 basis points at March 31, 2023.

150.    Defendant Cangemi was quoted in the 2Q23 Press Release as stating "[o]ur ***asset
quality remains strong. Our overall metrics are still among the best in the industry, with NPAs
at a mere 21 basis points of total assets, even though we had an uptick in non-performing loans.
Additionally, we had a net recovery of $1 million during the quarter.***"

151.    During an earnings call held the same day (the "2Q23 Earnings Call"), Defendant Cangemi stated: "As for asset quality, our metrics remain strong . . . and also best in the industry, despite an uptick in NPLs off of historical low levels in legacy NYCB." With respect to the increase of NPAs, to $246 million in the quarter, up from $174 million in the prior quarter, Defendant Cangemi stated that the increase "resulted largely from the inclusion of acquired loans from both our acquisitions[,]" and noted that "[d]espite this uptick, NPAs and total assets rank in the top quartile compared to industry peers, reflecting our disciplined underwriting and client selection." Defendant Cangemi further added that "[i]mportantly, this was another quarter of low or no loan losses as we recorded a net recovery of $1 million compared to 0 net charge-offs last quarter."

152.    During the 2Q23 Earnings Call, one analyst asked about the "increase in the CRE NPLs and if any of that was tied to office." In response, Defendant Cangemi noted that the Company was "covered there when it comes to any potential loss" related to the Signature Transaction and Flagstar Merger, and explained that office-related CRE "*was flat when you take out the acquisitions*."

153.    In response to another analyst question concerning NYCB's "disciplined client selection underwriting" and "outlook for loan growth" moving forward, Defendant Cangemi described NYCB's businesses as "thriving," stating:

> But I would say, in theory, right now, as expected, based on our growth trajectory, as according to plan, I think I said it last quarter, we don't have to make a loan this year and we'll do very well. The good news is that our businesses are thriving and we're looking forward to allocate capital to this opportunity at much higher spreads...

154.    Defendant Cangemi further informed investors that NYCB would not need to engage in the capital preservation efforts of its peers, stating that "[w]e've got a very strong capital position."

155. When asked during the 2Q23 Earnings Call about the status of NYCB's office portfolio and whether the Company was seeing any stress on its multi-family loans, Defendant Cangemi responded that NYCB's portfolio was "resilient" despite pressure from interest rates, stating:

> I'll start and I'll defer to John, CFO. But clearly, it's been resilient. On the multi-family side, it's been an environment where we have a lot of wealthy customers. They're going through this journey of no activity. There's a 3% coupon from the lowest going into, let's say, close to 7% and 8%. So there is a substantial change and they're weathering the storm, they're paying their bills.

> \* \* \*

> We're not seeing any late pays. We're not seeing delinquencies on multi-family. The commercial real estate portfolio is doing extremely well. It's resilient. We have statistics in the deck. We talked about that. We're not going to be perfect because obviously, it's an environment where it's fluid but it seems like, as we reappraise buildings, as we get deep into the portfolio and we deal with some one-off issues, it's been a very resilient portfolio. So with that, I'm going to have John go through the statistics. But I will tell you that we're very pleased with the asset quality given the ramp-up of interest rates.

156. Defendant Pinto added, in response to the same question, that the Company's office portfolio has been "very strong" despite seeing some delinquencies, stating:

> So the portfolio has been strong. We have seen some early delinquencies. We think the bulk of them will be cleared in the third quarter but we are working through a couple of items, as you can imagine. But still, it's been very strong. It's bread-and-butter type lending for us. It's the same structure that we did and that we've done historically for decades with multi-family just with a different collateral base.

157. An Investor Presentation filed on Form 8-K accompanying the 2Q23 Earnings Call (the "2Q23 Investor Presentation") stated that the Company had "*[d]isciplined client selection and underwriting.*" The 2Q23 Investor Presentation further stated that "*asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers,*" and "*asset quality over various credit cycles has consistently been better than our industry peers.*" The 2Q23 Investor Presentation also advised that "[n]on-performing assets (NPAs) as a percent of total assets

*ranked in the top quartile compared to industry peers reflecting disciplined client selection* and underwriting[,]" "*current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses*[,]" and "*[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles*."

158.    On July 25, 2023, ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████    *Id.* (emphasis added).

159.    Also on July 25, 2023, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

160.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

161. On August 8, 2023,





162.    On August 9, 2023, the Company submitted its quarterly report for the period ended June 30, 2023, on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("2Q23 10-Q"). The 2Q23 10-Q affirmed the previously reported financial results and stated:

> At June 30, 2023, total assets were $118.8 billion, up $28.7 billion compared to December 31, 2022. Total deposits were $88.5 billion at June 30, 2023, up $29.8 billion from December 31, 2022. These year-to-date increases were primarily due to our March 20, 2023, assumption of a substantial amount of the deposits and certain identified liabilities and the acquisition of certain assets and lines of business of Signature Bridge Bank, from the FDIC, as receiver for Signature Bridge Bank (the "Signature Transaction").

***

> The allowance for credit losses on loans and leases increased $201 million, equaling $594 million at June 30, 2023 from $393 million at December 31, 2022. The increase was primarily related to the initial allowance for credit losses of $132 million for the acquired loans in the Signature Transaction, an increase of $13 million in specific reserves primarily related to two loans that have moved to non-accrual and an increase of $56 million primarily related to our worsening forecast of macroeconomic conditions and origination volume since year-end. The allowance for credit losses on loans and leases represented 255 percent of nonperforming loans at June 30, 2023, as compared to 279 percent at the prior yearend.

> **Based upon all relevant and available information at June 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as that date.**

163.    The 2Q23 10-Q further added that "asset quality metrics remained strong during the second quarter of 2023 despite increases in NPLs and NPAs attributable to certain loans acquired in the Signature Transaction and Flagstar acquisition."

164.    On October 26, 2023, NYCB announced its third quarter 2023 financial results in a press release (the "3Q23 Press Release") which stated:

**Asset Quality:**

–    Non-performing assets ("NPAs") were $404 million at September 30, 2023 or 0.36% of total assets.

–     Non-performing loans ("NPLs") were $392 million at September 30, 2023 or 0.47% of total loans.

–    The allowance for credit losses totaled $619 million at September 30, 2023 or 158% of non-performing loans and 0.74% of total loans.

–    Net charge offs were $24 million during third quarter 2023 compared to zero during third quarter 2022 and net recoveries of $1 million in the previous quarter.

***

"On the asset quality front, while we experienced a significant decline in early-stage delinquencies compared to the previous quarter, non-performing loans increased on a linked-quarter basis, owing primarily to two commercial real estate loans in the office sector.  Despite this, our asset quality metrics continue to be among the best in the industry with non-performing loans at 47 basis points of total loans and net charge-offs of only three basis points.  This reflects our conservative underwriting practices.

165.    During the 3Q23 Earnings Call held on October 26, 2023, Defendant Cangemi touted NYCB "strong" asset quality metrics and "conservative" underwriting:

***Despite the increase in NPLs, our asset quality metrics remained strong as NPLs to total loans were 47 basis points compared to 28 basis points last quarter, while our net charge-offs were also up or a mere 3 basis points of average loans***.

Also, as you can see on Slides 9 to 12 in our investor presentation material, ***our asset quality metrics remain solid and continue to rank among the best relative to the industry and our peers. These strong metrics reflect our conservative underwriting standards, which have served us well over multiple business cycles***.

166.     In response to an analyst's question about NYCB's asset quality and the health of its office and multi-family portfolio given rent regulatory changes, Defendants Cangemi stated:

> With that being said, we have a very strong portfolio with low LTVs and we monitor it carefully, and we're seeing consistencies of payment. We're seeing the reaction to higher interest rates on the [indiscernible] option or a fixed rate option, then having the capacity and the ability to continue to pay. And that's what we're seeing. So we're not seeing any delinquency trends with any material at all in the multi-family space, which is a positive. Again, rates have significantly risen over the past year or so and it does have an impact on the cash flow, but these are well in tune. Operators have been able to manage through that.

167.     Defendant Pinto added that NYCB has a "very strong portfolio" that was performing "extremely well relevant to the marketplace[,]":

> So there was no -- I don't think it was a related charge-offs to that particular credit, but it's one loan. So we have a very strong portfolio. We have statistics that we put out in our slide presentation material. It was very clear on the overall strength of the portfolio, relatively low LTVs, strong debt service coverage ratios, a very strong sponsorship, ***but it's not a trend***, and we're monitoring it. No question rates are much higher. We're still coming out of the pandemic. We're evaluating overall square footage in rentals. And as far as leases coming due and exits of certain large clientele, but it's been a relatively stable scenario. And despite the negativity you're reading about, our portfolio is performing extremely well relevant to the marketplace.

168.     Also during the 3Q23 Earnings Call, Defendant Cangemi described the "enhanced monitoring" of NYCB's portfolio that the Company was conducting, stating NYCB was "very cognizant of what's coming due when it comes to refinancing in respect to coupons as well as the tenancy, we evaluate that. Feel pretty good about the portfolio."

169.     In response to an analyst's question concerning the health of NYCB's rent-stabilized multi-family loan book, Defendant Cangemi stated:

> The reality is that it's one off families -- maybe 1 or 2 families that one's going through a marital dispute that's going through the court system and with a handful of those credits tied to the relationship. It's a handful of relationships, it's not systemic, it's not something we're seeing yet. We're clearly monitoring.. . .

> So it's been a relatively strong book, like I said, a very powerful position regarding the consistency of performance. We're not seeing trends.

170.     Adams, NYCB's then-President of Commercial Real Estate Finance, added that "outside of those isolated instances," NYCB was not seeing "a lot of cracks" in the multi-family rent regulation portfolio:

> So it's not really rapid. And for the rest of the portfolio outside of those isolated instances, the market rents, like Tom mentioned earlier, are up, I think, 4% month-over-month and you just can't kill the New York multi-family market. So we're monitoring the rent-regulated properties closely, but there's not really a lot of cracks in that particular portfolio that is really raising anything for us to have any real concern right at this time.

171.     In response to a separate question concerning "where the [multi-family and CRE loan portfolio] debt service coverage ratios are shaping out," Adams assured investors that NYCB was tracking the loans and reserving appropriately:

> [O]f course, if they're just repricing and they're leaving a three-handle, four-handle coupon and today, it's seven plus, sure the debt service coverage isn't where it was typically when the loan was originated, but there's still enough coverage for them to meet all their obligations, operating as well as debt service. And obviously, we tracked that on an annual basis and if they are less than what we would expect, they get risk graded accordingly, and they get reserved the way that they should be based on our model.

172.     When asked during the 3Q23 Earnings Call about NYCB's office loans and the reserves allocated to that portfolio, Defendant Pinto responded:

> But like we talked about before, these -- prior to this quarter, the performance has been extremely strong. So we continue to look at that. We continue to look at the SCRs and the LTVs in the portfolio as well, as well as the deep dive we've been doing into the underlying leases in the portfolio. So we're comfortable with where we are right now, but we did start to see a bit of a build -- an allowance build here this quarter.

173.     An Investor Presentation filed the same day on Form 8-K (the "3Q23 Investor Presentation") accompanied the 3Q23 Earnings Call. The 3Q23 Investor Presentation stated that NYCB had "[d]isciplined client selection and underwriting[.]" The 3Q23 Investor Presentation added that NYCB's "asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers[,]" and "asset quality over various credit cycles has

consistently been better than our industry peers[.]" The 3Q23 Investor Presentation further stated the Company's NPLs as a percent of total loans held-for-investment were "favorable compared to industry peer median reflecting disciplined client selection and underwriting[,]" and that "current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses[,]" while "[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles."

174. On November 6, 2023,





175. On November 9, 2023,

176. That same day, on November 9, 2023, the Company submitted its quarterly report for the period ended September 30, 2023, on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("3Q23 10-Q"). The 3Q23 10-Q affirmed the previously reported financial results and stated: "***Based upon all relevant and available information at September 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as of that date***."

177. The above-referenced statements about NYCB's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses were materially false and/or misleading and failed to disclose material adverse facts about the Company's business,

operations, and prospects. Indeed, as the Company would later admit: (i) NYCB's "internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged" and "these ineffective controls impact the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately [impact] the recognition of the allowance for credit losses on loans and leases;" (ii) NYCB's "recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively;" (iii) NYCB "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" and (iv) NYCB "lack[ed] a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities."

178.   Additionally, as the Company's new management would later uncover through an assessment of the CRE loan portfolio asset quality, nearly $2 billion of NYCB's loan portfolio are NPLs, and the Company has taken a PCL of $1.257 billion, with additional expected losses and reserves still to come. On June 5, 2024, new CFO Craig Gifford acknowledged in a conference call that "the principal drivers" of the NPLs, losses and loss reserves were the same pre-Class Period market events that the Exchange Act Defendants claimed to have been well-insulated from: New York's rent regulation laws, COVID-related office vacancies, and federal interest rate hikes.

179.   As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Statements and Omissions Concerning NYCB's Internal Controls Over Financial Reporting**

180.    The Individual Defendants caused the Company to issue materially false and misleading statements concerning NYCB's internal controls over financial reporting, including the effectiveness of such controls.

181.    Each quarterly report filed on Form 10-Q (the 2Q22 10-Q, 3Q22 10-Q, 1Q23 10-Q, 2Q23 10-Q, and 3Q23 10-Q) and the 2022 10-K, each of which was signed by Defendants Cangemi and Pinto, made the following representations concerning NYCB's purported disclosure controls and procedures and internal controls over financial reporting:

(a) ***Evaluation of Disclosure Controls and Procedures***

Disclosure controls and procedures are the controls and other procedures that are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the U.S. Securities and Exchange Commission's (the "SEC's") rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rule 13a-15(e), as adopted by the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"). ***Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period.***

182.    The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. In truth, and as NYCB would later admit, "the Company did not maintain effective internal control over financial reporting." Further, NYCB would later admit that its internal controls suffered from material weaknesses that "create a reasonable possibility that a material misstatement to the

consolidated financial statements will not be prevented or detected on a timely basis." Specifically, NYCB: (i) "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (ii) lacked "leadership resources to conduct effective risk assessment and monitoring activities;" (iii) lacked "effective" "recurring monitoring activities over process level control activities, including internal loan review;" and (iv) operated internal loan review processes operated without an appropriate risk management "framework to ensure that ratings were consistently accurate, timely, and appropriately challenged[.]" As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Statements and Omissions in the Flagstar Offering Documents**

183.     NYCB and Flagstar announced on April 26, 2021 that their respective boards of directors had agreed to the terms of the Flagstar Merger. Thereafter, in connection with the Flagstar Merger, NYCB filed with the SEC: (i) a preliminary registration statement on Form S-4 on June 11, 2021; (ii) an amendment to the registration statement on Form S-4/A on June 24, 2021; (iii) a joint proxy statement and prospectus on Form 424B3 on June 25, 2021; (iv) several prospectus supplements, including on November 3, 2021, November 4, 2021, February 2, 2022, and March 4, 2022; (v) a current report on Form 8-K on April 27, 2022, announcing an April 26, 2022 amendment to the April 24, 2021 merger agreement between NYCB and Flagstar (the "April 26, 2022 Amended Merger Agreement"); (vi) a post-effective amendment to the registration statement

on Form S-4 on August 3, 2022; and (vii) another post-effective amendment to the registration statement on Form S-4 on September 28, 2022 (the "September 28, 2022 Registration Statement").

184. On October 11, 2022, the SEC declared the September 28, 2022 amended registration statement effective.

185. On October 12, 2022, NYCB filed an amended prospectus on Form 424B3 for the NYCB shares issued and exchanged for Flagstar shares in the Flagstar Merger.

186. On October 27, 2022, NYCB and Flagstar amended the Merger Agreement again, this time to extend the Merger Termination Date to December 31, 2022.

187. On December 1, 2022, NYCB and Flagstar announced the closing of the transaction for approximately $2.6 billion, representing NYCB's largest acquisition to date.

188. The Flagstar Offering Documents[7] contained untrue statements of material facts and/ or omitted to state material facts required to be stated therein, or necessary to make the statements therein not misleading. Specifically, the Flagstar Offering Documents materially misrepresented: (i) the FDIC's decision to reject NYCB's application for approval of the Flagstar Merger; (ii) NYCB's risk management framework and practices; and (iii) the asset quality of NYCB's highly concentrated CRE loan portfolio and the Company's unreliable estimation of its ACL and PCL.

189. With respect to the regulatory approval necessary to complete the Flagstar Merger, the Flagstar Offering Documents stated: "neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required to consummate the transactions contemplated by the merger agreement in a timely manner." The Flagstar Offering Documents continued:

---

[7] The "Flagstar Offering Documents" are comprised of the October 12, 2022 Prospectus Supplement and the September 28, 2022 Registration Statement, and documents incorporated by reference therein.

Subject to the terms of the merger agreement, NYCB and Flagstar have agreed to cooperate with each other and use reasonable best efforts to promptly prepare and file all necessary documentation, to effect all applications, notices, petitions and filings (and in the case of the applications, notices, petitions and filings in respect of the requisite regulatory approvals (as defined in "The Merger—Regulatory Approvals"), use their reasonable best efforts to make such filings by May 16, 2022), to obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties and governmental entities which are necessary or advisable to consummate the transactions contemplated by the merger agreement, and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such governmental entities. *Pursuant to the original merger agreement, these approvals included, among others, the approval of (i) the Board of Governors of the Federal Reserve System (the "Federal Reserve Board"), (ii) the Federal Deposit Insurance Corporation (the "FDIC"), (iii) the New York State Department of Financial Services ("NYDFS")*, (iv) Ginnie Mae, Fannie Mae, Freddie Mac, the Federal Housing Authority of the U.S. Department of Housing and Urban Development, the United States Department of Agriculture and the United States Department of Veterans Affairs (collectively, the "Mortgage Agencies") with respect to mortgage banking and mortgage servicing activities of Flagstar and certain subsidiaries of Flagstar and (v) the Texas Department of Insurance and the Vermont Department of Financial Regulation with respect to the change of control of certain Flagstar subsidiaries that hold licenses to engage in certain insurance activities. The initial submission of regulatory applications to the Federal Reserve Board, FDIC and NYDFS occurred on May 19, 2021, and the initial regulatory submissions with the Mortgage Agencies had been made as of June 11, 2021, the date of the initial filing of the registration statement on Form S-4 of which this amended prospectus forms a part.

*Pursuant to the amendments to the merger agreement effected by the merger agreement amendment, the approvals of the FDIC and the NYDFS are no longer required to consummate the transactions contemplated by the merger agreement. The requirement to obtain these approvals has been replaced, pursuant to the merger agreement amendment, with the approval of the Office of the Comptroller of the Currency (the "OCC"), which is required to consummate the transactions contemplated by the merger agreement*. The merger agreement amendment made no other changes to the approvals required to consummate the transactions contemplated by the merger agreement, including those described in the previous paragraph. The initial submission of regulatory applications to the OCC occurred on May 10, 2022.

Although *neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required to consummate the transactions contemplated by the merger agreement in a timely manner*, NYCB and Flagstar cannot be certain when or if they will be obtained, or that the granting of these regulatory approvals will not involve the imposition of conditions on the completion of the merger, the holdco merger, the conversion or the bank merger.

190.     The Flagstar Offering Documents further stated: "NYCB and Flagstar believe that the merger does not raise significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals."

191.     The Company's annual report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), which was incorporated by reference into the Flagstar Offering Documents, made the following representations about the Company's risk management practices:

**Enterprise Risk Management**

*The Company's and the Bank's Boards of Directors are actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, measure, monitor, mitigate, and report risk. The Company has established an ERM program that reinforces a strong risk culture to support sound risk management practices*. The Board is responsible for the approval and oversight of the ERM program and framework.

ERM is responsible for setting and aligning the Company's Risk Appetite Policy with the goals and objectives set forth in the budget, and the strategic and capital plans. *Internal controls and ongoing monitoring processes capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives, including the recognition of safety and soundness concerns and consumer protection. Additionally, ERM monitors key risk indicators against the established risk warning levels and limits, as well as elevated risks identified by the Chief Risk Officer.*

192.     The 2021 10-K also identified as a mere contingent and future "risk" that "[o]ur enterprise risk management framework may not be effective in mitigating the risks to which we are subject." In reality, NYCB's risk management was already "not effective" because, as the Company would later admit, NYCB's "Board of Directors did not exercise sufficient oversight responsibilities, which led to [NYCB] lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities." The Company would also later admit that NYCB's "recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively."

193.    NYCB's April 22, 2022 Definitive Proxy Statement (the "2022 Proxy"), incorporated by reference into the Flagstar Offering Documents, stated:

> Management of risk is important to the success of our operations and business strategies and *our Board devotes significant attention to the oversight of risks inherent in our banking business, including, but not limited to, information security risk, credit risk*, model risk, interest rate risk, liquidity risk, operational risk, strategic risk, compliance risk and reputational risk.
>
> The Board reviews the key risks associated with the Company's strategic plan annually and regularly throughout the year *as part of its consideration of the strategic direction of the Company as well as reviewing the output of the Company's risk management processes each year and reviewing risks associated with specific business units and corporate functions*.
>
> *While the Board of Directors as a whole is responsible for risk management oversight, management is responsible for the day-to-day management of the risks faced by the Company. As part of our risk oversight processes, our Chief Risk Officer reports to the Risk Assessment Committee; the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks; and senior members of management attend Board meetings and are available to address questions or concerns raised by the Board on risk management and other matters*. In carrying out its responsibilities in this area, the Board has delegated important duties to its committees.
>
> The Risk Assessment Committee has responsibility to oversee the functioning of the Company's enterprise risk management program and *to ensure that risk is appropriately identified, measured, mitigated, monitored, and reported within approved governance structures*. Among its duties, the Risk Assessment Committee reviews with management Company policies regarding risk assessment and management of risks that may be material to the Company, the Company's system of disclosure controls and system of internal controls over financial reporting, the Company's governance structure and processes, related person transactions, certain compliance issues and Board and committee structures, and the Company's compliance with legal and regulatory requirements.

194.    The Flagstar Offering Documents also contained false and misleading statements and omitted material facts concerning NYCB's CRE loan portfolio asset quality. Specifically, the 2021 10-K touted the Company's "leadership position in the multi-family and CRE markets" as "instrumental to our production of solid earnings and ou*r consistent record of exceptional asset quality.*" Further, the 2021 10-K stated: "*Our Asset Quality Metrics Remain Strong*."

195.   The 2Q22 10-Q, also incorporated by reference into the Flagstar Offering Documents, stated:

- Nonperforming assets of $56 million, equal to nine basis points (0.09%) of total assets ($63.1 billion);
- Non-performing loans of $50 million, equal to ten basis points (0.10%) of total loans ($48.5 million);
- Total loans past due 30 to 89 days of $30 million;
- ACL of $216 million, representing 434% of total non-performing loans and 0.45% of total loans ($48.5 billion);
- PCL of $9 million;
- Net charge-offs (recoveries) of ($7 million).

196.   The 2021 10-K, meanwhile, purported to warn of potential risks that, "if" they were to occur, "could" or "may" adversely affect the Company, but failed to disclose that such risks were already materializing. For instance, the 2021 10-K stated that: "[o]ur allowance for credit losses might not be sufficient to cover our actual losses, which would adversely impact our financial condition and results of operations." The 2021 Form 10-K also stated that NYCB's concentration in multi-family loans and CRE loans could expose the Company to "increased lending risks and related loan losses." Further, the Flagstar Offering Documents stated that "[A]n adverse development with respect to one loan or one credit relationship can expose us to a significantly greater risk of loss compared to an adverse development with respect to a one-to-four family residential real estate loan."

197.   The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose that NYCB's pivot to OCC regulatory approval was due to the FDIC's opposition to the Flagstar Merger given "NYCB's exposure to multi-family loans" and the banks' lending practices. Further, as the Company would later admit, NYCB: (i)

"lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (ii) lacked "leadership resources to conduct effective risk assessment and monitoring activities;" (iii) lacked "effective" "recurring monitoring activities over process level control activities, including internal loan review;" and (iv) operated internal loan review processes operated without an appropriate risk management "framework to ensure that ratings were consistently accurate, timely, and appropriately challenged[.]"

198.    Additionally, the Flagstar Offering Materials failed to disclose material facts necessary to apprise investors with Flagstar shares—that would be exchanged for NYCB shares pursuant to the terms of the Flagstar Merger—of the true risks inherent in investing in the Company in violation of Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303") and Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105").

199.    Pursuant to Item 303 and Item 105, NYCB was required to disclose facts to which it would later admit, specifically, that NYCB: (i) "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (ii) lacked "leadership resources to conduct effective risk assessment and monitoring activities;" (iii) lacked "effective" "recurring monitoring activities over process level control activities, including internal loan review;" and (iv) operated internal loan review processes operated without an appropriate risk management "framework to ensure that ratings were consistently accurate, timely, and appropriately challenged[.]"

200. Items 303 and 105 also required disclosure of the trends and uncertainties related to regulatory concerns regarding the Flagstar Merger, the reasons for NYCB and Flagstar's pivot to OCC approval, and NYCB's underwriting standards and exposure to multi-family loans.

201. NYCB's violations of Item 303 also made misleading Defendants' certifications as to the accuracy and completeness of the SEC filings. Defendants Cangemi and Pinto certified under criminal penalty with respect to the Company's 2021 10-K, for instance:

> In connection with the Annual Report of New York Community Bancorp, Inc. (the "Company") on Form 10-K for the fiscal year ended December 31, 2021 as filed with the Securities and Exchange Commission (the "Report"), the undersigned certify, pursuant to 18 U.S.C. Section 1350, as added by Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> (1) The Report *fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934*; and
>
> (2) *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report*.

## THE BOARD'S KNOWLEDGE BEFORE THE TRUTH EMERGED

202. In addition to the above-described discussions that ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

203. On December 4, 2023, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

███

204.   On January 17, 2024, ███████████████████████████





205.    On January 23, 2024,

206. On January 23, 2024, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████ ████████████

207. On January 24, 2024, █████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████

208. On January 30, 2024, █████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████

**THE TRUTH EMERGES**

209. On January 31, 2024, before the market opened, NYCB issued a press release announcing fiscal fourth quarter 2023 financial results (the "4Q23 Press Release"). The Company reported a fourth quarter net loss of $252 million due to "a $552 million provision for loan losses,"

which was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio.

210.    Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements.  Specifically, in the 4Q23 Press Release, the Company stated the following:

> For the three months ended December 31, 2023, the Company reported a net loss of $252 million compared to net income of $207 million for the three months ended September 30, 2023. For the three months ended December 31, 2023, the Company reported a net loss available to common stockholders of $260 million compared to net income available to common stockholders of $199 million for the three months ended September 30, 2023. Diluted EPS totaled $(0.36) for the three months ended December 31, 2023 compared to diluted EPS of $0.27 for the three months ended September 30, 2023.

> Fourth quarter 2023 net income and diluted EPS were impacted by merger-related items and a FDIC special assessment. As adjusted, the net loss for the three months ended December 31, 2023 totaled $185 million, compared to net income of $274 million for the three months ended September 30, 2023.  The net loss includes the impact from higher provision for credit losses that primarily reflects a significant increase in the ACL which strengthened the credit profile of the Company.

> ***

> "Shortly after closing the acquisition of Flagstar Bank, we were presented with the unique opportunity to accelerate this transformation when we were selected by the FDIC to purchase certain strategically and financially attractive assets and liabilities of Signature Bank. The benefits of this transaction were abundantly clear, as it strengthened our balance sheet by adding a significant amount of low-cost deposits and a middle-market business supported by over 130 private banking teams. The transaction also put us over $100 billion in total assets, placing us firmly in the Category IV large bank class of banks between $100 billion and $250 billion in assets and subjecting us to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards, requirements for overall risk management and stress testing.  While we began preparing to be a $100 billion bank almost immediately after closing the Flagstar acquisition, we crossed this important

threshold sooner than anticipated as a result of the Signature transaction. Alongside the integration of our three banks and in anticipation of our initial capital plan submission in April of this year, we have pivoted quickly and accelerated some necessary enhancements that come with being a $100 billion-plus Category IV bank.

"With this in mind, during the fourth quarter, we took decisive actions to build capital, reinforce our balance sheet, strengthen our risk management processes, and better align ourselves with the relevant bank peers. We significantly built our reserve levels by recording a $552 million provision for loan losses, bringing our ACL coverage more in line with these peer banks.  In addition, we added on-balance sheet liquidity as we prepare for the enhanced prudential standards that apply to banks with $100 billion or more in total assets.

"To this end, we are also building capital by reducing our quarterly common dividend to $0.05 per common share. We recognize the importance and impact of the dividend reduction on all of our stockholders and it was not made lightly.  We believe this is the prudent decision as it will allow us to accelerate the building of capital to support our balance sheet as a Category IV bank.

211.     The Company disclosed further details concerning its allowance for credit losses,

stating:

At December 31, 2023, the allowance for credit losses was $992 million compared to $619 million at September 30, 2023, up $373 million reflecting our actions to build reserves during the quarter to address weakness in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets, which better aligns the Company with its relevant bank peers, including Category IV banks.

212.     The Company also disclosed details concerning the Company's provision for credit

losses, stating:

For the three months ended December 31, 2023, the provision for credit losses totaled $552 million compared to a $62 million provision for the three months ended September 30, 2023.  The increase is primarily attributable to higher net charge-offs, as well as, to address weakness in the office sector, potential repricing risk in the multi-family portfolio, and an increase in classified assets.

*** 

Fourth quarter net charge-offs were primarily related to two loans. First, we had one co-op loan with a unique feature that pre-funded capital expenditures. Although the borrower was not in default, the loan was transferred to held for sale

during the fourth quarter. We expect the loan to be sold during the first quarter of 2024. We also performed a review of other co-op loans and did not find any other loans with similar characteristics.

Second, we had an additional charge-off on an office loan that went non-accrual during the third quarter, based on an updated valuation. Given the impact of recent credit deterioration within the office portfolio, we determined it prudent to increase the ACL coverage ratio.

Together, these two loans accounted for the bulk of the $185 million of net charge-offs we took during the fourth quarter.

213.    On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume.

214.    During an earnings call held the same day (the "4Q23 Earnings Call"), Defendant Cangemi was asked "[w]here do you see credit losses migrating next year? And if you expect any losses to come from the multi-family book?" In response, Defendant Cangemi stated that NYCB had "looked at the marketplace, looked at the office perspective and the general office weaknesses throughout the country" and "did a deep dive in the office portfolio as well as thinking through payment shock and interest rate shock given the rise of interest rates that we've experienced over the past few quarters, in particular, the impact to our customers in respect to repricing." Defendant Cangemi further noted that while they "clearly had significant addition to our reserve build," with respect to "the actual performance of the portfolio, there hasn't been a whole lot of change in respect to the NPAs and delinquencies." Defendant Pinto added that, with respect to NYCB's multi-family portfolio, the reserves announced for the fourth quarter reflected "repricing risk in that portfolio" and "we're not seeing any significant trends in the multi-family portfolio besides the repricing risk that we spoke about."

215.    Defendant Pinto further added:

***So we did a really, as Tom mentioned earlier, really deep dive on the office portfolio and really took into account some of the more recent appraisals we're***

76

*seeing and what we're seeing in that sector and really tried to capture that risk in that portfolio*. So the 800% coverage – the 800 basis points of coverage that we have there, we're comfortable with right now. We still have two loans that are the same loans we talked about in the third quarter that are sitting in non-accrual. *We haven't seen any other significant trends from a delinquency perspective yet in that portfolio. So we're comfortable with where we are now.* We'll continue to revisit it, of course, as we get additional appraisals in for properties that have been rated, that have been criticized.

216.    Also during the 4Q23 Earnings Call, Defendant Pinto assured investors that NYCB is "***very comfortable with the early delinquencies that we're seeing.***"

217.    During a question-and-answer portion of the 4Q23 Earnings Call, one analyst noted that to meet the reported "10% CET1 target," NYCB's provision for credit loss in 2024 "is going to have to be de minimis" and questioned "what are you guys baking in for provision to get to that 10% level? And is that aggressive?" In response, Defendant Pinto stated that NYCB expected that the fourth quarter provision of $552 million "covers the emerging risks and the portfolio that we have currently," and that NYCB was "very comfortable with the early delinquencies that we're seeing and those trends have not dramatically jumped up" and "***there's not a -- anywhere near a significant provision as we saw in the third and the fourth quarter combined in 2024 that we're expecting right now given what we're seeing in the portfolio and in the portfolio dynamics***."

218.    When asked by an RBC Capital Markets analyst specifically about the Company's decision to cut its dividend and whether it "ha[d] anything to do with your outlook for credit[,]" Defendant Cangemi responded:

*Let me be crystal clear on this. This is razor focused on looking at the company's long term plan and being part of the new Category IV banking institutions and having a capital position as we grow it into a level that we are in our peer group.* And clearly, the dividend significantly increases that capital efficient in 2024 and beyond.

When you take all of the factors that we talked about between the forward guidance and the dividend adjustment, we get our CET1 to double digits. That is primarily focused on the rationale there as well as thinking about the future growth in this company as a Category IV bank. And there's no question that this was a difficult

decision as a firm, but clearly necessary as we reestablish our capital allocation story.

219.    When the RBC Capital Markets analyst followed up to confirm that "it's more about the latter. It's not about your outlook for credit is what you're saying?" Cangemi responded: "Yes."

220.    Following this, *Bloomberg* published an article entitled "NYCB's Talks With Watchdog Led to Moves that Rocked Market." In the article, *Bloomberg* reported that:[8]

> Mounting pressure from a top US watchdog led to New York Community Bancorp's surprise decision to slash its dividend and stockpile cash in case commercial real estate loans go bad, according to people with direct knowledge of the matter.
>
> The drastic financial moves — which triggered a record plunge in the company's stock and dragged down shares across the industry last week — followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency, the people said, asking not to be identified describing the confidential discussions.
>
> Two senior executives left their posts in the months before the bank unveiled its measures, one of the people said. As of late last year, the company's website no longer showed chief risk officer Nicholas Munson and chief audit executive Meagan Belfinger on its leadership page. The changes weren't publicly reported by the firm at the time.
>
> A spokesperson for the OCC declined to comment, as did Munson and Belfinger. The bank confirmed Munson's departure to the Financial Times and Bloomberg News on Monday, but declined to otherwise comment.
>
> New York Community Bancorp has said building reserves is part of its widely expected transition to more stringent capital rules after the lender swelled beyond $100 billion in assets while acquiring parts of Signature Bank last year. But investors were rattled when it set aside $552 million for potential loan losses — more than 10 times what analysts anticipated — and slashed quarterly dividends by 70%.

---

[8]    Hannah Levitt, et al., *NYCB's Talks With Watchdog Led to Moves That Rocked Market*, Bloomberg (Feb. 5, 2024), https://www.bloomberg.com/news/articles/2024-02-05/nycb-s-tense-talks-with-watchdog-led-to-moves-that-rocked-market?embedded-checkout=true (last accessed Apr. 9, 2024).

The OCC wielded unusually tight control over those payouts after the firm's acquisition of Flagstar Bank in late 2022. The deal gives the watchdog a right to object to any dividends set by the parent company through late 2024, regulatory filings show.

Then, last year, US watchdogs drew a painful lesson from the failure of another firm that had grown rapidly — Silicon Valley Bank. SVB collapsed after using deposits from tech companies to load up its balance sheet with long-term assets. When clients later tapped their cash to weather a slump in fundraising, SVB began selling holdings at losses to keep up with withdrawals, setting off panic and a run.

A Federal Reserve review ultimately found that examiners didn't act swiftly enough to shore up the lender's controls and balance sheet after it surpassed $100 billion in assets. In a letter outlining lapses, the Fed's vice chair for supervision, Michael Barr, suggested authorities must sometimes be more aggressive — even forcing banks to hold extra capital awhile to "focus management's attention."

New York Community Bancorp almost doubled in size over the past 15 months thanks to its acquisition of Flagstar and opportunistic takeover of deposits and some loans from Signature Bank, which failed last year. The deals gave the 165-year-old lender new heft and drove up its share price.

The takeovers also catapulted its assets past $100 billion, placing the lender in a more rigorous category of regulation, in which the firm lagged behind its new peers in terms of capital and loan-loss reserves.

In recent months, global regulators and investors have grown more concerned about the declining value of US commercial properties and the inability of some borrowers to refinance — and whether regional lenders may get burned.

It's unclear why or precisely when Munson and Belfinger exited their posts. Archived copies of the company's website show they were listed among its leadership in early October but not by the end of the year.

On Wednesday, the bank said it would reduce shareholder payouts and beef up reserves, noting that debts 30 to 89 days past due had jumped 48% last quarter compared to the quarter before. Net charge-offs in the period were primarily related to a pair of debts tied to a co-op complex and offices.

"We are taking decisive actions to build capital, strengthen our balance sheet and risk management processes which better aligns us with the relevant peers for a bank of our larger size and complexity," Chief Executive Officer Thomas Cangemi said on an earnings conference call Wednesday. He declined to comment on talks with regulators when an analyst asked if something had changed there.

The stock dropped 45% over the two days after its announcement, leading the broader KBW Regional Banking Index of 50 companies down 8.2%, its worst two-day performance since SVB imploded. An additional decline on Monday left the bank's stock 48% lower than before its disclosure.

**Tiered Regulation**

US rules introduced under former President Donald Trump eased the regulatory burden on many small banks and introduced several tiers of scrutiny above them, based on a lender's size and risk profile. Those range from Category I for the giant Wall Street firms down to Category IV for banks with between $100 billion and $250 billion assets — where New York Community Bancorp now sits. Firms below that level are deemed uncategorized.

Each level imposes new combinations of capital requirements, liquidity rules, stress testing and other must-dos. That can make it challenging for banks to jump from one bucket up to the next.

221.    That same day, *Reuters* also published an article entitled "New York Community Bancorp shares decline after Fitch downgrade, Citi PT cut." The *Reuters* article stated the following:[9]

Feb 5 (Reuters) - Shares of New York Community Bancorp (NYCB.N), dropped nearly 10.6% on Monday, resuming their descent after a one-day reprieve following a downgrade by ratings agency Fitch and a price target cut by brokerage Citigroup.

The bank's shares had plunged nearly 45% in two days after reporting a surprise fourth-quarter loss due to higher provisions tied to its commercial real estate (CRE) portfolio.

They pared losses on Friday before Fitch downgraded the bank's credit rating. Citi later lowered the target price on its shares to $7 from $11.

The trading in NYCB's stock reflects increased levels of uncertainty, Citi analysts wrote in a note. "We don't see a lot in near-term to change perception and see better risk-reward elsewhere."

New York Community Bank on Monday confirmed its chief risk officer Nick Munson had left the company after the Financial Times had earlier reported Munson's departure weeks ahead of the company's fourth-quarter result.

---

[9]    *New York Community Bancorp shares decline after Fitch downgrade, Citi PT cut*, Reuters (Feb. 5, 2024), https://www.reuters.com/markets/us/new-york-community-bancorp-pay-dividend-1594-certain-preferred-stock-2024-02-05/ (last accessed Apr. 9, 2024).

"We can confirm that Nick Munson left the company in early 2024," the bank said in an email.

NYCB's results shone a spotlight on the banking industry's exposure to the troubled CRE sector, where borrowers are under pressure due to higher interest rates and lower occupancies due to remote work.

*\*\**

But analysts have said the issues at NYCB were specific to its balance sheet and were not reflective of other banks.

Investors should be "playing offense" with other U.S. banking stocks as the recent turmoil has created "attractive entry points," Citi said.

Separately, NYCB kept the quarterly dividend for its preferred stock unchanged on Monday, days after it slashed the payout for its common shares by 70%.
The bank said it would pay a dividend of $15.94 per preferred share. Preferred shareholders are typically entitled to more favorable terms of dividend compared to common shareholders.

NYCB has said it is building capital to deal with stricter regulatory requirements after the purchase of Signature Bank last year pushed its assets above a $100 billion threshold.

222. Following the publication of the *Bloomberg* and *Reuters* articles, the Company's

share price fell once again from $5.40 on February 5, 2024, a $4.20 per share on February 6, 2024,

amounting to a further decline of 22% in the Company's share price.

223. On February 6, 2024, Moody's cut NYCB's corporate debt ratings to junk citing

"high governance risks[,]" reporting that this ***rating action reflects multi-faceted financial, risk-***

***management and governance challenges facing NYCB***." Moody's further noted that "NYCB

faces high governance risks from its transition with regards to the leadership of its second and third

lines of defense, the risk and audit functions of the bank, at a pivotal time."

224. On February 7, 2024, Defendant DiNello hosted a special analyst call with investors

and analysts during which he acknowledged NYCB was "dealing with a very serious situation

since [the Company's] fourth quarter earnings release." During the call, Defendant DiNello told

analysts that moving forward, NYCB would "build[] a solid capital base" and "enhance the processes that are needed to properly identify the inherent losses in the book going forward[,]" while being "laser-focused on reducing [the Company's] CRE concentration" as quickly as possible.

225.    During the February 7, 2024 call, Defendant DiNello was asked whether "management's hand was forced by regulators to take actions that in normal course you may not have taken." In response, Defendant DiNello stated: "Let me put that to bed right here, okay? ***What we did was what we needed to do, all right? We did the proper review of our loan portfolio. We made some changes in the way we risk weighted our loan portfolio and came to the conclusion that we needed to take action, and we did***. . . . So this speculation of why and when and who, look, we did the right thing, and we're going to go forward now."

226.    In response to an analyst's question of whether NYCB would need to increase loan loss ACL provisions and reserves in 2024, Defendant DiNello stated: "I don't have any idea of what that need might be because the only thing I can tell you is that at 12/31, we were in the right place."

227.    Also during the February 7, 2024 call, one investor asked Defendant DiNello for his "assessment of the risk management infrastructure at the company today and relative to where you need to be as a Category IV bank." Defendant DiNello responded:

> Well, of course, as you grow as an organization, you have to continue to strengthen your risk and compliance framework. It's a hallmark of mine. You may not know this, but I started my career as a bank examiner. So I have a high respect for not only the regulatory process, but the way the world thinks about the importance of risk compliance and having the right infrastructure. Because if you don't have that, if you're not in a position to properly identify the risk that you're exposed to, then you're not going to be ready for them if they come to pass.
>
> And so we're probably never going to be totally satisfied with it. But -- and look, we're in a position here where we've got -- I think we can announce a very strong new CRO in the very near future. We're getting that wrapped up. And that person

will come in and assess it better than probably I can right now and make sure that we are -- if we need to improve it or how we need to improve it, that we do it. And we are absolutely committed to that.

228.    When asked about NYCB's high CRE concentration levels in comparison to its peers and whether the Company could operate a $100 billion institution with such heavy concentration, Defendant DiNello responded that "we're an outlier there" but noted that the Company planned to reduce concentration moving forward.

229.    On February 23, 2024, Defendant Cangemi informed the Company that he would be resigning as President and CEO, effective immediately. Then, on February 25, 2024, the Company appointed Defendant DiNello "to the offices of President and Chief Executive Officer of the Company and the Bank, which appointment became effective on February 29, 2024." The Company announced these changes via Form 8-K filed with the SEC on February 29, 2024.

230.    In that same Form 8-K filed with the SEC, the Company announced that Defendant Dahya was resigning from the Board, effective February 25, 2024, and attached Defendant Dahya's resignation letter as Exhibit 99.1. Defendant Dahya's resignation letter stated: "At the time of my resignation I did not support the proposed appointment of Mr. DiNello as President and CEO of the Company."

231.    Then, in a February 29, 2024 Form 12b-25 filing with the SEC, signed by Defendant Pinto, the Company announced that it would be unable to timely file its Annual Report because it discovered adjustments that must be made to its financial reports prior to completing the Annual Report. The Company further stated:

> Separately, as part of management's assessment of the Company's internal controls, management identified material weaknesses in the Company's internal controls related to internal loan review, resulting from ineffective oversight, risk assessment and monitoring activities. Although assessment of the Company's internal controls is not yet complete, the Company expects to disclose in the 2023 Form 10-K that its disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2023. The Company's

remediation plan with respect to such material weaknesses is expected to be described in the 2023 Form 10-K.

232.    Then, on March 1, 2024, Fitch Ratings downgraded the Company, stating that "The Rating Outlook is Negative."[10]

233.    Following these series of events, the Company's share price took a further hit and fell from $4.79 per share on February 29, 2024 to a close of $2.73 per share on March 4, 2024 – the lowest that the Company's share price had been since 1996.[11]

234.    Then, on March 7, 2024, the Company filed a Current Report on Form 8-K with the SEC. The Current Report announced that NYCB entered into "investment agreements with affiliates of funds managed by Liberty 77 Capital, L.P. and certain other investors […] for an aggregate investment amount of $1.05 billion." Attached to the Current Report as Exhibit 99.2 was a press release announcing that "Mr. [Joseph] Otting will become Chief Executive Officer and Mr. DiNello will be named as a Non-Executive Chairman." The press release further stated that "As part of the reconstitution, the Board will be reduced to nine members and will include Secretary Mnuchin, Mr. Otting, Mr. Puwalski, Mr. Berlinski, Mr. DiNello, Marshall Lux, Peter Schoels, Jennifer Whip and David Treadwell."

235.    In another press release attached to the March 7, 2024 Form 8-K, former Treasury Secretary Mnuchin, who participated in the cash infusion, stated, "In evaluating our investment, we were mindful of the Bank's credit risk profile. With the over $1 billion of capital invested in

---

[10]     *Fitch Downgrades New York Community Bancorp; Outlook Negative*, Fitch Ratings (Mar. 1, 2024), https://www.fitchratings.com/research/banks/fitch-downgrades-new-york-community-bancorp-outlook-negative-01-03-2024 (last accessed Apr. 9, 2024).

[11]     *See* Elisabeth Buchwald, *NYCB stock tumbles to lowest level since 1996*, CNN Business (Mar. 4, 2024), https://edition.cnn.com/2024/03/04/business/nycb-stock-price/index.html (last accessed Apr. 9, 2024).

the Bank, we believe we now have sufficient capital should reserves need to be increased in the future to be consistent with or above the coverage ratio of NYCB's large bank peers."

236.    The announcement helped quell consumer fears that had driven a deposit outflow of approximately $6 billion from NYCB in the preceding month. As Defendant DiNello confirmed on a conference call on March 7, 2024, "there certainly were some people that lined up to withdraw," but "[o]nce the press release was out, it was back to normal."

237.    On March 14, 2024, the Company filed another Current Report on Form 8-K with the SEC. In the Current Report, the Company announced that "In connection with the completion of the Investment, Thomas Cangemi, James Carpenter, Leslie Dunn, Lawrence Rosano Jr, Ronald Rosenfeld and Robert Wann (the "Resigning Directors") resigned as members of the NYCB Board, effective as of March 11, 2024."

238.    Then, on March 20, 2024, the Company filed another Current Report on Form 8-K with the SEC which announced, *inter alia*, the resignations of Defendants Savarese and Treadwell from the Board.

239.    On March 28, 2024, *Reuters* published an article entitled "US banks face loss risk from multi-family property loan exposure, says Fitch."[12] In the article, it was noted that "Fitch Ratings analysts highlighted the risks facing banks which have underwritten loans behind apartment complexes and other multifamily properties." The article went onto state:

> But supply has begun to outstrip demand, creating downward pressure on the rents landlords can charge, Fitch noted during Wednesday's call. These landlords also face rising interest rates and insurance premiums, coupled with decreasing apartment values.

---

[12]    Matt Tracy, *US banks face loss risk from multi-family property loan exposure, says Fitch*, Reuters (Mar. 28, 2024), https://www.reuters.com/business/finance/us-banks-face-loss-risk-multi-family-property-loan-exposure-says-fitch-2024-03-27/ (last accessed Apr. 9, 2024).

These factors have weighed on several regional banks with high exposure to the asset class, and in particular those most exposed to rent-controlled multifamily loans, where landlords face a ceiling on rent increases to offset rising costs.

"Especially in the more stringent rent-controlled areas, there is a limited ability to make up that difference," said Brian Thies, senior director at Fitch, on Wednesday's call.

"So I would say it can be a concern for loan performance at this point."

This was seen in late February, when regional bank New York Community Bancorp [] posted $2.7 billion in losses and a $552 million provision for credit losses in its fourth quarter, including on a New York-based rent-controlled multifamily loan.

Fitch highlighted 10 banks with the greatest multifamily loan exposure as of year-end 2023. Flagstar Bank [], which merged with New York Community Bancorp in 2022, topped the list with 43.6% of its loan portfolio in multifamily.

240.     On April 12, 2024, NYCB issued a press release announcing the appointment of three new executives who replaced, effective immediately, Defendant Pinto, Defendant Adams and the General Counsel, Patrick Quinn.

241.     On June 5, 2024, during a call with NYCB investors at the Company's Annual General Meeting, Defendant Otting admitted that the departures of "most of the executive management" (including Cangemi, Pinto, Adams, Quinn) and the "majority of the board" were part of an effort "of holding people accountable" "for material weaknesses and other items associated with the company."

## DAMAGES TO THE COMPANY

### Securities Class Action

242.     On February 6, 2024, the Securities Class Action complaint was filed in the United States District Court for the Eastern District of New York against the Company and the Officer Defendants, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5.

243. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

244. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

245. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

246. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

247. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

248.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

249.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

**The Company's Share Repurchase Damages**

250.    The Individual Defendants caused the Company to repurchase substantial amounts of its own common stock at artificially inflated prices, causing significant harm to the Company.

251.    The Individual Defendants, in the knowledge that the Company's share price was artificially inflated, caused the Company to repurchase approximately 1,288,763 shares of its own stock for a total amount in excess of $12.67 million.  As detailed herein, because the Company's share price was in fact worth considerably less than the Company paid, the Individual Defendants caused the Company to overspend by ***over $9.16 million***, as follows:

| Repurchase Period[13] | Number of Shares | Average Price per Share ($) | Total Paid ($) | Amount Overpaid By ($)[14] |
|---|---|---|---|---|
| March 2023 | 146,448 | 7.57 | 1,108,611.36 | 708,808.32 |
| April 2023 | 26,330 | 8.93 | 235,126.90 | 163,246 |
| May 2023 | 111,992 | 10.49 | 1,174,796.08 | 869,057.92 |
| June 2023 | 51,885 | 10.81 | 560,876.85 | 419,230.80 |
| July 2023 | 10,323 | 12.11 | 125,011.53 | 96,829.74 |
| August 2023 | 12,555 | 13.53 | 169,869.15 | 135,594 |
| September 2023 | 11,078 | 11.69 | 129,501.82 | 99,258.88 |
| October 2023 | 1,525 | 10.29 | 15,692.25 | 11,529.00 |

---

[13]    The Repurchase Period covers each and every day within the stated month. *E.g.*, "March 2023" covers from March 1 through March 31.

[14]    As the Company's common stock was actually worth $2.73, the price on March 4, 2024 when the truth was revealed, the Individual Defendants caused the Company to overpay for its own common stock by this amount.

| Repurchase Period[13] | Number of Shares | Average Price per Share ($) | Total Paid ($) | Amount Overpaid By ($)[14] |
|---|---|---|---|---|
| November 2023 | 4,897 | 9.34 | 45,737.98 | 32,369.17 |
| December 2023 | 50,526 | 9.92 | 501,217.92 | 363,281.94 |
| January 2024 | 861,204 | 10.00 | 8,612,040.00 | 6,260,953.08 |
| **TOTAL** | **1,288,763** | **-** | **12,678,481.84** | **9,160,158.85** |

## CORPORATE GOVERNANCE

252.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

253.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

254.     At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") "which specifically applies to Directors, and the CEO, the CFO, together with all other senior financial officers of the Company designated by the CEO."

255.     In a section entitled "Director and Senior Financial Officer Responsibilities," the Code of Conduct states, in relevant part:

Directors and Senior Financial Officers shall:

[] engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

[] produce full, fair, accurate, timely, and understandable disclosures in the reports that the Company periodically files with, or submits to, the United States Securities and Exchange Commission and in other public communications made by the Company;

[] comply with all applicable governmental laws, rules, and regulations, as well as the rules adopted by any exchange upon which Company-issued securities are listed;

[] promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, or any fraud, whether or not material, that involves management or other employees who have a significant role in financial reporting, disclosures, or internal controls; and

[] promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and to the operation of its business, or a material violation of this Code, by the Company or any agent thereof.

256.    In a section entitled "Enforcement," the Code of Conduct provides that:

Violations of this Code by Directors or Senior Financial Officers are matters of the utmost concern. A Senior Financial Officer who compromises or violates the law or policies and procedures contained in this Code may be subject to disciplinary actions, up to and including termination of employment for cause. A Director who compromises or violates the law or policies and procedures contained in this Code may be subject to disciplinary action upon the review and determination of the Board, up to and including removal from the Board. Directors and Senior Financial Officers may also be subject to civil and/or criminal prosecution.

**Code of Professional Conduct**

257.    Further, the Company also had in place its "Code of Professional Conduct to establish and promote the highest standards of integrity, accountability, and ethics in the conduct of business among Company personnel and with the Company's customers, its vendors, and the banking industry."

258.    The Code of Professional Conduct provides, in relevant part, that "each member of the Board of Directors2 (each, a "Director") and each Employee of the Company (together with

the Directors, collectively, "Company Personnel") shall abide by this Code and the following principles of professional conduct – to wit, each shall:

> [] Faithfully advance the legitimate business interests of the Company while fully complying with all applicable laws, regulations, and Company policies […];
>
> [] Avoid apparent and actual conflicts of interest, as well as breaches of fiduciary duties […];
>
> [] Cooperate with the Company's auditors, examiners, regulators, other authorized governmental agencies (e.g., IRS, GSEs) and attorneys, and be completely candid with them.

259. In a section entitled "Obligation to Report to Company Officials," the Code of Professional Conduct states:

> Company Personnel that witness any act(s) and/or omission(s) by other Company Personnel that such witnessing Company Personnel reasonably believes to be in violation of this Code (each such act or omission ultimately determined to be in violation of this Code, a "Code violation") shall be responsible for reporting such act(s) and/or omission(s) to the GC, Human Resources, a departmental manager, or the Flagstar Ethics Hotline (for information about how to submit a confidential report via the Flagstar Ethics Hotline, please see section III.B, below)

260. In a section entitled "Compliance with Laws, Rules, and Regulations," the Code of Professional Conduct provides, in relevant part:

> Obeying the law, both in letter and in spirit, is one of the foundations on which the Company's policies, including this Code, are built. All Company Personnel must respect and obey all applicable laws, rules, and regulations (including, without limitation, insider trading laws). Although not all Company Personnel are expected to know the details of such laws, rules, and regulations, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate personal, such as an officer within Human Resources or Legal.

**Audit Committee Charter**

261. At all relevant times, the Company had in place its Audit Committee Charter which sets forth the specific duties and responsibilities of the Audit Committee – comprised of Defendants Dahya, Dunn, Lux, Savarese, and Whip. The Audit Committee Charter provides that

the purpose of the Audit Committee is to "assist the Boards in fulfilling their respective oversight responsibilities, including with respect to review and, as applicable, approval of (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; (3) the qualifications, performance and independence of the Company's Independent Registered Public Accounting Firm (the "Independent Auditor"); (4) the performance of the Company's internal audit function (the "Internal Audit Function"); (5) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time; and (6) to provide the annual report of the Committee to be included in the Company's annual proxy statement."

262.    The Audit Committee Charter further sets forth these additional duties and responsibilities:

> [] Oversee the preparation of an annual report by the Audit Committee which must be included in the Holding Company's annual proxy statement.
>
> [] Meet with management of the Company and the Independent Auditor to review and discuss the Holding Company's annual audited financial statements and quarterly financial statements and such other related financial statements of the Bank or any of the Company's affiliates as the Committees in its discretion shall deem necessary or appropriate;
>
> [] With regard to the Company's financial statements and disclosures, review: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;
>
> [] Discuss the Company's policies with respect to risk assessment and risk management to ensure that the CEO and senior management of the Company assess and manage the Company's exposure to risk;

[] Discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

[] Perform, or engage others to undertake such discussion, meetings, actions, monitoring, investigations, or other procedures as the Committees deem necessary or appropriate.

## Risk Committee Charter

263.    At all relevant times, the Company had in place its Risk Assessment Committee Charter which sets forth the specific duties and responsibilities of the Risk Assessment Committee – comprised of Defendants Carpenter, Lux, Rosano, Rosenfeld, Treadwell, Wann, and Whip. The Risk Assessment Committee Charter states that its purpose "is to assist the Board in fulfilling its responsibilities with respect to oversight of the Corporation's risk management and compliance frameworks, including as it relates to (1) the risk appetite of the Corporation; (2) the enterprise compliance program; (3) regulatory compliance and supervisory expectations; and (4) the policies and procedures used to identify, measure, monitor and manage various risks, including the Corporation's strategic, credit and investment, market, operational, compliance, liquidity and reputational risks."

264.    The Risk Assessment Committee Charter sets forth these additional duties and responsibilities, in relevant part:

[] Review and approve the Corporation's risk framework, risk appetite and policies, including:

[] Reviewing the Corporation's actual risk profile against the Board approved risk appetite which includes information on the categories of risk the Corporation faces (e.g., credit, liquidity, interest rate, price, strategic, compliance, operational, and reputation risk); review exceptions, if any, to risk limits and key risk indicators ("KRIs") that can serve as signals of changing risk; and review management proposed updates and/or revisions to Board-level KRIs and recommend appropriate action to the Board for its consideration and approval.

[] Reviewing and evaluating proposed updates to the Corporation's Risk Appetite Policy and supporting documentation in order to make recommendations to the Board that considers how much risk the Corporation or applicable NYCB Entity is prepared to take in order to pursue its Strategic Plan objectives, what kinds of risks are most relevant on an enterprise-wide basis, and how it should define its risk appetite tolerances.

[] Review and evaluate supporting information, documentation and rationale for any Risk Profiles that are not aligned with their corresponding Risk Appetites, along with monitoring timelines for bringing them into alignment. The Committee shall be promptly notified if any Risk Profiles exceed their corresponding Risk Appetite.

[] Oversee risk concentrations across the Corporation including, without limitation, commercial real estate and liquidity, and review of reports that indicate whether concentrations are within the accepted tolerances as described within the Risk Appetite Policy.

[] Oversee senior management's responsibilities related to oversight of the Corporation's credit portfolio, including management's responses to trends in credit risk, credit concentration and asset quality, and review and assess on a quarterly basis management's process for establishing the Corporation's allowance for credit losses.

[] Consult with other committees of the Board on risk-related matters, in such manner as the Committee or its chair deems appropriate. The chairperson of the Committee shall discuss with the chairperson of the Audit Committee the Committee's review of the Corporation's allowance for credit losses on a quarterly basis.

[] Oversee the Corporation's Enterprise Risk Management ("ERM") Framework and Enterprise Compliance Risk Management Framework, including overseeing the CRO and ECCO's design and implementation of the ERM framework.

[] Carry out other duties or responsibilities expressly delegated to the Committee by the Board from time to time.

## DUTIES OF THE DIRECTOR DEFENDANTS

265.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

266.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

267.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

268.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

269.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and

disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

270.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Director

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

271.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

272.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

273.    Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

274.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

275.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and

useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

276.    "In general, the relevant Board of Directors for the purposes of demand futility is the one in place at the time of the filing of the operative complaint. […] But, Plaintiff may plead demand futility as to an earlier iteration of the […] Board of Directors (*i.e.*, the one in place when the Original Complaint was filed) if the derivative claims in the Amended Complaint already were "validly in litigation" before the Amended Complaint was filed." *Barenbaum v. Palleschi*, 1:1-cv-05913 (MKV), 2020 U.S. Dist. LEXIS 180624, at *23-24 (S.D.N.Y. Sep. 30, 2020) (citing *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006)). Plaintiff contends that the three-part test set out in *Barenbaum* (*Id.* at *24) is satisfied and that the claims herein are validly in litigation, thus demand futility need only be pled as to the Board on February 15, 2024, the date Plaintiff filed the original complaint.

277.    At the time this suit was initially filed, the Board was comprised of thirteen (13) members – the Director Defendants, along with Defendant Cangemi (collectively in this section, the "Director Defendants"). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.,* seven (7), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

278.    According to the Company's 2023 Proxy Statement, "[t]he Board has determined that 10 of our 14 directors are "independent" within the meaning of the rules of the New York Stock Exchange." The Board determined that Defendants Cangemi, DiNello, Carpenter, and Wann are not independent and, thus, demand is futile as to each of them.

279.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions

concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

280.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

281.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Amended Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

282.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

283.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

284.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**THE DIRECTOR DEFENDANTS**
**ARE NOT INDEPENDENT OR DISINTERESTED**

**Defendant Cangemi**

285.     Defendant Cangemi is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its then-President and CEO) was an employee of the Company who derived substantially all of his income from his employment with NYCB, making him not independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Cangemi cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would have exposed him to liability and threatened his livelihood.

286.     As CEO, Defendant Cangemi also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Cangemi could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Cangemi is therefore futile.

287.     In addition, Defendant Cangemi receives lucrative compensation in connection with his employment with the Company. Defendant Cangemi is not independent from Defendants Dahya, Dunn, Rosano, Savarese, and Whip as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Cangemi. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant

substantial compensation he receives, Defendant Cangemi could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

288. Defendant Cangemi has served as a Company director. As a director, Defendant Cangemi was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Cangemi failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

289. Defendant Cangemi, as a trusted senior officer of the Company, conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

290. Because of Defendant Cangemi's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Cangemi is unable to comply with his fiduciary duties and prosecute this action. Defendant Cangemi is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

291. In addition, Defendant Cangemi signed and thus personally made the false and misleading statements in the 2022 10-K, 1Q23 10-Q, 2Q23 10-Q, and 3Q23 10-Q and faces a substantial likelihood of liability therefor.

292.    Defendant Cangemi also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Cangemi secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, and (iii) executive compensation which Defendant Cangemi would materially benefit from. Accordingly, Defendant Cangemi faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

293.    Defendant Cangemi further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Cangemi not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Cangemi cannot, therefore, independently and objectively consider a demand to prosecute this action.

294.    Defendant Cangemi is neither independent nor disinterested. Any demand upon Defendant Cangemi is futile and, thus, excused.

**<u>Defendant DiNello</u>**

295.    According to the Company's 2023 Proxy Statement, Defendant DiNello is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

296.    Defendant DiNello has served as a Company director at all relevant times hereto. As a director, Defendant DiNello was required to, among other things: (i) ensure that the Company

complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant DiNello failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

297. As a trusted Company director, and Chairman of the Board, Defendant DiNello conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

298. Additionally, in connection with his role as a Company director, Defendant DiNello receives substantial income. Accordingly, Defendant DiNello cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

299. In addition, Defendant DiNello signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

300. Moreover, Defendant DiNello previously served as President, CEO, and a director of Flagstar, and held other senior roles within Flagstar prior to that. Meanwhile, Defendant Whip also served as a director of Flagstar. Thus, Defendants DiNello and Whip each have a longstanding business relationship with one another and cannot reasonably consider a demand to sue each other.

301. Further, Defendant DiNello, as former President and CEO of Flagstar, also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such,

Defendant DiNello could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant DiNello is therefore futile.

302.     Defendant DiNello also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant DiNello secured (i) the re-election of himself along with Defendants Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan which Defendant DiNello would materially benefit from. Accordingly, Defendant DiNello faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

303.     Defendant DiNello further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant DiNello not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant DiNello cannot, therefore, independently and objectively consider a demand to prosecute this action.

304.     Defendant DiNello is neither independent nor disinterested. Any demand upon Defendant DiNello is futile and, thus, excused.

**Defendant Carpenter**

305.     According to the Company's 2023 Proxy Statement, Defendant Carpenter is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

306. Defendant Carpenter has served as a Company director at all relevant times hereto. As a director, Defendant Carpenter was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Carpenter failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

307. As a trusted Company director, Defendant Carpenter conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

308. Additionally, in connection with his role as a Company director, Defendant Carpenter receives substantial income. Accordingly, Defendant Carpenter cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

309. In addition, Defendant Carpenter signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

310. Defendant Carpenter also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Carpenter secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment

to the Company's 2020 Omnibus Incentive Plan which Defendant Carpenter would materially benefit from. Accordingly, Defendant Carpenter faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

311. Defendant Carpenter further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Carpenter not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Carpenter cannot, therefore, independently and objectively consider a demand to prosecute this action.

312. Defendant Carpenter is neither independent nor disinterested. Any demand upon Defendant Carpenter is futile and, thus, excused.

**Defendant Dahya**

313. Defendant Dahya has served as a Company director at all relevant times hereto. As a director, Defendant Dahya was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Dahya failed to fulfil

these duties by permitting the false and misleading statements to be made and not correcting those statements.

314. As a trusted Company director, Defendant Dahya conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

315. Defendant Dahya also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dahya is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Dahya failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Dahya faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

316. Additionally, in connection with his role as a Company director, Defendant Dahya receives substantial income. Accordingly, Defendant Dahya cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

317. In addition, Defendant Dahya signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

318. Defendant Dahya also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Dahya secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to

continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Dahya would materially benefit from. Accordingly, Defendant Dahya faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

319. Defendant Dahya further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Dahya not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Dahya cannot, therefore, independently and objectively consider a demand to prosecute this action.

320. Defendant Dahya is neither independent nor disinterested. Any demand upon Defendant Dahya is futile and, thus, excused.

**Defendant Dunn**

321. Defendant Dunn has served as a Company director at all relevant times hereto. As a director, Defendant Dunn was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Dunn failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

322. As a trusted Company director, Defendant Dunn conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

323. Defendant Dunn also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dunn is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Dunn failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Dunn faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

324. Additionally, in connection with her role as a Company director, Defendant Dunn receives substantial income. Accordingly, Defendant Dunn cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

325. In addition, Defendant Dunn signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

326. Defendant Dunn also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Dunn secured (i) the re-election of herself along with Defendants DiNello, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Dunn would

materially benefit from. Accordingly, Defendant Dunn faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

327. Defendant Dunn further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Dunn not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Dunn cannot, therefore, independently and objectively consider a demand to prosecute this action.

328. Defendant Dunn is neither independent nor disinterested. Any demand upon Defendant Dunn is futile and, thus, excused.

**<u>Defendant Lux</u>**

329. Defendant Lux has served as a Company director at all relevant times hereto. As a director, Defendant Lux was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Lux failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

330. As a trusted Company director, Defendant Lux conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

331. Defendant Lux also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Lux is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Lux failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Lux faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

332. Additionally, in connection with his role as a Company director, Defendant Lux receives substantial income. Accordingly, Defendant Lux cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

333. In addition, Defendant Lux signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

334. Defendant Lux also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Lux secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan which Defendant Lux would materially benefit from.

Accordingly, Defendant Lux faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

335. Defendant Lux is neither independent nor disinterested. Any demand upon Defendant Lux is futile and, thus, excused.

**Defendant Rosano**

336. Defendant Rosano has served as a Company director at all relevant times hereto. As a director, Defendant Rosano was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Rosano failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

337. As a trusted Company director, Defendant Rosano conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

338. Additionally, in connection with his role as a Company director, Defendant Rosano receives substantial income. Accordingly, Defendant Rosano cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

339.     In addition, Defendant Rosano signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

340.     Defendant Rosano also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Rosano secured (i) the re-election of himself along with Defendants DiNello, Dunn, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Rosano would materially benefit from. Accordingly, Defendant Rosano faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

341.     Defendant Rosano further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Rosano not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Rosano cannot, therefore, independently and objectively consider a demand to prosecute this action.

342.     Defendant Rosano is neither independent nor disinterested. Any demand upon Defendant Rosano is futile and, thus, excused.

**Defendant Rosenfeld**

343.     Defendant Rosenfeld has served as a Company director at all relevant times hereto. As a director, Defendant Rosenfeld was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and

accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Rosenfeld failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

344.    As a trusted Company director, Defendant Rosenfeld conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

345.    Additionally, in connection with his role as a Company director, Defendant Rosenfeld receives substantial income. Accordingly, Defendant Rosenfeld cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

346.    In addition, Defendant Rosenfeld signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

347.    Defendant Rosenfeld also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Rosenfeld secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Rosenfeld would materially benefit from. Accordingly, Defendant Rosenfeld faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and

is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

348.     Defendant Rosenfeld further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Rosenfeld not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Rosenfeld cannot, therefore, independently and objectively consider a demand to prosecute this action.

349.     Defendant Rosenfeld is neither independent nor disinterested. Any demand upon Defendant Rosenfeld is futile and, thus, excused.

**Defendant Savarese**

350.     Defendant Savarese has served as a Company director at all relevant times hereto. As a director, Defendant Savarese was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Savarese failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

351.     As a trusted Company director, Defendant Savarese conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

352. Defendant Savarese also serves as Chair of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Savarese is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Savarese failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Savarese faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

353. Additionally, in connection with his role as a Company director, Defendant Savarese receives substantial income. Accordingly, Defendant Savarese cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

354. In addition, Defendant Savarese signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

355. Defendant Savarese also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Savarese secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Savarese would materially benefit from. Accordingly, Defendant Savarese faces a substantial likelihood of liability for the damage

caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

356.    Defendant Savarese further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Savarese not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Savarese cannot, therefore, independently and objectively consider a demand to prosecute this action.

357.    Defendant Savarese, while serving as Chair of the Audit Committee, reappointed KPMG LLP as the Company's public accounting firm, according to the Company's 2023 Proxy Statement. Notably, Defendant Savarese spent many years of his career at KPMG LLP. Indeed, for 19 years, Defendant Savarese was an Audit Partner in KPMG's Financial Services Practice, serving as partner in charge of audits of both Banks (including the Company and the Bank) and international banks with branches and agencies in the United States. During this time, Defendant Savarese served as KPMG's representative to the New York Bankers Association and The Institute of International Bankers. From 2008 to 2012, Defendant Savarese served as Audit Partner, Risk Management, for KPMG's Advisory Practice, where he managed risk at KPMG and developed and applied complex risk management objectives; risk management policies for model development; advisory service protocols in connection with certain requirements of the Public Company Accounting Oversight Board; policies for internal controls over financial reporting services provided to non-audit clients; and reviewed engagement letters and management risk performance. Defendant Savarese's selection of KPMG was clearly not the product of informed

and independent judgment, thus demonstrating Defendant Savarese's inability to exercise such independent and objective decision-making. Thus, demand is excused as to Defendant Savarese.

358. Defendant Savarese is neither independent nor disinterested. Any demand upon Defendant Savarese is futile and, thus, excused.

**Defendant Schoels**

359. Defendant Schoels has served as a Company director at all relevant times hereto. As a director, Defendant Schoels was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Schoels failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

360. As a trusted Company director, Defendant Schoels conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

361. Additionally, in connection with his role as a Company director, Defendant Schoels receives substantial income. Accordingly, Defendant Schoels cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

362. In addition, Defendant Schoels signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

363. Defendant Schoels also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Schoels secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Schoels would materially benefit from. Accordingly, Defendant Schoels faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

364. Defendant Schoels further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Schoels not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Schoels cannot, therefore, independently and objectively consider a demand to prosecute this action

365. Defendant Schoels is neither independent nor disinterested. Any demand upon Defendant Schoels is futile and, thus, excused.

**Defendant Treadwell**

366. Defendant Treadwell has served as a Company director at all relevant times hereto. As a director, Defendant Treadwell was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure

the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Treadwell failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

367. As a trusted Company director, Defendant Treadwell conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

368. Defendant Treadwell also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Treadwell is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Treadwell failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Treadwell faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

369. Additionally, in connection with his role as a Company director, Defendant Treadwell receives substantial income. Accordingly, Defendant Treadwell cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

370. In addition, Defendant Treadwell signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

371.    Defendant Treadwell also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Treadwell secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Treadwell would materially benefit from. Accordingly, Defendant Treadwell faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

372.    Defendant Treadwell further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Treadwell not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Treadwell cannot, therefore, independently and objectively consider a demand to prosecute this action.

373.    Defendant Treadwell is neither independent nor disinterested. Any demand upon Defendant Treadwell is futile and, thus, excused.

**Defendant Wann**

374.    According to the Company's 2023 Proxy Statement, Defendant Wann is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

375. Defendant Wann has served as a Company director at all relevant times hereto. As a director, Defendant Wann was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Wann failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

376. As a trusted Company director, Defendant Wann conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

377. Additionally, in connection with his role as a Company director, Defendant Wann receives substantial income. Accordingly, Defendant Wann cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

378. In addition, Defendant Wann signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

379. Defendant Wann also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Wann secured (i) the re-election of himself along with Defendants DiNello, Dunn, and Rosano to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Wann would

materially benefit from. Accordingly, Defendant Wann faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

380. Defendant Wann further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Wann not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Wann cannot, therefore, independently and objectively consider a demand to prosecute this action.

381. Defendant Wann is neither independent nor disinterested. Any demand upon Defendant Wann is futile and, thus, excused.

**Defendant Whip**

382. Defendant Whip has served as a Company director at all relevant times hereto. As a director, Defendant Whip was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Whip failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

383.    As a trusted Company director, Defendant Whip conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

384.    Defendant Whip also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Whip is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Whip failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Whip faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

385.    Additionally, in connection with her role as a Company director, Defendant Whip receives substantial income. Accordingly, Defendant Whip cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

386.    In addition, Defendant Whip signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

387.    Defendant Whip also solicited the 2023 Proxy Statement which contained the false and misleading information as alleged herein. As a result, Defendant Whip secured (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) an amendment to the Company's 2020 Omnibus Incentive Plan, which Defendant Whip would materially benefit

from. Accordingly, Defendant Whip faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

388. Defendant Whip further caused and/or permitted the Company to repurchase its own common stock at artificially inflated prices, resulting in damage to the Company in excess of $2.89 million. As such, Defendant Whip not only breached their duty to the Company, but also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and faces a substantial likelihood of liability therefor. Defendant Whip cannot, therefore, independently and objectively consider a demand to prosecute this action.

389. Moreover, Defendant Whip previously served as a director of Flagstar. Meanwhile, Defendant DiNello served as President, CEO, and a director of Flagstar. Thus, Defendant Whip has a longstanding professional relationship with Defendant DiNello and cannot reasonably and independently consider a demand to sue him.

390. Defendant Whip is neither independent nor disinterested. Any demand upon Defendant Whip is futile and, thus, excused.

**Additional Reasons Demand is Futile**

391. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

392. The Company, at all material times, had its Code of Conduct, Business Code, and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and

truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

393.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

394.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

395.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

396. Publicly traded companies, such as NYCB, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

397. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

### CLAIMS FOR RELIEF

### COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duties)

398. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

399. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

400. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

401. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by making or permitted false and misleading statements and/or failing to disclose that: (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

402. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

403. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against the Individual Defendants for Gross Mismanagement)

404.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

405.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

406.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

407.     Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

408.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

409.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

410.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

411.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

412.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

413.     By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

414.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

415.     Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V

### (Against the Director Defendants for Aiding and Abetting)

416.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

417.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

418.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

419.    As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

420.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

421.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VI

### (Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934)

422.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

423.    The Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.  Despite this artificial inflation in the price of the Company's shares, the

Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

424.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NYCB, their control over, and/or receipt and/or modification of NYCB's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning NYCB, participated in the fraudulent scheme alleged herein.

425.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

426.    The Individual Defendants were each members of NYCB's Board of Directors and senior management team during the aforesaid time period. Based on their roles at NYCB, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

427.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false

and misleading or contained material omissions. Given the nature and extent of the problems at NYCB, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

428.     Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

429.     As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

430.     As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

### COUNT IX

**(Against Defendant Cangemi and the Director Defendants
for Violations of Section 14(a) of the Securities Exchange Act of 1934)**

431.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

432.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

433.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

434.     Under the watch and direction of Defendant Cangemi and the Director Defendants (together, the "Proxy Defendants"), the 2023 Proxy Statement failed to disclose that (i) the Board did not effectively manage risk, which ultimately resulted in, among other things, the fourth quarter 2023 net loss of $252 million; (ii) the Board were not in fact "committed to maximizing long-term shareholder value"; (iii) the Board's corporate governance was insufficient; (iv) despite the existence of the Code of Conduct and related corporate governance, the Individual Defendants continuously engaged in wrongful and unlawful conduct; and (v) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to the Company.

435.    Furthermore, the 2023 Proxy Statement also failed to disclose that (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

436.    The Proxy Defendants also caused the 2023 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

437.    Moreover, the 2023 Proxy Statement was false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

438.    In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and

omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors.

439.     The misrepresentations and omissions set forth herein were material to shareholders in voting on the proposals in the 2023 Proxy Statement who would not have approved, *inter alia*: (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years; (ii) executive compensation; and (iii) the amendment to the Company's 2020 Omnibus Incentive Plan.

440.     As a result of the respective Proxy Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, and approved, *inter alia*: (i) the re-election of Defendants DiNello, Dunn, Rosano, and Wann to the Board for an additional three years; (ii) executive compensation; and (iii) the amendment to the Company's 2020 Omnibus Incentive Plan.

441.     The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Awarding, against the Director Defendants and in favor of the Company, damages sustained by the Company as a result of the Director Defendants' aiding and abetting of the Individual Defendants' breaches of fiduciary duty;

D.     Awarding, against the Officer Defendants and in favor of the Company, all contribution and indemnification under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

E.     Awarding, against the Individual Defendants and in favor of the Company, for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 as the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company;

F.     Awarding, against Defendant Cangemi and the Director Defendants and in favor of the Company, Defendant Cangemi and the Director Defendants violations of Section 14(a) of the Securities Exchange Act of 1934;

G.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

H.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  May 12, 2025

**RIGRODSKY LAW, P.A.**

By: _/s/ Timothy J. MacFall_
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: gms@rl-legal.com
Email: vl@rl-legal.com

*Attorneys for Plaintiff*